ACCEPTED
07-17-00112-CV
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
8/2/2017 2:36 PM
Vivian Long, Clerk

No. 07-17-00112-CV

IN THE COURT OF APPEALS
FOR THE SEVENTH DISTRICT OF TEXAS
AT AMARILLO

FILED IN
7th COURT OF APPEALS
AMARILLO, TEXAS
8/2/2017 2:36:27 PM
VIVIAN LONG
CLERK

GRANITE OPERATING COMPANY AND APACHE CORPORATION

*Appellants*,

v.

PEYTON ROYALTIES, L.P., BAILEY PEYTON, INDIVIDUALLY AND AS TRUSTEE OF
THE GEORGE BAILEY PEYTON, IV 2007 GRANTOR RETAINED ANNUITY
TRUST NO. 1, PEYTON HOLDINGS, PAC PRODUCTION COMPANY,
MESA OIL & GAS CORPORATION, AND CATTALO, LTD.

*Appellees*.

On Appeal from the 31st Judicial District Court
of Wheeler County, Texas

**BRIEF OF APPELLANTS
GRANITE OPERATING COMPANY AND APACHE CORPORATION**

John A. "Jad" Davis
State Bar No. 05511400
jadavis@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
400 West Illinois, Suite 1400
Midland, Texas 79701
Ph: (432) 687-0011
Fax: (432) 687-1735

Ryan Clinton
State Bar No. 24027934
rdclinton@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
600 Congress Ave., Suite 3100
Austin, Texas 78701
Ph: (512) 493-9600
Fax: (512) 693-9625

**Counsel for Appellants Granite Operating Company
and Apache Corporation**

Oral Argument Requested

# IDENTITY OF PARTIES

| **Parties** | **Trial and Appellate Counsel** |
|---|---|
| Defendants:  Granite Operating Company and Apache Corporation | Appellate Counsel:<br>Ryan Clinton<br>State Bar No. 24027934<br>rdclinton@dgclaw.com<br>DAVIS, GERALD & CREMER, P.C.<br>600 Congress Ave., Suite 3100<br>Austin, Texas 78701<br>Ph: (512) 493-9600<br>Fax: (512) 493-9625<br><br>John A. "Jad" Davis<br>State Bar No. 05511400<br>jadavis@dgclaw.com<br>DAVIS, GERALD & CREMER, P.C.<br>400 West Illinois, Suite 1400<br>Midland, Texas 79701<br>Ph: (432) 687-0011<br>Fax: (432) 687-1735<br><br>Trial Counsel:<br>John Ben Blanchard<br>State Bar No. 02446200<br>jblanchard@bf-law.com<br>Adam T. Blanchard<br>State Bar No. 24072816<br>ablanchard@bf-law.com<br>Brown & Fortunato, P.C.<br>905 S. Fillmore, Suite 400<br>Amarillo, TX 79101<br>Ph:  (806) 345-6300<br>Fax:  (806) 345-6363 |

| | |
|---|---|
| Plaintiffs: Tommy Yowell; Gail Yowell; Harry Graff; El Tercio, LLC; and Casuarina Investments, LLC (d/b/a LAR Resources, LLC) | Joe W. Hayes<br>State Bar No. 09277300<br>joe@tshhr.com<br>John Smithee<br>State Bar No. 18788600<br>john@tshhr.com<br>Templeton, Smithee, Hayes,<br> Heinrich & Russell, L.L.P.<br>320 S. Polk, Suite 1000<br>Amarillo, TX 79101<br>Ph: (806) 324-0324<br>Fax: (806) 379-8568 |
| Third-Party Defendants: Peyton Royalties, L.P.; Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1; and Peyton Holdings Corporation ("The Peyton Group") | Thomas C. Riney<br>State Bar No. 16935100<br>triney@rineymayfield.com<br>Joni Kleinschmidt<br>State Bar No. 24037249<br>jkleinschmidt@rineymayfield.com<br>Kerri L. Stampes<br>State Bar No. 24031270<br>kstampes@rineymayfield.com<br>Riney & Mayfield LLP<br>320 S. Polk Street, Suite 600<br>Amarillo, TX 79101<br>Ph: (806) 468-3200<br>Fax: (806) 376-4509 |

| Third-Party Defendants:  PAC Production Company; Mesa Oil & Gas Corporation; and Cattalo, Ltd. ("The PAC Group") | Thomas A. Zabel<br>State Bar No. 22235500<br>tzabel@zflawfirm.com<br>John Smither<br>State Bar No. 00789637<br>jsmither@zflawfirm.com<br>Nancy H. Elliott<br>State Bar No. 08701240<br>nelliott@zflawfirm.com<br>Zabel & Freeman<br>1135 Heights Blvd.<br>Houston, TX 77008<br>Ph: (713) 802-9117<br>Fax: (713) 802-9114<br><br>Formerly represented by:<br>Ronald D. Nickum<br>State Bar No. 15015000<br>rdn@nickumlaw.com<br>610 S.W. 11th Avenue<br>Amarillo, TX 79101<br>Ph:  (806) 371-8888<br>Fax:  (806) 374-9618 |
| --- | --- |

# TABLE OF CONTENTS

Identity of Parties.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xii

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

Issues Presented.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

Statement of Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    The 1986 Leases: Aikman Oil Company leases the minerals, then sells the leases while reserving an overriding royalty interest.. . . . . . . . . . . . . . 1

    The 2007 Leases & the First Lawsuit: Amarillo Production Company buys top leases of the minerals and sues Upland... . . . . . . . . . . . . . . . . . . . 2

    The Upland Sale & the Indemnification Agreement: Cordillera purchases Upland from the Peyton Group, which indemnifies Cordillera and Upland against "any adverse consequence arising from or in connection with" APC's lease-termination claims.. . . . . . . . . . . . . . . . . . . 2

    The First Lawsuit's Settlement: Bailey Peyton settles the APC lawsuit on behalf of Upland—reserving overriding royalty interests in the top leases.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Current Lawsuit: The 1986 leases' overriding-royalty-interest owners sued Granite, and the Peyton Group declined to honor the indemnification agreement... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Judgment: The trial court rejected Plaintiffs' claims against Granite and Apache and also Granite and Apache's claims against the Peyton Group and the PAC Group... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Summary of the Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

I.   The Trial Court Erred by Rendering Judgment That Granite &
     Apache Take Nothing on Their Breach-of-Indemnification-
     Agreement Claim Against the Peyton Group.. . . . . . . . . . . . . . . . . 8

     A.   The Peyton Group Unambiguously Promised to Indemnify
          Upland and Cordillera for "Any Adverse
          Consequence"—Including Future Lawsuits and Defense
          Costs—"Arising From or in Connection with" APC's
          Lease-Termination Claims.. . . . . . . . . . . . . . . . . . . . . . . . 10

     B.   Continuing To Be Concerned About the Risks of APC's
          Lease-Termination Claims, Upland Settles the APC
          Suit—But Only With an Agreement That All Existing
          Overriding Royalty Interests in the Top Leases Be
          Adjusted if the Aikman Leases' Overriding-Royalty-
          Interest Owners Ever Bring a Successful Claim Against
          Upland.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     C.   Precisely as the Parties Predicted, the 1986 Leases'
          Overriding-Royalty-Interest Owners Sued Upland... . . . . . . . 14

     D.   Under the Plain Meaning of the Upland Sales Contract and
          Undisputed Facts, Plaintiffs' Lawsuit Triggered the Peyton
          Group's Obligation to Indemnify Granite and Apache... . . . . 15

          1.   The text of the sales agreement answers the
               question: as partial consideration for being paid
               $73,170,000.00, the Peyton Group agreed to
               indemnify Upland and Cordillera up to
               $5,400,000.00 for "any adverse consequence arising
               from or in connection with" APC's lease-
               termination claims.. . . . . . . . . . . . . . . . . . . . . . . . . 16

          2.   The Peyton Group's arguments for evading its
               contractual indemnification obligation are without
               merit... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

vi

II.  The Trial Court Also Erred by Ordering Granite & Apache to Pay the Peyton Group $220,396.00 in Trial and Appellate Attorneys' Fees.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    A.  The Peyton Group Is Not Entitled to Recover Attorneys' Fees on Granite and Apache's Breach-of-Indemnification-Agreement Claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        1.  Because the trial court's take-nothing judgment as to Granite and Apache's breach-of-indemnification-agreement claim is in error, so too is its judgment awarding the Peyton Group attorneys' fees for defending against the claim.. . . . . . . . . . . . . . . . . . . . 26

        2.  At minimum, the Peyton Group is not entitled to recover contingent appellate attorneys' fees because there is no evidence to support the $43,500 award. . . . 27

    B.  The Peyton Group Is Also Not Entitled to Recover Attorneys' Fees for Defending Against Granite and Apache's Unreached Alternative Claim for a Declaration of Proportionate Royalty Reduction.. . . . . . . . . . . . . . . . . . . 28

III. If This Court Reverses the Trial Court's Judgment That Plaintiffs Take Nothing on Their Claims Against Granite and Apache, Then The Court Should Also Reverse the Trial Court's Judgment That Granite and Apache Take Nothing on Their Proportionate-Royalty-Reduction Claim Against the Peyton Group and the PAC Group.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Prayer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Certificate of Compliance.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**APPENDIX**

App. A –     Final Judgment (3.CR.784-92)

App. B –     Upland Sales Agreement (2.CR.845-96)

App. C –     APC v. Upland Settlement Agreement (3.CR.426-31)

CASES

*Bocquet v. Herring*,
    972 S.W.2d 19 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*,
    136 S.W.3d 227 (Tex. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Cross Timbers Oil Co. v. Exxon Corp.*,
    22 S.W.3d 24 (Tex. App.—Amarillo 2000, no pet.). . . . . . . . . . . . . . . . . . 8

*Cross v. Littlefield*,
    No. 11-14-00224-CV, 2016 WL 6998981
    (Tex. App.—Eastland Nov. 30, 2016, no pet.) (mem. op.). . . . . . . . . . . . 25

*EOG Resources, Inc. v. Wagner & Brown, Ltd.*,
    202 S.W.3d 338 (Tex. App.—Corpus Christi 2006,
    pet. denied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Fain & McGaha v. Biesel*,
    331 S.W.2d 346 (Tex. Civ. App.—Fort Worth 1960,
    writ ref'd n.r.e.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 22

*FM Properties Operating Co. v. City of Austin*,
    22 S.W.3d 868 (Tex. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gipson-Jelks v. Gipson*,
    468 S.W.3d 600 (Tex. App.—Houston [14th Dist.]
    2015, no pet.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Greenwood & Tyrrell v. Helm*,
    264 S.W. 221 (Tex. Civ. App.—San Antonio 1924,
    writ ref'd). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
    352 S.W.3d 462 (Tex. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 19

*In re Q.D.T.*,
No. 14-09-00696-CV, 2010 WL 4366125
(Tex. App.—Houston [14th Dist.] 2010, no pet.)
(mem. op.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Intercontinental Group P'ship v. KB Home Lone Star L.P.*,
295 S.W.3d 650 (Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*J.M. Davidson, Inc. v. Webster*,
128 S.W.3d 223 (Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 16

*Kachina Pipeline Co., Inc. v. Lillis*,
471 S.W.3d 445 (Tex. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*MBM Fin. Corp. v. Woodlands Operating Co., L.P.*,
292 S.W.3d 660 (Tex. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mid-Century Ins. Co. of Tex. v. Lindsey*,
997 S.W.2d 153 (Tex. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Moayedi v. Interstate 35/Chisam Rd., L.P.*,
438 S.W.3d 1 (Tex. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*,
473 S.W.3d 296 (Tex. 2015) . . . . . . . . . . . . . . . . . . . . . . . . 9, 17, 19

*Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.*,
414 S.W.3d 911 (Tex. App.—Houston [1st Dist.] 2013,
pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Stoud Prod., L.L.C. v. Hosford*,
405 S.W.3d 794 (Tex. App.—Houston [1st Dist.] 2013,
pet. denied). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Terrell v. Munger Farm Co.*,
129 S.W.2d 407 (Tex. Civ. App.—Fort Worth 1939,
writ dism'd judgm't cor.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Universal C.I.T. Credit Corp. v. Daniel*,
    150 Tex. 513, 243 S.W.2d 154 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . [9](#)

*Utica Nat'l Ins. Co. of Tex. v. Am. Indemnity Co.*,
    141 S.W.3d 198 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [18](#), [19](#)

*Weaver v. Jamar*,
    383 S.W.3d 805 (Tex. App.—Houston [14th Dist.]
    2012, no pet.).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . [9](#), [22](#)

*Yzaguirre v. KCS Res., Inc.*,
    53 S.W.3d 368 (Tex. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . [8](#), [22](#)

## STATUTES AND RULES

TEX. CIV. PRAC. & REM. CODE § 37.009.. . . . . . . . . . . . . . . . . . . . . . . . . . . . [30](#)

TEX. R. CIV. P. 329b(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [xiii](#)

## OTHER AUTHORITIES

11 RICHARD A. LORD,
    WILLISTON ON CONTRACTS (4th ed. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . [9](#)

BLACK'S LAW DICTIONARY (10th ed. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . [17](#)

BLACK'S LAW DICTIONARY (6th ed. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . [17](#)

PATRICK H. MARTIN AND BRUCE M. KRAMER,
    WILLIAMS & MEYERS, OIL AND GAS LAW:
    MANUAL OF OIL AND GAS TERMS (16th ed. 2016). . . . . . . . . . . . . . . . . . [2](#)

WEBSTER'S II NEW COLLEGE DICTIONARY (1999). . . . . . . . . . . . . . . . . . . . . [17](#)

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1988). . . . . . . . . . . . . . . . [17](#)

WEBSTER'S THIRD NEW INT'L DICTIONARY (2002). . . . . . . . . . . . . . . . . . . . [17](#)

## STATEMENT OF THE CASE

*Nature of the Case*:  This appeal is part of a larger dispute over oil-and-gas royalty interests. This portion of the dispute relates to Defendants Granite Operating Company and Apache Corporation's third-party breach-of-indemnification-agreement claim, the trial court's attorneys-fee award against Granite and Apache, and, to the extent Plaintiffs prevail on their separate appeal in this matter, Granite and Apache's contingent claim for a declaration of proportionate royalty reduction.

*Trial Court*:  The Honorable Steve R. Emmert, 31st Judicial District Court of Wheeler County, Texas.

*Trial Court Disposition*:  The various parties filed competing motions for summary judgment. 1.CR.390-405, 406-21; 2.CR.8-21, 22-68, 268-302, 542-63, 648-69, 833-44, 927-36, 978-80; 3.CR.513-16. The trial court denied Plaintiffs' motion for summary judgment and granted Granite and Apache's motion for summary judgment with respect to Plaintiffs' claims. 3.CR.648, 775-77, 780. The trial court denied Granite and Apache's motion for summary judgment and granted the Peyton Group's motion for summary judgment with respect to Granite and Apache's third-party claims. 3.CR.779-80. The trial court also denied Granite and Apache's motion for summary judgment and granted the PAC Group's motion for summary judgment with respect to Granite and Apache's third-party claims. 3.CR.779-80.

The trial court incorporated its summary judgment holdings into a Final Judgment, which also ordered that Granite and Apache pay the Peyton Group $220,396.00 in trial and appellate attorneys' fees. 3.CR.784-92 (App. A).

Apache and Granite requested findings of fact and conclusions of law and filed a notice of past-due findings of fact and conclusions of law. 3.CR.793-95, 913-16. Plaintiffs filed a motion for reconsideration, 3.CR.796-811,

which was denied by operation of law, *see* TEX. R. CIV. P. 329b(c). No findings of fact or conclusions of law were issued.

**STATEMENT REGARDING ORAL ARGUMENT**

Due to the complexity of both the facts and legal issues presented in this appeal, Granite and Apache believe that oral argument would be beneficial to the Court's consideration of the matter and therefore respectfully request the opportunity to present oral argument.

# ISSUES PRESENTED

1. When the Peyton Group sold Upland (now Granite) to Cordillera (now owned by Apache) for $73,170,000.00, it promised to indemnify Upland and Cordillera for "any adverse consequence arising out of or in connection with" then-pending lease-termination claims in a lawsuit against Upland. Among the potential "adverse consequences" expressly contemplated by the parties at that time was a possible future lawsuit brought by Plaintiffs in this case, who own overriding royalty interests in the leases that were contested in the first lawsuit. Did the trial court err by holding that Plaintiffs' fully anticipated lawsuit did *not* trigger the Peyton Group's contractual indemnification obligation?

2. The trial court ordered that Granite and Apache pay the Peyton Group $220,396.00 in trial court and contingent appellate attorneys' fees for defending against two of Granite and Apache's third-party claims.

   A. Did the trial court err by ordering Granite and Apache to pay the Peyton Group $130,046.40 in trial-court attorneys' fees and $43,500 in contingent appellate attorneys' fees for defending against Granite and Apache's breach-of-indemnification-agreement claim given that—as a matter of law—the Peyton Group is not the prevailing party on the contract claim?

   B. Did the trial court err by ordering Granite and Apache to pay the Peyton Group $43,500.00 in contingent appellate attorneys' fees given that the record is legally insufficient to support such fees?

   C. Did the trial court err by ordering Granite and Apache to pay the Peyton Group $46,849.60 in attorneys' fees for defending against Granite and Apache's contingent declaratory judgment claim given that the claim's express contingency—that Plaintiffs first prevail on their claims—never occurred?

3. If (and only if) Plaintiffs prevail on appeal on their overriding-royalty-interest claim against Granite and Apache, did the trial court err by holding that Granite and Apache take nothing on their claims for a declaration of proportionate royalty reduction?

This appeal relates primarily to the Peyton Group's breach of an indemnification agreement it entered into as part of its $73,170,000.00 sale of Upland Resources (which is now Granite) to Cordillera Energy Partners, LLC (which is now part of Apache) in 2007. Defendants/Appellants Granite and Apache seek to reverse those parts of the trial court's judgment holding that (1) Granite and Apache take nothing on their breach-of-indemnification-agreement claim against the Peyton Group; and (2) Granite and Apache pay the Peyton Group $220,396.00 in attorneys' fees. In addition, Granite and Apache conditionally appeal that part of the trial court's judgment holding that they take nothing on their claim against the Peyton Group and the PAC Group for a declaration of proportionate royalty deduction. The facts of this appeal are undisputed, albeit lengthy and dense.

**The 1986 Leases: Aikman Oil Company leases the minerals, then sells the leases while reserving an overriding royalty interest.**

In 1986, Aikman Oil Company leased the mineral rights associated with a section of land in Wheeler County, Texas, 1.CR.1221-37, and soon thereafter assigned the leases to Jay Haber. 1.CR.1245-50. The assignment of the leases included a provision reserving to Aikman an overriding royalty interest,1.CR.1245, and stating that if the leases are ever renewed or extended or a new lease of the same

minerals is obtained in the future, the overriding royalty interest would "attach" to the renewed, extended, or new lease.  1.CR.1246.[1]

Years later, Upland acquired Aikman's leases, 1.CR.1269-74, and Plaintiffs acquired Aikman's overriding royalty interests, 1.CR.17-18.

**The 2007 Leases & the First Lawsuit:  Amarillo Production Company buys top leases of the minerals and sues Upland.**

In May 2007, Amarillo Production Company ("APC") bought top leases of the same Wheeler County acreage.  1.CR.1292-1341.[2]  Shortly thereafter, APC sued Upland—alleging that the 1986 Aikman leases had terminated due to lapses in production.  1.SuppCR.19-23.  APC sought a declaration of superior title and monetary damages.  1.SuppCR.22-23.

**The Upland Sale & the Indemnification Agreement:  Cordillera purchases Upland from the Peyton Group, which indemnifies Cordillera and Upland against "any adverse consequence arising from or in connection with" APC's lease-termination claims.**

While APC's lawsuit was pending against Upland, Upland's owner—the Peyton Group—was in discussions to sell Upland to Cordillera.  But the APC lawsuit

---

[1]  An overriding royalty interest is a royalty interest carved out of the leasehold estate and, absent an express provision to the contrary, does not survive the lease's termination. *Fain & McGaha v. Biesel*, 331 S.W.2d 346, 348 (Tex. Civ. App.—Fort Worth 1960, writ ref'd n.r.e.).  The provision in the Aikman-to-Haber assignment that attempts to prevent the interest's termination upon the leases' termination has been at times referred to as an "anti-washout" or "evergreen" clause.

[2]  A "top lease" is "[a] lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated." PATRICK H. MARTIN AND BRUCE M. KRAMER, WILLIAMS & MEYERS, OIL AND GAS LAW: MANUAL OF OIL AND GAS TERMS at 1088 (16th ed. 2016).

(among others) stood as a potential impediment to the sale; so as partial consideration for Upland's $73,170,000.00 sales price, the Peyton Group agreed to indemnify Upland and Cordillera for "any [a]dverse [c]onsequence arising from or in connection with" all claims that APC asserted in its litigation against Upland:

> Sellers shall jointly and severally indemnify, defend and hold harmless Buyer and Upland and their respective Affiliates, directors, managers, officers, shareholders, employees, agents and representatives ... from ... any Adverse Consequence arising from or in connection with all pending or threatened claims or causes of action asserted against Upland in the litigation styled Amarillo Production Company v. Upland Resources, Inc.[,] Cause No. 12, 021, in the 31st District Court in and for Wheeler County, Texas ("the Byrd Well Litigation"), including any appeal of the Byrd Well Litigation[.]

2.CR.886 (App. B). In turn, the parties defined "adverse consequences" as any:

> actions, awards, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes (including interest thereon), liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

2.CR.850.

The parties also agreed that:

- the Peyton Group would pay up to $5,400,000.00 for any adverse consequence of "the [APC] Litigation," 2.CR.888;

- Cordillera's "right to enforce" the indemnification obligation included the right to withhold any royalties due to the Peyton Group's affiliate, Peyton Oil and Gas, 2.CR.889; and,

- the Upland sale would close on November 1, 2007, 2.CR.858.

3

**The First Lawsuit's Settlement:  Bailey Peyton settles the APC lawsuit on behalf of Upland—reserving overriding royalty interests in the top leases.**

On October 31, 2007, Bailey Peyton—as President of Upland—executed a settlement of the APC-Upland lawsuit.  3.CR.431 (App. C).  The parties agreed that:

- Upland would pay APC $320,000.00 and "release" the 1986 Aikman leases,  3.CR.428;

- APC would assign the 2007 top leases to Cordillera,  3.CR.428; and,

- APC would reserve, within its assignment of the top leases to Cordillera, a 5% overriding royalty interest in the top leases, 3.CR.428, and transfer, from the reserved 5% overriding royalty interest, a 2% overriding royalty interest to Upland or Peyton Oil & Gas, 3.CR.428-29.

Finally, the parties agreed that if the 1986 leases' overriding-royalty-interest owners ever successfully brought a claim against Upland for an interest in the 2007 top leases, then APC and Upland's own overriding royalty interests in the top leases would be proportionately reduced:

> Proportionate Reduction of ORRI.  Plaintiff [APC] agrees to assign to Defendant [Upland] a two percent ORRI in the Top Leases in question. The parties understand that ORRI owners under the prior lease will lose their interests.  However, Plaintiff agrees that they will share on a proportionate basis any reduction in retained override if such owners make a claim and the prior ORRI owners recover any interest.  The Parties understand that Defendant has a two percent ORRI and the Plaintiff will have a three percent ORRI, and that any reduction shall be shared on that basis.  It is agreed, however, that Plaintiff and Defendant may jointly or separately defend any action brought by third parties for recovery of overrides under the prior lease or leases, and may jointly or separately settle or try any such cases.  If either Defendant or Plaintiff separately settles or tries any such action, its override shall be reduced by the amount of override recovered, if any, by any such third party

4

without proportionate reduction. Only if the Plaintiff and Defendant both settle or try such an action and lose will their override be proportionately reduced.

3.CR.429.

The same day, APC assigned the top leases to Granite (instead of Cordillera), 1.CR.1342-47, expressly reserving the 5% overriding royalty interest, 1.CR.1342. As agreed, Upland released its interest in the 1986 Aikman leases. 1.CR.1289-91. And later, the Peyton Group and the PAC Group acquired the combined 5% overriding royalty interests in the top leases carved out in the APC-to-Granite assignment. 1.CR.392.

**The Current Lawsuit: The 1986 leases' overriding-royalty-interest owners sued Granite, and the Peyton Group declined to honor the indemnification agreement.**

On September 10, 2013, Plaintiffs (the current owners of the 1986 Aikman leases' overriding royalty interest) sued Granite (which Upland had been renamed) and Apache (which owns Cordillera and the top leases)—claiming that because the 1986 leases terminated, their overriding royalty interest in the 1986 leases "attached" to the 2007 top leases. 1.CR.12-32. Granite and Apache thereafter sent two letters to the Peyton Group's counsel requesting indemnification and a defense to Plaintiffs' suit based on the settlement agreement's indemnification clause. 2.CR.913-15.

After the Peyton Group refused, 2.CR.916-17, Granite and Apache filed a third-party claim against the Group for breach of the indemnification agreement,

1.CR.371. Granite and Apache also brought contingent third-party claims against the Peyton Group and the PAC Group for a declaration of a proportionate reduction in their overriding royalty interests in the top leases "in the event" that the underlying Plaintiffs were to prevail on their claims against Granite and Apache. 1.CR.372.

**The Judgment: The trial court rejected Plaintiffs' claims against Granite and Apache and also Granite and Apache's claims against the Peyton Group and the PAC Group.**

All sides filed motions for summary judgment. 1.CR.390-405, 406-21; 2.CR.8-21, 22-68, 268-302, 542-63, 648-69, 833-44, 927-36, 978-80; 3.CR.513-16. The trial court denied Plaintiffs' motion for summary judgment and granted Granite and Apache's motion for summary judgment with respect to Plaintiffs' royalty claims. 3.CR.648, 775-77, 780. The trial court denied Granite and Apache's motion for summary judgment and granted the Peyton Group's motion for summary judgment with respect to Granite and Apache's third-party claims. 3.CR.779-80. And the trial court denied Granite and Apache's motion for summary judgment and granted the PAC Group's motion for summary judgment with respect to Granite and Apache's third-party claims. 3.CR.779-80.

The trial court incorporated its summary judgment holdings into a final judgment, which also ordered that Granite and Apache pay the Peyton Group $220,396.00 in trial and appellate attorneys' fees. 3.CR.784-92. Granite and Apache now respectfully appeal part of the trial court's judgment.

6

## SUMMARY OF THE ARGUMENT

This is a multi-party appeal of the trial court's judgment in a multi-issue oil-and-gas dispute. This portion of the appeal relates primarily to the Peyton Group's failure to honor their contractual obligation to indemnify Upland, Cordillera, and their affiliates for "*any adverse consequence* arising from or in connection with" lease-termination claims in a lawsuit pending against Upland at the time the Peyton Group sold Upland to Cordillera for $73,170,000.00. Because Plaintiffs' royalty-interest lawsuit against Granite (which Upland was renamed) and Apache (which acquired Cordillera) in this case is an "adverse consequence" of the prior lease-termination claims against Upland, Plaintiffs' suit triggered the Peyton Group's contractual obligation to indemnify Granite and Apache as a matter of law. The trial court was wrong to rule to the contrary.

The trial court was also wrong to award the Peyton Group $220,396.00 in attorneys' fees from Granite and Apache. First, the Peyton Group is not the "prevailing party" with respect to Granite and Apache's breach-of-indemnification-agreement claims and thus cannot recover prevailing-party fees. Second, the evidence is legally insufficient to support an award of contingent appellate attorneys' fees. Third, the trial court erred by awarding the Peyton Group fees for "defending" against Granite and Apache's contingent declaratory judgment claim that was never

7

before the Court because its contingency (Plaintiffs first winning on their claims against Granite and Apache) never occurred.

And finally, if (and only if) this Court holds that Plaintiffs do prevail on their overriding-royalty-interest claims against Granite and Apache, then the trial court's judgment that Granite and Apache take nothing on their claims for a declaration of proportionate royalty reduction is also erroneous. The parties unambiguously agreed that if Plaintiffs ever sued and prevailed, the others would proportionately share a reduction in their own overriding royalty interests.

## ARGUMENT

### I. THE TRIAL COURT ERRED BY RENDERING JUDGMENT THAT GRANITE & APACHE TAKE NOTHING ON THEIR BREACH-OF-INDEMNIFICATION-AGREEMENT CLAIM AGAINST THE PEYTON GROUP.

In Texas, a deal is a deal. Contracting parties are "masters of their own choices," *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d 24, 26 (Tex. App.—Amarillo 2000, no pet.), and courts will not modify a contract to give any party the benefit of a bargain it did not make, *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 374 (Tex. 2001). That's why, in construing a contract, the "primary" duty of courts is to give effect to "the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citations omitted). And courts "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none

8

will be rendered meaningless." *J.M. Davidson*, 128 S.W.3d at 229 (citing *Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158 (1951)).

"[C]ourts must [also] enforce contract terms as written and may not rewrite contracts or add to their language under the guise of interpretation." *Weaver v. Jamar*, 383 S.W.3d 805, 811 (Tex. App.—Houston [14th Dist.] 2012, no pet.). And courts will construe contracts "as understood in light of the facts and circumstances surrounding the contract's execution." *Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). "Those circumstances include ... 'the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties." *Id.* (quoting 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999)). Finally, courts will "give words their plain, common, or generally accepted meaning unless the contract shows that the parties used words in a technical or different sense." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) (citing *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014)).

In this case, the Peyton Group unambiguously agreed to indemnify Upland (now Granite) and Cordillera (now owned by Apache) and any of their affiliates for "<u>any adverse consequence</u> arising from or in connection with" APC's previous claims that the 1986 Aikman leases had terminated. The trial court incorrectly let the Peyton

9

Group off the hook for that promise. On appeal as to decisions made on competing motions for summary judgment, the duty of the appellate court is to "review both sides' summary judgment evidence," "determine all questions presented," and "render the judgment that the trial court should have rendered." *FM Properties Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). As such, this Court should reverse that part of the final judgment incorporating the grant of the Peyton Group's motion for summary judgment, reverse that part of the final judgment incorporating the denial of Granite and Apache's motion for summary judgment, and remand the case to the trial court for a determination of Granite and Apache's damages.[3]

A. **The Peyton Group Unambiguously Promised to Indemnify Upland and Cordillera for "Any Adverse Consequence"—Including Future Lawsuits and Defense Costs—"Arising From or in Connection with" APC's Lease-Termination Claims.**

It is undisputed that there were multiple lawsuits pending against Upland when Cordillera and the Peyton Group were in discussions over the possible sale of Upland to Cordillera in 2007. 2.CR.886. Among the pending lawsuits was APC's suit, 2.CR.886, which alleged that the 1986 Aikman leases—then owned by Upland—had terminated due to periods of nonproduction. 1.SuppCR.20-21. The fact that multiple lawsuits were pending against Upland at the time was of clear relevance to Cordillera

---

[3] Whether brought in the form of a traditional or no-evidence motion for summary judgment, the Peyton Group's motion is wrong for the same reasons: the undisputed summary judgment evidence conclusively establishes that the Peyton Group breached its contractual obligation to indemnify Granite and Apache against Plaintiffs' overriding-royalty-interest claims. *See infra* Part I.A-D.

(or any other prospective buyer, for that matter). But APC's lease-termination claims were of particular importance to the transaction—and not just because the claims threatened Upland's interest in the leases.

APC's claims also mattered because they put Upland at risk for being sued a second time—by the 1986 leases' overriding royalty interest owners, who would likely claim that because the 1986 leases terminated, their overriding royalty interests "attached" to any new lease of the same minerals. 1.CR.1246; 3.CR.429. Ordinarily, an overriding royalty interest in a lease expires upon the lease's termination. *See Fain & McGaha*, 331 S.W.2d at 348; *Stoud Prod., L.L.C. v. Hosford*, 405 S.W.3d 794, 808 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). But the Aikman-to-Haber assignment of the 1986 leases—which carved out the overriding royalty interest—also included a clause designed to burden the leasehold interest not just as to the leases actually conveyed but also any future leases of the minerals that did not then exist. 1.CR.1246. That clause states:

> Should the Subject Leases or any one of the Subject Leases terminate and in the event Assignee obtains an extension, renewal or new lease or leases covering or affecting all or part of the mineral interest covered and affected by said lease or leases, then the overriding royalty interest reserved herein shall attach to said extension, renewal or new lease or leases....

1.CR.1246.

11

Because the clause purports to create an interest in a future lease that does not and may never exist, it presents an obvious rule-against-perpetuities problem—as the trial court in this case ultimately and correctly determined. 3.CR.775-77, 780. But at the time of the Upland sale, the parties could not have known how a future court might someday rule as to the provision's validity. So as partial consideration for Cordillera's $73,170,000.00 million purchase of Upland, the Peyton Group expressly indemnified Cordillera, Upland, and any of their affiliates for "<u>any adverse consequence</u> arising from or in connection with" APC's lease-termination claims:

> Sellers shall jointly and severally indemnify, defend and hold harmless Buyer and Upland and their respective Affiliates, directors, managers, officers, shareholders, employees, agents and representatives ... from ... any Adverse Consequence arising from or in connection with all pending or threatened claims or causes of action asserted against Upland in the litigation styled Amarillo Production Company v. Upland Resources, Inc.[,] Cause No. 12, 021, in the 31st District Court in and for Wheeler County, Texas ("the Byrd Well Litigation"), including any appeal of the Byrd Well Litigation[.]

2.CR.886. And the parties also agreed to expansively define the term "adverse consequences" as:

> all actions, awards, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes (including interest thereon), liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

2.CR.850.

12

*This was no small commitment.*  In fact, it was so comprehensive that the parties agreed to cap the Peyton Group's indemnification exposure arising from APC's particular litigation at $5,400,000.00.  2.CR.888.

B.   **Continuing To Be Concerned About the Risks of APC's Lease-Termination Claims, Upland Settles the APC Suit—But Only With an Agreement That All Existing Overriding Royalty Interests in the Top Leases Be Adjusted if the Aikman Leases' Overriding-Royalty-Interest Owners Ever Bring a Successful Claim Against Upland.**

After the Peyton Group and Cordillera executed the Upland sales agreement (but before the sale closed), Bailey Peyton (then President of Upland) executed a settlement of the APC-Upland litigation.  3.CR.431.  The Upland sale and APC's lease-termination claims were so intertwined that the lawsuit was ultimately settled the day before the sale closed.  3.CR.431.  It is no coincidence, then, that the Upland sales contract reflects the parties' understanding of the future risks presented to Upland by APC's lease-termination claims.

To settle APC's suit against Upland, Upland agreed to pay APC $320,000 and to "release" the 1986 Aikman leases that APC claimed had already terminated.  3.CR.428.  APC, in return, agreed to assign the 2007 top leases to Cordillera.  3.CR.428.  APC and Upland further agreed that in the assignment of the top leases from APC to Cordillera, APC would reserve a 5% overriding royalty interest—3% for itself and 2% for Upland or Peyton Oil & Gas.  3.CR.428-29.

13

And there again, the parties expressed their full understanding that the termination of the 1986 leases might attract a future lawsuit by the 1986 leases' overriding-royalty-interest owners. Specifically, the parties agreed that they would proportionately reduce their own overriding royalty interests in the top leases if the 1986 leases' overriding-royalty-interest owners ever successfully sued Upland in the future:

> Plaintiff agrees to assign to Defendant a two percent ORRI in the Top Leases in question. The parties understand that ORRI owners under the prior lease will lose their interests. However, Plaintiff agrees that they will share on a proportionate basis any reduction in retained override if such owners make a claim and the prior ORRI owners recover any interest. The Parties understand that Defendant has a two percent ORRI and the Plaintiff will have a three percent ORRI, and that any reduction shall be shared on that basis.

3.CR.429.

## C. Precisely as the Parties Predicted, the 1986 Leases' Overriding-Royalty-Interest Owners Sued Upland.

Upland and Bailey Peyton were right to predict that the 1986 leases' overriding-royalty-interest owners would eventually sue Upland to reclaim what they believed was an entitlement to an overriding royalty interest in any lease of the same minerals owned by Upland: in September 2013, the current owners of the 1986 leases' overriding royalty interest (Plaintiffs here) sued Granite (which Upland had been renamed) and Apache (which owns Cordillera and the 2007 top leases). 1.CR.12-32.

14

Plaintiffs assert that pursuant to the language of the Aikman-to-Haber assignment of the 1986 leases, their overriding royalty interests in the 1986 leases "attached" to the 2007 top leases after the 1986 leases terminated. 1.CR.12-32. Defendants Granite and Apache thereafter sent two letters to the Peyton Group's counsel requesting that it honor the indemnification agreement in the Upland sales contract. 2.CR.913-15. When the Peyton Group refused, 2.CR.916-17, Granite and Apache filed a third-party claim against the Peyton Group for breach of the indemnification agreement. 1.CR.371.

**D.** **Under the Plain Meaning of the Upland Sales Contract and Undisputed Facts, Plaintiffs' Lawsuit Triggered the Peyton Group's Obligation to Indemnify Granite and Apache.**

The primary question presented in this appeal is this: did Plaintiffs' lawsuit in this case—which alleges that because the 1986 Aikman leases terminated, their overriding royalty interest in the 1986 leases "attached" to the 2007 top leases—trigger the Peyton Group's contractual duty to indemnify Upland for "any adverse consequence arising from or in connection with" APC's lease-termination claims? The answer to that question is "yes" because Plaintiffs' lawsuit is the direct consequence of APC's lease-termination claims. Accordingly, that portion of the trial court's judgment holding that Granite and Apache take nothing on their breach-of-indemnification-agreement claim against the Peyton Group is in error.

**1.    The text of the sales agreement answers the question: as partial consideration for being paid $73,170,000.00, the Peyton Group agreed to indemnify Upland and Cordillera up to $5,400,000.00 for "any adverse consequence arising from or in connection with" APC's lease-termination claims.**

The courts' primary focus in any contract-construction dispute is the intent of the parties as expressed in the words of the contract. *See J.M. Davidson*, 128 S.W.3d at 229; *see supra*. The text of the indemnification agreement is undisputed and unambiguous: the Peyton Group agreed to indemnify Upland and Cordillera for "<u>any</u> <u>[a]dverse [c]onsequence</u>"—expressly including but not limited to future lawsuits—"arising from or in connection with" APC's lease-termination claims. 2.CR.886 (emphasis added). Because Plaintiffs' claims in this lawsuit arose "from or in connection with" APC's lease-termination claims, the Peyton Group breached the indemnification agreement by refusing to indemnify Granite and Apache against Plaintiffs' lawsuit.

Again, we must start with the text: in the Upland sales agreement, the Peyton Group agreed to "jointly and severally indemnify, defend and hold harmless [Cordillera] and Upland and their respective Affiliates ... from ... <u>any [a]dverse</u> <u>[c]onsequence arising from or in connection with all pending or threatened claims or</u> <u>causes of action asserted against Upland in the [APC] litigation</u>." 2.CR.886 (emphasis added). In turn, the agreement defines "[a]dverse [c]onsequences" as "all actions," "suits," "proceedings," "claims," "liabilities," "reasonable amounts paid in

16

settlement," "expenses, and fees, including court costs and reasonable attorneys' fees and expenses." 2.CR.850.

These words have unambiguous meaning. "The term 'arise' has broad meaning and includes 'to originate; to stem (from) ... [t]o result (from),' and ... to come into being ... [or] to come about.'" *Plains Expl.*, 473 S.W.3d at 308 (quoting BLACK'S LAW DICTIONARY 129 (10th ed. 2014) and WEBSTER'S THIRD NEW INT'L DICTIONARY 117 (2002)). "Connection" means "the state of being [joined or linked together]," "causal or logical relation or sequence," "contextual relations or associations," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 278 (1988), or "[a]n association or relationship," WEBSTER'S II NEW COLLEGE DICTIONARY 239 (1999). "Cause of action" means "[t]he fact or facts which give a person a right to judicial redress or relief against another," "[t]he legal effect of an occurrence in terms of redress to a party to the occurrence," or "[a] situation or state of facts which would entitle a party to sustain action and give him right to seek a judicial remedy in his behalf." BLACK'S LAW DICTIONARY 221 (6th ed. 1990). And a "claim" means "[a] demand," a "basis for demanding," "[a] statement of fact: assertion of truth," WEBSTER'S II NEW COLLEGE DICTIONARY 206 (1999), or "an assertion open to challenge," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 244 (1988). Thus, the Court must decide whether Plaintiffs' lawsuit against Granite and Apache "originates" or "stems" from *or* is "linked to" or "causally or logically related to" the

17

facts, occurrences, or legal effects of APC's lease-termination claims in the prior lawsuit against Upland. The answer is quite clearly "yes."

Indeed, the evidence is conclusive that there is a "but for" causal relationship between APC's lease-termination claims and Plaintiffs' lawsuit. Simply put, had APC not sued Upland alleging that the 1986 Aikman leases terminated for non-production, Plaintiffs would not have sued Granite and Apache claiming that *because* the 1986 leases terminated, their overriding royalty interests in the 1986 leases "attached" to the 2007 top leases. That level of causal relationship has—in and of itself—been held in some circumstances to meet an "arising out of" causal-nexus requirement. *See Utica Nat'l Ins. Co. of Tex. v. Am. Indemnity Co.*, 141 S.W.3d 198, 203 (Tex. 2004) ("This Court has held that 'arise out of' means that there is simply a 'causal connection or relation,' which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation.") (quoting *Mid-Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 156 (Tex. 1999)).

Moreover, the full text of the indemnification agreement indicates that the parties did not intend to adopt a stricter-than-but-for causation standard. Specifically, the parties agreed that "<u>any</u> adverse consequence" would be covered by the indemnification agreement so long as it arose either "from <u>or in connection with</u>" APC's lease-termination claims. 2.CR.886 (emphasis added). The parties' inclusion of "in connection with" in addition to "arising from" in the agreement's language

18

reinforces that their intent was to adopt a comprehensive indemnification obligation—not one narrowed by an unduly strict causal-nexis requirement. *Id.*; *see also Plains Expl.*, 473 S.W.3d at 308-09 (indicating that courts look to context of a contract's "arising under" requirement to determine the level of causal connection required).

But regardless, Plaintiffs' lawsuit triggers the Peyton Group's indemnification obligation under any causal-relation test because Plaintiffs' lawsuit is the direct, logical, and fully predicted result of APC's lease-termination claims. In the first lawsuit, APC claimed that the 1986 leases terminated for non-production. 1.SuppCR.20-21. In the second lawsuit, Plaintiffs claim that *because* the 1986 leases terminated (or were "released"), they now own an interest in the 2007 top leases. 1.CR.19, 23, 419. That sequence of causally linked events occurred precisely as the Peyton Group and Upland expected and planned for; and they each expressly agreed that if and when it occurred, the Peyton Group would be responsible up to $5,400,000.00. 2.CR.886. A causal nexus—under any standard—was satisfied.

The business context of the parties' agreement also indicates that the parties intended for Plaintiffs' lawsuit to be covered under the indemnification agreement. *See Plains Expl.*, 473 S.W.3d at 305 ("facts and circumstances" surrounding the execution of a contract may "aid in the construction of the contract's language"); *Houston Expl.*, 352 S.W.3d at 469 (courts construe contracts "as understood in light

of the facts and circumstances surrounding the contract's execution"). At the time the indemnification clause was written and executed, the parties knew that APC's lease-termination claims threatened Upland's working interest in the 1986 leases; that was the very substance of APC's lawsuit. 1.SuppCR.19-23. But they also knew at the time that APC's lease-termination claims would likely result in Upland being sued again later by the 1986 leases' overriding-royalty-interest owners—*i.e.*, Plaintiffs here. 3.CR.429. Upland and Bailey Peyton (working on behalf of Upland at the time) were so cognizant of this possibility that in the concurrent settlement of the APC-Upland lawsuit, they insisted upon including a provision stating that the overriding royalty interests in the 2007 top leases (as carved out in the settlement agreement) would be proportionately reduced if the 1986 leases' overriding-royalty-interest owners ever successfully sued Upland for recognition that their interests "attached" to the top leases. 3.CR.429. Indeed, given that Bailey Peyton and Upland—both parties to the indemnification agreement—were so demonstrably mindful of the prospect of a lawsuit from Plaintiffs that they expressly addressed it in the settlement agreement, it would be preposterous to argue that they *wouldn't* have considered such a lawsuit to be an "adverse consequence arising from or in connection with" APC's claims.

In short, the link between APC's lease-termination claims and Plaintiffs' lawsuit is direct and unequivocal. As a matter of law under the undisputed summary

judgment facts, Plaintiffs' lawsuit triggered the Peyton Group's contractual indemnification obligation because Plaintiffs' suit "arose from or in connection with" APC's lease-termination claims. Accordingly, that portion of the trial court's judgment holding that Granite and Apache take nothing on their breach-of-indemnification-agreement claim against the Peyton Group is in error and should be reversed and remanded for determination of damages.[4]

### 2. The Peyton Group's arguments for evading its contractual indemnification obligation are without merit.

In the trial court, the Peyton Group moved for traditional summary judgment against Granite and Apache's breach-of-indemnification-agreement claims. 1.CR.394-400. There, the Group made three arguments for evading contractual indemnification: (1) that there is no identity of parties between APC's lawsuit and Plaintiffs' lawsuit here, 1.CR.396 ("Neither Yowell nor any of the other plaintiffs in the present suit were aware of or had any involvement in the [APC] litigation."); (2) that there is no identity of claims between APC's lawsuit and Plaintiffs' lawsuit here, 1.CR.397 ("There was no claim or cause of action related to the ORRI of the Yowell plaintiffs in [the APC] suit."); and (3) that Plaintiffs' lawsuit arose from "the settlement" of the APC-Upland lawsuit but not from APC's "claims or causes of action," 1.CR.397. Each is without merit.

---

[4] In deposition testimony, even Bailey Peyton agreed that Plaintiffs' lawsuit was an "adverse consequence," 2.CR.908, at minimum creating a fact question.

21

The Peyton Group's first two arguments—that Plaintiffs to this lawsuit were not involved in the APC-Upland lawsuit and that Plaintiffs' overriding-royalty interests were not at issue in the APC-Upland lawsuit, 1.CR.396-97—are merely attempts to add limitations to the indemnification agreement to which the parties never agreed. There is nothing in the Upland sales agreement stating that if the "adverse consequence" is a new lawsuit, the parties to the new lawsuit must be the same as those in the APC lawsuit (nor that the parties to the new lawsuit be "aware of" the APC lawsuit). 2.CR.845-96. Likewise, there is nothing in the Upland sales agreement stating that if the "adverse consequence" is a new lawsuit, the claims and causes of action advanced in the new lawsuit must mirror the claims and causes of action in APC's lawsuit. 2.CR.845-96. Rather, the only limitation on the indemnification obligation is that the "adverse consequence" must "arise from or in connection with" APC's claims and causes of action—which Plaintiffs' claims plainly do. *See supra* Part I.D.1. The Peyton Group's arguments therefore improperly ask this Court to judicially add restrictions to limit the Group's unambiguous and comprehensive contractual commitment; the Court should decline. *See Yzaguirre*, 53 S.W.3d at 374; *Weaver*, 383 S.W.3d at 811.[5]

---

[5] In addition, although Plaintiffs' overriding royalty interests may not have been presented as an issue in APC's lawsuit, the lawsuit nonetheless had a direct and unequivocal effect on their interests: if APC was right that the leases terminated for cessation of production, then so too did Plaintiffs' overriding royalty interests. *See Fain & McGaha*, 331 S.W.2d at 348.

22

The Peyton Group's third and final argument for avoiding the contractual indemnification obligation—that Plaintiffs' lawsuit arises from the "settlement" of APC's lawsuit but not from APC's claims and causes of action, 1.CR.397—is incorrect. As explained above, Plaintiffs' lawsuit in this case (which alleges that their overriding royalty interest attached to the 2007 top leases because the 1986 leases terminated) arose *directly* from APC's claims (which alleged that the 1986 Aikman leases terminated due to cessation of production). *See supra* Part I.D.1. Although it is true that the settlement of the APC-Upland lawsuit memorialized the 1986 leases' termination, 3.CR.428, it was APC's lawsuit that put at risk a judicial determination that the leases had terminated, 1.SuppCR.19-23. The fact that Upland settled APC's lease-termination lawsuit by "releasing" the 1986 leases—rather than risking a judicial determination of the same—does not exculpate the Peyton Group from its comprehensive contractual obligation.[6]

Moreover, the Peyton Group's argument relies on a false premise. As mentioned, the settlement agreement states that the Peyton Group will indemnify Upland not only against future events "arising from" APC's lease-termination claims, but also for future events arising "<u>in connection with</u>" APC's lease-termination claims. 2.CR.886 (emphasis added). Having a mere "connection with" a prior event

---

[6] Nor does it help the Peyton Group that the top leases were conveyed from APC to Upland in the settlement. The legal question is whether Plaintiffs' lawsuit "arose from or in connection with" APC's lease-termination claims—which it obviously did.

is a low bar. And the evidence conclusively demonstrates that Plaintiffs' lawsuit—which alleges that they are owed royalties on the top leases *because the 1986 leases terminated*—arose "in connection with" APC's claims *that the 1986 leases terminated*. *See supra* Part I.D.1.

In short, all of APC's claims against Upland—however styled—were founded upon the allegation that the 1986 leases terminated. And all of Plaintiffs' claims in this case—however styled—were founded upon the allegation that the 1986 leases terminated. As a matter of law, therefore, Plaintiffs' lawsuit "arose from or in connection with" APC's lease-termination claims and thus triggered the Peyton Group's indemnification obligation. Accordingly, the trial court should have granted Granite and Apache's motion for summary judgment and denied the Peyton Group's motion for summary judgment with respect to the breach-of-indemnification-agreement claim. The trial court's final judgment incorporating the denial of Granite and Upland's motion for summary judgment on their breach-of-indemnification-agreement claim and its grant of the Peyton Group's motion for summary judgment as to the claim was in error and should be reversed. In addition, judgment should be rendered that the Peyton Group breached the agreement by declining to indemnify

Granite and Apache, and the case should be remanded for a determination of Granite and Apache's resulting damages.[7]

## II. THE TRIAL COURT ALSO ERRED BY ORDERING GRANITE & APACHE TO PAY THE PEYTON GROUP $220,396.00 IN TRIAL AND APPELLATE ATTORNEYS' FEES.

After ruling on the parties' summary judgment motions, the trial court held a hearing on whether to order Granite and Apache to pay the Peyton Group an attorneys-fee award for defending itself against Granite and Apache's third-party claims, 3.RR.1-39, and ultimately ordered that Granite and Apache pay the Peyton Group a total of $220,396.00 in attorneys' fees. 3.CR.790-92. For defending against Granite and Apache's breach-of-indemnification-agreement claim, the court awarded the Peyton Group $130,046.40 for trial-court attorneys' fees and another $43,500 in contingent appellate attorneys' fees. 3.CR.791-92. And for defending against Granite and Apache's claim for a declaration of proportionate royalty reduction, the court awarded the Peyton Group another $46,849.60 in attorneys' fees. 3.CR.792. Each award is erroneous.

---

[7] In a response brief filed in the trial court, the Peyton Group cursorily advanced an argument that Granite and Apache didn't provide proper "notice" of the Group's indemnification obligation. *See* 3.CR.378. The Group's first "notice" argument—that although it received notice through its attorney of record, it should have received notice through a different attorney, *see id.*—is not serious. The Group admits that it received notice and that's the entire point of any notice provision. Its second argument—that although it received notice, deposition testimony suggests that in general, a party "could" be impaired by notice being delayed, 3.CR.379—lacks legal and factual authority. The Group offered no evidence that it actually was impaired, and pure speculation is legally insufficient. *See Cross v. Littlefield*, No. 11-14-00224-CV, 2016 WL 6998981, at *3 (Tex. App.—Eastland Nov. 30, 2016, no pet.) (mem. op.).

**A.** **The Peyton Group Is Not Entitled to Recover Attorneys' Fees on Granite and Apache's Breach-of-Indemnification-Agreement Claim.**

   **1.** **Because the trial court's take-nothing judgment as to Granite and Apache's breach-of-indemnification-agreement claim is in error, so too is its judgment awarding the Peyton Group attorneys' fees for defending against the claim.**

The Peyton Group asserted entitlement to recover attorneys' fees for defending against Granite and Apache's breach-of-indemnification-agreement claim based on the Upland sales contract's "Legal Fees" provision, which states that "[t]he prevailing party in any proceeding brought under or to enforce this Agreement shall be additionally entitled to recover court costs and reasonable attorneys' fees from the non-prevailing party." 2.CR.892. It is axiomatic that to be a "prevailing party" with respect to a contract claim, the party must prevail on that contract claim. *Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653-54 (Tex. 2009). Because—as a matter of law—the Peyton Group is *not* entitled to prevail on Granite and Apache's breach-of-indemnification-agreement claim, *see supra* Part I, the Group is also not entitled to recover attorneys' fees from Granite and Apache on the claim. *Id.*[8]

---

[8] The trial court awarded the Peyton Group attorneys' fees pursuant to the indemnification agreement in the Upland sales contract. 3.CR.791. Any argument that the Group would alternatively be entitled to attorneys' fees for a declaration of rights under the indemnification agreement would be wrong for two reasons: (1) as demonstrated in this brief, the Peyton Group is not the prevailing party as to Granite and Apache's claims relating to the indemnification agreement, *see infra* Part I; and (2) a party may not recover attorneys' fees under the Declaratory Judgment Act when the issue is already before the court on a breach-of-contact claim, *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 670 (Tex. 2009).

**2. At minimum, the Peyton Group is not entitled to recover contingent appellate attorneys' fees because there is no evidence to support the $43,500 award.**

Unsupported and naked opinion or conclusory witness testimony is legally insufficient to support an award of damages. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). A request for attorneys' fees must be supported by an account of the services performed (or to be performed), who performed them (or will perform them), and how much time the work required (or will require). *Sentinel Integrity Solutions, Inc. v. Mistras Group, Inc.*, 414 S.W.3d 911, 930 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). When an award of attorneys' fees is supported by legally insufficient evidence, the court of appeals may render a take-nothing judgment as to such fees. *See Gipson-Jelks v. Gipson*, 468 S.W.3d 600, 606 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *In re Q.D.T.*, No. 14-09-00696-CV, 2010 WL 4366125, at *9-10 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (mem. op.).

The entirety of the Peyton Group's "evidence" of contingent appellate attorneys' fees is the following four sentences from its counsel's testimony:

> If there were an appeal to the Court of Appeals, it's my opinion that $22,000 would be a reasonable fee for handling the case through the appeal. If there was a petition for review filed with the Supreme Court, it's my opinion that an additional $7,500 would be a reasonable fee. If the Supreme Court ordered briefing on the merits, it's my opinion that an additional $9,000 would be a reasonable fee. And if the Supreme Court ordered oral argument, my opinion is that the representation

27

through an oral argument and completion of proceedings in the Supreme Court of Texas would be an additional $5,000.00.

3.RR.13. That testimony is *per se* legally insufficient. It provides no account of the services required, who might perform them, or how many hours would be necessary to perform them. *See Sentinel*, 414 S.W.3d at 930. It is based on nothing more than the *ipse dixit* of the witness and is thus legally insufficient to support the trial court's award. *See Coastal*, 136 S.W.3d at 232. Accordingly, Granite and Apache request that the Court vacate the trial court's appellate-attorneys-fee award and render judgment that the Peyton Group take nothing on their request for contingent appellate attorneys' fees. *See Gipson-Jelks*, 468 S.W.3d at 606; *In re Q.D.T.*, 2010 WL 4366125, at *9-10.

### B. The Peyton Group Is Also Not Entitled to Recover Attorneys' Fees for Defending Against Granite and Apache's Unreached Alternative Claim for a Declaration of Proportionate Royalty Reduction.

Granite and Apache also pleaded an alternative, contingent cause of action against the Peyton Group—that "in the event that" Plaintiffs prevailed on their royalty-interest claims, then Granite and Apache would be entitled to a declaration that the PAC Group and the Peyton Group's overriding royalty interests in the top leases be proportionately reduced to account for Plaintiffs' interest. 1.CR.372. This alternative claim was based on the plain terms of the Upland-APC settlement agreement, which both created overriding royalty interests (now owned by the PAC

28

Group and the Peyton Group) in the APC top leases and mandated—in advance—that the parties would "share on a proportionate basis any reduction in retained override if [the 1986 overriding royalty interest] owners make a claim and ... recover any interest." 3.CR.429.

To be clear, Granite and Apache have not asserted (and do not assert) that Plaintiffs' claims have merit. To the contrary, they vigorously contested Plaintiffs' claims and ultimately prevailed in the trial court—which rendered judgment that Plaintiffs take nothing. 3.CR.787-88. Granite and Apache's claims for a proportionate royalty reduction were pleaded *only* upon the contingency that Plaintiffs first prevailed on their claims against Granite and Apache—which didn't happen. Because that contingency didn't happen, Granite and Apache's declaratory judgment claim for a proportionate royalty reduction never arose.

In their pleadings, Granite and Apache made clear that their cause of action for a declaration of proportionate royalty reduction was advanced only "in the event" that Plaintiffs prevailed on their royalty claims against Granite and Apache. 1.CR.372 ("Defendants maintain that the [Plaintiffs' overriding royalty interest] did not attach to the 2007 Leases. However, *in the event that it is determined* that [their interests] do attach....) (emphasis added); *see also* 3.RR.37 ("[W]e had a Breach of Contract Action and *in the alternative* the Dec Action.") (emphasis added). And in its granted

summary judgment motion, the Peyton Group fully agreed—asserting that Granite and Apache's contingent claims for a proportionate royalty reduction never arose:

- Granite and Apache's request for a "declaratory judgment on this issue is premature," 1.CR.399;

- "[n]o controversy has yet arisen in this case as to any proportionate reduction in the [overriding royalty interest]," 1.CR.399; and

- "[t]he proportionate reduction obligation does not arise until the [overriding-royalty-interest] owners under the prior lease[s] (Plaintiffs in the present action) ... recover an interest," 1.CR.400.

They were right. And because the contingency necessary for Granite and Apache's claims never occurred, the claims advanced based on that contingency were never before the trial court. It was erroneous, therefore, for the trial court to award the Peyton Group $46,849.60 for "defending" against the unreached claims.

For a party to recover attorneys' fees under the Uniform Declaratory Judgment Act, the fees must be "equitable and just" under the circumstances. TEX. CIV. PRAC. & REM. CODE § 37.009. Whether a fee is "equitable and just" is a matter of law, and a trial court abuses its discretion in awarding attorneys' fees under the Act if it rules "arbitrarily, unreasonably, or without regard to guiding legal principles." *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). Because Granite and Apache's declaratory judgment claim for a proportionate royalty deduction did not present a controversy between the parties—because the contingency never occurred—the trial court's attorneys-fee award of $46,849.60 to the Peyton Group for "defending" the unreached

30

claim was arbitrary, unreasonable, and without regard to guiding legal principles. *See Bocquet*, 972 S.W.2d at 20.

The Peyton Group has never cited—and Granite and Apache have not found—any authority for the position that a trial court may award a party attorneys' fees for "defending" against a contingent claim that was never before the Court because the contingency never occurred. The closest Texas case to those facts affirmatively rejects an award of attorneys' fees on a claim pleaded in the alternative and thus never reached. *See EOG Resources, Inc. v. Wagner & Brown, Ltd.*, 202 S.W.3d 338, 347-48 (Tex. App.—Corpus Christi 2006, pet. denied) (affirming denial of attorneys' fees for claim pleaded "as a separate and *alternative* cause of action" that was "not before the trial court"). Accordingly, that part of the trial court's judgment awarding the Peyton Group $46,849.60 for "defending" the unreached contingent proportionate-royalty-reduction claim was erroneous and should be reversed, and judgment should be rendered that the Group take nothing in attorneys' fees related to Granite and Apache's contingent claim.

31

**III.** **IF THIS COURT REVERSES THE TRIAL COURT'S JUDGMENT THAT PLAINTIFFS TAKE NOTHING ON THEIR CLAIMS AGAINST GRANITE AND APACHE, THEN THE COURT SHOULD ALSO REVERSE THE TRIAL COURT'S JUDGMENT THAT GRANITE AND APACHE TAKE NOTHING ON THEIR PROPORTIONATE-ROYALTY-REDUCTION CLAIM AGAINST THE PEYTON GROUP AND THE PAC GROUP.**

The underlying Plaintiffs have separately appealed that part of the trial court's judgment holding that Plaintiffs take nothing on their overriding-royalty-interest claims against Granite and Apache. 3.CR.787-88. The merits of those claims will be addressed in separate briefing—with Granite and Apache as Appellees. Should Plaintiffs prevail on appeal as to the merits of those royalty-interest claims against Granite and Apache, then Granite and Apache's contingent declaratory judgment claim with respect to the parties' relative royalty interests in the top leases would no longer be contingent. If that happens, then Granite and Apache request that this Court reach the merits of their claims for a declaration regarding proportionate-royalty reduction, render judgment declaring that the PAC Group and the Peyton Group's overriding royalty interests in the 2007 top leases be proportionately reduced as required by the settlement agreement, and remand the claim to the trial court for a determination of the appropriate amount of the reduction in overriding royalty interests.

As previously discussed, the agreement settling the APC-Upland lawsuit:

- required Upland to "release" the 1986 Aikman leases and purchase APC's 2007 top leases, 3.CR.428;

- recognized that the 1986 leases' overriding-royalty-interest owners (the underlying Plaintiffs in this suit) would be negatively affected, 3.CR.429;

- required the creation of overriding-royalty interests in the top leases for Upland (whose interests are now owned by the Peyton Group) and APC (whose interests are now owned by the PAC Group), 3.CR.429;

- speculated that the 1986 Aikman leases' overriding-royalty-interest owners (the underlying Plaintiffs here) would sue Upland, 3.CR.429; and

- agreed that if Plaintiffs sued Upland and prevailed, the overriding-royalty-interests created for Upland/Peyton Group and APC/PAC Group in the settlement agreement would be proportionately reduced, 3.CR.429.

The proportionate-reduction clause of the settlement agreement states:

Plaintiff agrees to assign to Defendant a two percent ORRI in the Top Leases in question. The parties understand that ORRI owners under the prior lease will lose their interests. However, Plaintiff agrees that they will share on a proportionate basis any reduction in retained override if such owners make a claim and the prior ORRI owners recover any interest. The Parties understand that Defendant has a two percent ORRI and the Plaintiff will have a three percent ORRI, and that any reduction shall be shared on that basis. It is agreed, however, that Plaintiff and Defendant may jointly or separately defend any action brought by third parties for recovery of overrides under the prior lease or leases, and may jointly or separately settle or try any such cases. If either Defendant or Plaintiff separately settles or tries any such action, its override shall be reduced by the amount of override recovered, if any, by any such third party without proportionate reduction. Only if the Plaintiff and Defendant both settle or try such an action and lose will their override be proportionately reduced.

3.CR.429. The clause speaks for itself: if the 1986 leases' overriding-royalty-interest owners ever sue and prevail, then the 2007 leases' overriding-royalty interests created under the APC-Upland settlement agreement "will be proportionately reduced." 3.CR.429. Based on this unambiguous provision, Granite and Apache pleaded in the trial court that if (and only if) the underlying Plaintiffs prevail in their lawsuit against Granite and Apache, then a declaration should be issued that the overriding-royalty interests in the 2007 top leases be proportionately reduced. 1.CR.372.

In the court below, the PAC Group agreed that Granite and Apache are correct on this point. 2.CR.14 (conceding Granite and Apache are "entitled" to a "reduction of the Third Party Defendants' overriding royalty interests (referred to in the Settlement Agreement as an ORRI) in the event the Plaintiffs recover an overriding royalty interest under the [top leases]"); *id.* (noting that the third-party defendants "agreed that if the Plaintiffs recovered an overriding royalty interest [in the top leases from Granite and Apache], the Third Party Defendants would contribute a part of their overriding royalty interest [in the top leases] to make up the ORRI recovered by Plaintiffs.").

The Peyton Group, however, disagreed. The Group's primary argument is that the claim is not yet ripe because the underlying Plaintiffs have not yet prevailed on their claims against Granite and Apache. 1.CR.399-400. But that, of course, will no longer be the case if the Plaintiffs prevail on appeal, and Granite and Apache advance

34

this appellate issue *only* upon the contingency of Plaintiffs first prevailing on their royalty claims.

The Peyton Group's only other argument against the proportionate-royalty-reduction claim is that the provision placed the proportionate-reduction obligation upon "Plaintiff and Defendant"—*i.e.*, the parties to the Upland-APC settlement agreement—and not the Peyton Group. 1.CR.400. But the Peyton Group is undisputedly the present owner of the overriding-royalty interest carved out for Upland (which was operated by Bailey Peyton at the time and is the primary Defendant sued here). As a matter of long-settled and conclusive Texas law, when a contract places an obligation upon a party to the contract, an assignee of the party's interest steps into the shoes of the assignor as to all rights and obligations. *E.g.*, *Terrell v. Munger Farm Co.*, 129 S.W.2d 407, 408 (Tex. Civ. App.—Fort Worth 1939, writ dism'd judgm't cor.); *Greenwood & Tyrrell v. Helm*, 264 S.W. 221, 222 (Tex. Civ. App.—San Antonio 1924, writ ref'd). And in any event, Upland (now Granite)—whose overriding royalty interest the Peyton Group owns—was a party to the settlement agreement and is a party to the lawsuit. The Group's argument is thus without logical or legal basis.[9]

---

[9] In addition, if the Court reaches and rules in favor of Granite and Apache on their proportionate-royalty-reduction claims, that would be another reason that the Peyton Group would not be a prevailing party for purposes of those claims and thus should not obtain attorneys' fees as to the claims. *See Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 455 (Tex. 2015).

## PRAYER

For all of these reasons, Appellants Granite Operating Company and Apache Corporation respectfully request that this Court:

- reverse that portion of the trial court's judgment holding that Granite and Apache take nothing on their breach-of-indemnification-agreement claim, render judgment that the Peyton Group is obligated to indemnify Granite and Apache, and remand this case for determination of Granite and Apache's damages; and

- reverse that portion of the trial court's judgment ordering that Granite and Apache pay $220,396.00 in attorneys' fees and render judgment that the Peyton Group take nothing on their attorneys' fees claims against Granite and Apache.

In addition, if (and only if) the Court reverses the trial court's award that Plaintiffs take nothing on their claims against Granite and Apache, then Granite and Apache respectfully request that the Court reverse the trial court's judgment that Granite and Apache take nothing on their proportionate-royalty-reduction claims and remand for determination of the appropriate proportionate royalty reduction.

Respectfully submitted,


*/s/ Ryan Clinton*
Ryan Clinton
State Bar No. 24027934
rdclinton@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
600 Congress Ave., Suite 3100
Austin, Texas 78701
(512) 493-9600
Fax: (512) 493-9625

John A. "Jad" Davis
State Bar No. 05511400
jadavis@dgclaw.com
DAVIS, GERALD & CREMER, P.C.
400 W. Illinois, Ste. 1400
Midland, Texas 79701
(432) 687-0011
Fax: (432) 687-1735

ATTORNEYS FOR APPELLANTS
GRANITE OPERATING COMPANY AND
APACHE CORPORATION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this brief was sent on August 2, 2017, to the following persons:

**VIA EFSP & EMAIL**
Joe W. Hayes
joe@tshhr.com
John Smithee
john@tshhr.com
Templeton, Smithee, Hayes,
  Heinrich & Russell, L.L.P.
320 S. Polk, Suite 1000
Amarillo, TX 79101

**VIA EFSP & EMAIL**
Thomas C. Riney
triney@rineymayfield.com
Joni Kleinschmidt
jkleinschmidt@rineymayfield.com
Kerri L. Stampes
kstampes@rineymayfield.com
Riney & Mayfield LLP
320 S. Polk Street, Suite 600
Amarillo, TX 79101

**VIA EFSP & EMAIL**
Thomas A. Zabel
tzabel@zflawfirm.com
John Smither
jsmither@zflawfirm.com
Nancy H. Elliott
nelliott@zflawfirm.com
Zabel Freeman
1135 Heights Blvd.
Houston, TX 77008

_/s/ Ryan Clinton_
Ryan Clinton

## CERTIFICATE OF COMPLIANCE

Relying on the word count function in the word processing software used to produce this document (WordPerfect X3), I certify that the number of words in this brief (excluding any caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix) is 8,756 and that the text of the document is in 14-pt. font. The text of all footnotes is 12-pt. font.

*/s/ Ryan Clinton*
Ryan Clinton

FILED FOR RECORD
2017 JAN 13 AM 9: 25
SHERRI JONES DIST. CLERK
WHEELER COUNTY, TEXAS
BY _____

| | | |
|---|---|---|
| TOMMY YOWELL; GAIL YOWELL; HARRY GRAFF; EL TERCIO, LLC; and CASUARINA INVESTMENTS, LLC (d/b/a LAR RESOURCES, LLC), | § § § § § § § | |
| Plaintiffs and Cross-Defendants, | § § § | |
| VS. | § § § | |
| GRANITE OPERATING COMPANY and APACHE CORPORATION, | § § § § | |
| Defendants, Third-Party Plaintiffs, and Counter-Defendants, | § § § § § | |
| VS. | § § | NO. 12,944 |
| PEYTON ROYALTIES, L.P.; BAILEY PEYTON, INDIVIDUALLY AND AS TRUSTEE OF THE GEORGE BAILEY PEYTON, IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1; and PEYTON HOLDINGS CORPORATION, | § § § § § § § § | |
| Third-Party Defendants, | § § | |
| and | § § | |
| PAC PRODUCTION COMPANY; MESA OIL & GAS CORPORATION; and CATTALO, LTD., | § § § § § | |
| Third-Party Defendants, CrossPlaintiffs, and Counter-Plaintiffs | § § § § | |

Final Judgment – Page 1

140575v1

**APPENDIX A - Page 1**

## FINAL JUDGMENT

### Background

On the 10th day of August, 2016, there came on to be heard the following motions:

1. **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' OVERRIDE CLAIM** (brought by Granite Operating Company and Apache Corporation against Plaintiffs Tommy Yowell, Gail Yowell, Harry Graff, El Tercio, LLC and Casuarina Investments, LLC d/b/a LAR Resources, LLC).

2. **THIRD PARTY DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT AGAINST THE CLAIMS OF PLAINTIFFS WITH SUPPORTING AUTHORITY** (brought by Third Party Defendants PAC Production Company (PAC), Cattalo, Ltd. (Cattalo), and Mesa Oil & Gas, Inc. (Mesa) against Plaintiffs Tommy Yowell, Gail Yowell, Harry Graff, El Tercio, LLC and Casuarina Investments, LLC d/b/a LAR Resources, LLC).

3. **THIRD PARTY DEFENDANTS' SECOND AMENDED MOTION FOR SUMMARY JUDGMENT AGAINST THE CLAIMS OF DEFENDANTS WITH SUPPORTING AUTHORITY** (brought by Third Party Defendants PAC Production Company (PAC), Cattalo, Ltd. (Cattalo), and Mesa Oil & Gas, Inc. (Mesa) against Granite Operating Company and Apache Corporation).

4. **TRADITIONAL AND NO-EVIDENCE MOTIONS FOR SUMMARY JUDGMENT, AND FIRST SUPPLEMENT THERETO, OF THIRD PARTY DEFENDANTS PEYTON ROYALTIES, L.P., BAILEY PEYTON, INDIVIDUALLY AND AS TRUSTEE OF THE GEORGE BAILEY PEYTON, IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1 AND PEYTON HOLDINGS CORPORATION** (Brought by Third Party Defendants Peyton Royalties, L.P., Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No, 1 and Peyton Holdings Corporation (collectively, the Peytons) against Granite Operating Company and Apache Corporation).[1]

5. **PLAINTIFFS' FIRST AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT** (brought by Tommy Yowell, Gail Yowell, Harry Graff, El Tercio, LLC and Casuarina Investments, LLC d/b/a LAR Resources, LLC against Defendants Granite Operating Company and Apache Corporation).

6. **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST CERTAIN THIRD PARTY DEFENDANTS** (brought by Granite Operating Company and Apache Corporation against Third Party Defendants PAC Production

---

[1] By order of November 12, 2015, all claims of these third party defendants, except for their claims for attorney's fees, were dismissed.

Company (PAC), Cattalo, Ltd. (Cattalo), Mesa Oil & Gas, Inc. (Mesa), and Peyton Royalties, LP).

7. **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST THIRD PARTY DEFENDANTS BAILEY PEYTON, INDIVIDUALLY AND AS TRUSTEE OF THE GEORGE BAILEY PEYTON, IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1** (Defendants' Indemnity Motion), (brought by Granite Operating Company and Apache Corporation against Third Party Defendant Bailey Peyton, Individually and as Trustee of the George Bailey Peyton IV 2007 Grantor Retained Annuity Trust No. 1).

8. **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST CERTAIN THIRD PARTY DEFENDANTS** (Defendants' Proportionate Reduction Motion), (brought by Granite Operating Company and Apache Corporation against Third Party Defendant Bailey Peyton, Individually and as Trustee of the George Bailey Peyton IV 2007 Grantor Retained Annuity Trust No. 1).

Third Party Defendants have withdrawn their **MOTION FOR SUMMARY JUDGMENT AGAINST THE CLAIMS OF PLAINTIFFS WITH SUPPORTING AUTHORITY** and submitted their **THIRD PARTY DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT AGAINST THE CLAIMS OF PLAINTIFFS WITH SUPPORTING AUTHORITY**.

It is STIPULATED BY THE PARTIES that **THIRD PARTY DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** insofar as it pertains to Plaintiffs' "**Ground No. 7:** During the period of November 1, 2009 to April 15, 2015, the ownership of the 1986 Override was owned by the Plaintiffs in the following proportions: (a) T. Yowell-1/6; (b) Gail Yowell-1/6; (c) Harry Graff-1/3; (d) El Tercio, LLC-1/4; and (e) Casuarina Investments, LLC-1/12." shall be interpreted to read: "This ground is not contested as to the claimed proportions only."

After considering the motions, the responses, and the summary judgment evidence, on August 10, 2016, the Court entered its order on motions for summary judgment.

140575v1

Following the entry of the August 10 order, the following motions were filed:

1. **PLAINTIFFS' MOTION FOR RECONSIDERATION, OR ALTERNATIVELY, FOR MODIFICATION OF FINAL JUDGMENT.**

2. **DEFENDANTS' MOTION FOR NEW TRIAL**

3. **MOTION TO MODIFY JUDGMENT OF THIRD PARTY DEFENDANTS PEYTON ROYALTIES, L.P.; BAILEY PEYTON, INDIVIDUALLY AND AS TRUSTEE OF THE GEORGE BAILEY PEYTON, IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1; AND PEYTON HOLDINGS CORPORATION.**

On the 20th day of October, 2016, the Court held a hearing on the foregoing motions. After considering the motions, the responses, the authorities, and the arguments of counsel, the Court denied the Plaintiffs' Motion for Reconsideration but found its Order dated August 10, 2016 should be modified. The Court entered an interlocutory Order to that effect on October 20, 2016. By a separate order also dated October 20th, this Court severed **(a)** the Higgins claim and **(b)** the Zybach claim (as defined below) into Cause No. 13,392. The Court entered an order on October 26th denying the Defendants' Motion for New Trial.

In accordance with its prior orders, IT IS ACCORDINGLY ORDERED, ADJUDGED, and DECREED and Judgment is rendered in the following respects:

1. Defendants' Motion for Summary Judgment on Plaintiffs' Override Claim is **granted**, **except** as to Plaintiffs' claims against Defendant, Granite Operating Company, relating to: **(a)** the recovery of Plaintiffs' overriding royalty percentage of the proceeds from the production of oil and gas from Section 42, Block A-3, H&GN RR Co. Survey in Wheeler County, Texas, under that Oil and Gas Lease recorded at Vol. 353 and Page 732, et. seq. of the Official Public Records of Wheeler County, Texas, but only to the extent that said claims cover the 1/36 undivided interest of Jim Tom Higgins in the E/2 of section 42, Block A-3, H&GN RR Co. Survey in Wheeler County, Texas, during the

Final Judgment – Page 4

140575v1

period November 1, 2009 to July 12, 2011 (**the Higgins claim**); and **(b)** the recovery of Plaintiffs' overriding royalty percentage of the proceeds from the production of oil and gas produced from Section 42, Block A-3, H&GN RR Co. Survey in Wheeler County, Texas, under those Oil and Gas Leases recorded at Vol. 353 and Page 723, et. seq.; Vol. 353 and Page 732, et. seq.; Vol. 353 and Page 726 et. seq.; and Vol. 353 and Page 729 et. seq. of the Official Public Records of Wheeler County, Texas, but only to the extent that said claims cover the 2% interest owned in said leases by Wayne Zybach during the period of November 1, 2009 to November 23, 2011 (**the Zybach claim**). Defendants' Motion for Summary Judgment On Plaintiffs' Override Claim is specifically **denied** as to **(a)** the Higgins claim and **(b)** the Zybach claim.

2.  Third Party Defendants' Second Motion for Summary Judgment Against The Claims of Plaintiffs With Supporting Authority is **granted** and Declaratory Judgment is entered that Plaintiffs take nothing by their claims against Defendants, **except** as to the Plaintiffs' claims against Defendant, Granite Operating Company, relating to **(a)** the Higgins claim and **(b)** the Zybach claim.

3.  Third Party Defendants' Second Amended Motion for Summary Judgment Against the Claims of Defendants with Supporting Authority is **granted**.

4.  The Traditional and No Evidence Motions for Summary Judgment, and First Supplement thereto, of Third Party Defendants Peyton Royalties, L.P.; Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1; and Peyton Holdings Corporation are **granted**.

5.  The following motions are **denied**:

    a.  Plaintiffs' First Amended Motion for Partial Summary Judgment;

b.  Defendants' Motion for Summary Judgment Against Certain Third Party Defendants

c.  Defendants' Motion for Summary Judgment Against Certain Third Party Defendants (Defendants' Proportionate Reduction Motion).

d.  Defendants' Motion for Summary Judgment Against Third Party Defendants Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1 (Defendants' Indemnity Motion); and

e.  All claims for recovery of attorney's fees **except** the claims of Third Party Defendants Peyton Royalties, LP; Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1; and Peyton Holdings Corporation against Defendants Granite Operating Company and Apache Corporation, which are addressed subsequently.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that:

6.  Plaintiffs Tommy Yowell, Gail Yowell, Harry Graff, El Tercio, LLC and Casuarina Investments, LLC (d/b/a LAR Resources, LLC) take nothing on the claims remaining in this cause against Defendants Granite Operating Company and Apache Corporation.

7.  Defendants Granite Operating Company and Apache Corporation take nothing on their claims against Third Party Defendants PAC Production Company, Cattalo, Ltd., and Mesa Oil & Gas, Inc.

8.  Defendants Granite Operating Company and Apache Corporation take nothing on their claims against Third Party Defendants Peyton Royalties, L.P.; Bailey Peyton,

APPENDIX A - Page 6

Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1; and Peyton Holdings Corporation.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that:

9. Within sixty (60) days from December 20, 2016, Granite Operating Company and Apache Corporation shall pay to Peyton Royalties, L.P., PAC Production Company, Mesa Oil & Gas Corporation, and Cattalo, LTD all suspended overriding royalty interest payments under the 2007 leases on Section 42, Block A-3, H&GN RR Co. Survey in Wheeler County, Texas, as described in the pleadings of this case, and the assignment of oil and gas leases from Amarillo Production Company to Granite Operating Company of October 31, 2007 recorded in the county records of Wheeler County, Texas at Vol. 574, Page 89, that have not heretofore been paid, and that Granite Operating Company and Apache Corporation provide an accounting of all overriding royalty interest payments which accrued to Peyton Royalties, L.P., PAC Production Company, Mesa Oil & Gas Corporation, and Cattalo, LTD during the period of suspense.

## Attorney's Fees

On the 21st day of December, 2016, there came on to be heard the claim for attorney's fees of Third Party Defendants Peyton Royalties, L.P. ("Peyton Royalties"), Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained Annuity Trust No. 1 ("Peyton"), and Peyton Holdings Corporation ("Peyton Holdings'), from Granite Operating Company ("Granite") and Apache Corporation ("Apache"), as set forth in the Third Amended Original Answer and Counterclaim of Third Party Defendants, Peyton Royalties, L.P., Bailey Peyton, Individually and as Trustee of the George Bailey Peyton, IV 2007 Grantor Retained

Final Judgment – Page 7

140575v1

Annuity Trust No. 1, and Peyton Holdings Corporation against Granite Operating Company and Apache Corporation.

The Peyton parties appeared in person and by their attorney of record, and Apache and Granite appeared by their attorney of record, and all parties announced ready for trial. No jury having been demanded, all questions of fact were submitted to the court.

Under the Order of August 10, 2016, as modified by the Order of October 20, 2016, Peyton and Peyton Holdings are prevailing parties on the claims asserted against them by Granite and Apache under the Stock Purchase and Sale Agreement of September 12, 2007, and on the claim for declaratory judgment regarding the indemnity issue under that Agreement asserted against them by Granite and Apache, and are therefore entitled to recover reasonable attorney's fees and court costs under Section 12.14 of the Agreement from Granite and Apache.

The court, after hearing evidence and arguments of counsel, is of the opinion that Peyton and Peyton Holdings are entitled to recover reasonable attorney's fees and court costs from Granite and Apache as set forth below. The court finds the amount of these attorney's fees to be reasonable. It is therefore ORDERED, ADJUDGED, and DECREED that Peyton and Peyton Holdings recover from Granite and Apache, as follows:

1. $130,046.40 for attorney's fees for services rendered through the trial of this case;

2. the additional sum of $22,000.00 if Granite or Apache unsuccessfully appeals this judgment to the Court of Appeals;

3. the additional sum of $7,500.00 if a petition for review is filed but not granted by the Texas Supreme Court;

4. the additional sum of $9,000.00 if briefing on the merits is ordered in the Texas Supreme Court but the petition to review is not granted; and

5. the additional sum of 5,000.00 for the completion of proceedings in the Texas Supreme Court if the appeal is unsuccessful.

The court further finds that it may award reasonable attorney's fees and court costs as are equitable and just to Peyton Royalties and Peyton Holdings in connection with the declaratory judgment asserted against them by Granite and Apache regarding the alleged liability for proportionate reduction. It is therefore ORDERED, ADJUDGED, and DECREED that Peyton Holdings and Peyton Royalties recover from Granite and Apache the sum of $46,849.60 for services rendered through the trial of this case. The court finds this amount to be reasonable, fair and equitable.

It is further ORDERED, ADJUDGED, and DECREED that Peyton, Peyton Holdings, and Peyton Royalties recover their court costs from Granite and Apache.

All writs and processes in the enforcement and collection of this judgment or the costs the court may issue as necessary.

It is further ORDERED, ADJUDGED, and DECREED that the total amount of the judgment will bear interest at the rate of 5 percent per annum from date of judgment until paid.

All relief requested in this case by any party and not expressly granted herein is denied. This judgment finally disposes of all parties and claims and is appealable.

SIGNED this _12th_ day of _January_ 2017.

_____
JUDGE PRESIDING

# EXHIBIT A

STOCK PURCHASE AND SALE AGREEMENT

by and among

**BAILEY PEYTON**
**GEORGE BAILEY PEYTON IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1**

"Sellers"


UPLAND RESOURCES, INC.

"Company"


and

CORDILLERA ENERGY PARTNERS III, LLC

"Buyer"


Dated September 12, 2007

512819 000002 HOUSTON 543524.5

CONFIDENTIAL    APACHE001130



CONFIDENTIAL    APACHE001131

846

## TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ......................................................................................................... 1
    Section 1.01    Defined Terms................................................................................... 1
    Section 1.02    References and Titles. ...................................................................... 8

ARTICLE 2 PURCHASE AND SALE .......................................................................................... 8
    Section 2.01    Purchase and Sale of Upland Common Stock................................. 8
    Section 2.02    Adjustments to Purchase Price......................................................... 8
    Section 2.03    The Closing. ..................................................................................... 9

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF UPLAND AND SELLERS ....... 9
    Section 3.01    Organization. .................................................................................... 9
    Section 3.02    Subsidiaries. .................................................................................. 10
    Section 3.03    Authority and Enforceability........................................................ 10
    Section 3.04    No Violations. ............................................................................... 10
    Section 3.05    Consents and Approvals................................................................ 11
    Section 3.06    Capital Structure; Ownership of Upland Common Stock.................... 11
    Section 3.07    No Undisclosed Liabilities............................................................ 12
    Section 3.08    Brokers.......................................................................................... 12
    Section 3.09    Upland Balance Sheet. .................................................................. 12
    Section 3.10    Absence of Certain Changes or Events. ....................................... 12
    Section 3.11    Compliance with Laws, Material Agreements and Permits.................. 13
    Section 3.12    Governmental Regulation. ............................................................ 14
    Section 3.13    Litigation. ...................................................................................... 14
    Section 3.14    No Restrictions.............................................................................. 14
    Section 3.15    Title to Non-Oil and Gas Assets. ................................................. 14
    Section 3.16    Taxes. ............................................................................................ 14
    Section 3.17    Employee Benefit Plans. ............................................................... 16
    Section 3.18    Payment Contracts and Benefits. ................................................. 16
    Section 3.19    Accounts Receivable..................................................................... 16
    Section 3.20    Insurance. ...................................................................................... 16
    Section 3.21    Office and Other Equipment. ....................................................... 16
    Section 3.22    Title to Oil and Gas Assets........................................................... 17
    Section 3.23    Oil and Gas Operations................................................................. 17
    Section 3.24    Hydrocarbon Sales Agreements................................................... 17
    Section 3.25    Environmental Matters.................................................................. 17
    Section 3.26    Royalties........................................................................................ 18
    Section 3.27    Securities Matters.......................................................................... 18
    Section 3.28    Insider Interests. ........................................................................... 18
    Section 3.29    Financial Requirements................................................................. 18
    Section 3.30    Bank Accounts and Powers of Attorney. ..................................... 18
    Section 3.31    Representations and Warranties Exclusive. .................................. 18

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................... 19
    Section 4.01    Organization. .................................................................................. 19

**APPENDIX B - Page 3**

Section 4.02    Authority and Enforceability.............................................................19
Section 4.03    No Violations. ....................................................................................19
Section 4.04    Consents and Approvals.....................................................................19
Section 4.05    Governmental Regulation. ................................................................19
Section 4.06    Litigation. ...........................................................................................19
Section 4.07    Funding. ..............................................................................................20
Section 4.08    Brokers. ...............................................................................................20
Section 4.09    Held for Investment............................................................................20
Section 4.10    Buyer's Investigation; Sophisticated Buyer......................................20
Section 4.11    Absence of Certain Changes and Events...........................................20
Section 4.12    Compliance with Law. ......................................................................20
Section 4.13    No Undisclosed Liabilities.................................................................20

ARTICLE 5 COVENANTS.....................................................................................21
Section 5.01    Conduct of Business by Upland and Sellers Pending Closing............21
Section 5.02    Access to Assets, Personnel and Information. ..................................23
Section 5.03    Additional Arrangements..................................................................24
Section 5.04    Public Announcements.......................................................................24
Section 5.05    Payment of Expenses. ........................................................................24
Section 5.06    Operations. ..........................................................................................24
Section 5.07    Adjustments to the Financial Statements. .........................................24
Section 5.08    Tax Matters. .......................................................................................26
Section 5.09    Upland Name Change. .......................................................................28
Section 5.10    Signs.....................................................................................................28
Section 5.11    Preferential Right to Purchase............................................................28

ARTICLE 6 TITLE AND ENVIRONMENTAL MATTERS .....................................29
Section 6.01    Title Defect Adjustments. ..................................................................29
Section 6.02    Environmental Defect Adjustments. ..................................................31
Section 6.03    Casualty Loss. ....................................................................................32

ARTICLE 7 CONDITIONS......................................................................................32
Section 7.01    Conditions to Each Party's Obligation to Effect the Transaction.........32
Section 7.02    Conditions to Obligations of Buyer. .................................................33
Section 7.03    Conditions to Obligation of Sellers....................................................33

ARTICLE 8 CLOSING..............................................................................................34
Section 8.01    Closing Obligations............................................................................34

ARTICLE 9 POST-CLOSING GAS IMBALANCE ...................................................35
Section 9.01    Gas Balancing. ...................................................................................35

ARTICLE 10 TERMINATION ..................................................................................35
Section 10.01   Termination Rights.............................................................................35
Section 10.02   Effect of Termination. .......................................................................36

ARTICLE 11 INDEMNIFICATION AND ASSUMPTION .......................................36
Section 11.01   Survival of Representations and Warranties.......................................36
Section 11.02   Indemnification By Sellers.................................................................37
Section 11.03   Indemnification by Buyer and Upland. ..............................................39
Section 11.04   Matters Involving Third Parties. ........................................................39

-ii- CONFIDENTIAL     APACHE001133

**APPENDIX B - Page 4**

Section 11.05    Indemnification Despite Negligence. ................................................ 40
Section 11.06    Determination of Adverse Consequences. ........................................ 40
Section 11.07    Offset. ............................................................................................ 40
Section 11.08    Application of Article 11. ............................................................... 40
ARTICLE 12 MISCELLANEOUS ................................................................................. 41
Section 12.01    Amendment. ................................................................................... 41
Section 12.02    Notices. .......................................................................................... 41
Section 12.03    Counterparts. .................................................................................. 41
Section 12.04    Entire Agreement; No Third Party Beneficiaries. ........................... 42
Section 12.05    Applicable Law. ............................................................................. 42
Section 12.06    No Remedy in Certain Circumstances. ........................................... 42
Section 12.07    Assignment. .................................................................................... 42
Section 12.08    Waivers. ......................................................................................... 42
Section 12.09    Confidentiality Agreement. ............................................................ 43
Section 12.10    Incorporation. ................................................................................ 43
Section 12.11    Waiver of Jury Trial. ...................................................................... 43
Section 12.12    Jurisdiction and Venue. .................................................................. 43
Section 12.13    Damage Waiver. ............................................................................. 43
Section 12.14    Legal Fees. ..................................................................................... 43
Section 12.15    Injunctive Relief, Specific Performance. ....................................... 43
Section 12.16    Further Assurances. ........................................................................ 44
Section 12.17    Transition. ...................................................................................... 44

Schedules

Schedule 1.01(a)    Allocated Values
Schedule 7.02(d)    Lessors' Non-Producing Minerals to be Leased
Schedule 9.01       Gas Balancing

Disclosure Schedule

Exhibits

Exhibit A    Leases
Exhibit B    Wells
Exhibit C    Form of Lease
Exhibit D    Form of Guaranty Agreement
Exhibit E    Form of Transition Agreement

849

**APPENDIX B - Page 5**

## STOCK PURCHASE AND SALE AGREEMENT

This Stock Purchase and Sale Agreement (this "Agreement") is made and entered into as of the 12th day of September, 2007, by and among Cordillera Energy Partners III, LLC, a Colorado limited liability company ("Buyer"), Bailey Peyton, George Bailey Peyton IV 2007 Grantor Retained Annuity Trust No. 1 (each, a "Seller", and collectively, the "Sellers"), and Upland Resources, Inc., a Texas corporation ("Upland").

All of the issued and outstanding shares of capital stock of Upland, are owned by Sellers. Buyer wishes to purchase from Sellers all of the capital stock of Upland on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for and in consideration of the recitals and the mutual covenants and agreements set forth in this Agreement, the parties to this Agreement hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.01    Defined Terms. As used in this Agreement, each of the following terms has the meaning given in this Section 1.01 or in the Sections referred to below:

"Accounting Arbitrator" has the meaning specified in Section 5.07(b).

"Act" means the Securities Act of 1933, as amended.

"Adverse Consequences" means all actions, awards, suits, proceedings, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, reasonable amounts paid in settlement, liabilities, obligations, taxes (including interest thereon), liens, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"Affiliate" means, with respect to any Person, each other Person that directly or indirectly (through one or more intermediaries or otherwise) controls, is controlled by, or is under common control with such Person.

"Agreement" means this Stock Purchase and Sale Agreement, including all exhibits and schedules, the Disclosure Schedule, and any other schedules and similar attachments, as amended, supplemented or modified from time to time.

"Allocated Values" means the allocation of values among the Oil and Gas Interests and other assets shown on Schedule 1.01(a).

"Applicable Rate" means the London Interbank Offered Rate for three (3) month loans as published in The Wall Street Journal, as such rate may be adjusted from time to time, plus 0.5%.

"Bank Consent" means the full consent of Upland's lenders under its senior credit facility to the transaction contemplated by this Agreement.

CONFIDENTIAL    APACHE001135

"Buyer" means Cordillera Energy Partners III, LLC, a Colorado limited liability company.

"Buyer Indemnitees" has the meaning specified in Section 11.02.

"Buyer's Projected Costs" means the costs and expenses associated with the maintenance, exploration, development, operation and abandonment of a well or unit assuming that all projected wells and units listed in Schedule 1.01(a) are drilled and developed and that all wells and units listed in Schedule 1.01(a) commence and/or continue to produce Hydrocarbons for the time period necessary for Buyer to realize the present value for such wells or units as set forth in Schedule 1.01(a) (assuming that such present value was determined with a discount factor of 10% compounded annually).

"Byrd Well Litigation" has the meaning specified in Section 11.02.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, or any successor statutes and any regulations promulgated thereunder.

"Cleanup" has the meaning specified in Section 11.02(b)(i)(1).

"Closing" means the consummation of the transaction contemplated by this Agreement.

"Closing Date" means the date on which the Closing occurs.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any comparable successor statute or statutes.

"Confidentiality Agreement" means the Confidentiality Agreement dated February 2, 2007 between Upland and Buyer relating to Upland's furnishing of information to Buyer in connection with Buyer's evaluation of the possibility of the transaction.

"Credit Adjustment" has the meaning specified in Section 6.01(g).

"Cure Period" has the meaning assigned to such term in Section 6.01(e).

"Defect Amount" has the meaning specified in Section 6.01(c).

"Defensible Title" means such right, title and interest that is held directly or indirectly by Upland or for the benefit of Upland, in the Ownership Interests that, except for and subject to the Permitted Encumbrances: (i) entitles Upland to receive as to each Ownership Interest set forth in Schedule 1.01(a), not less than the "NRI" set forth in Schedule 1.01(a) in the oil, gas and associated liquid and gaseous hydrocarbons produced, saved and marketed from such Ownership Interests; (ii) obligates Upland to bear costs and expenses relating to the maintenance, development and operation of any such Ownership Interest in an amount not greater than the "Working Interest" set forth in Schedule 1.01(a), and (iii) is free and clear of Liens and material encumbrances and defects. Upland's title to an Ownership Interest shall be presumed to be Defensible Title, unless Buyer can show through actual evidence (rather than a mere assertion that documents are missing from Sellers' or Upland's records) submitted with a Title Defect notice pursuant to Section 6.01(b) that Upland's title to an affected lease or well has failed or that

such Ownership Interest is subject to a Lien (except for Permitted Encumbrances) that would create a material diminution in value in such Ownership Interest.

"Disclosure Schedule" means the Disclosure Schedule attached hereto and any documents listed on such Disclosure Schedule.

"Effective Date Balance Sheet" has the meaning specified in Section 5.07(a).

"Effective Time" means July 1, 2007, at 7:00 a.m. at the location of the Oil and Gas Interests.

"Environmental Defect" means any circumstance or condition that would constitute a breach of Upland's and Sellers' warranty and representation set forth in Section 3.25 without regard to Upland's or Sellers' disclosure of such circumstance or condition on the Disclosure Schedule, taking into account the standards set forth in Section 11.02(b)(iii).

"Environmental Law" means any federal, state, or local statute, code, ordinance, rule, regulation, policy, guideline, permit, consent, approval, license, judgment, order, writ, decree, common law, injunction or other authorization in effect on the date of this Agreement or at a previous time applicable to Upland's operations relating to (a) emissions, discharges, releases or threatened releases of Hazardous Materials into the natural environment, including into ambient air, soil, sediments, land surface or subsurface, buildings or facilities, surface water, groundwater, publicly owned treatment works, septic systems or land; (b) the generation, treatment, storage, disposal, use, handling, manufacturing, transportation or shipment of Hazardous Materials; (c) occupational health and safety; or (d) otherwise relating to the pollution of the environment, solid waste handling, treatment or disposal, or operation or reclamation of oil and gas operations or mines.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"GAAP" means generally accepted accounting principles, as recognized by the U.S. Financial Accounting Standards Board (or any generally recognized successor).

"Governmental Action" means any authorization, application, approval, consent, exemption, filing, license, notice, registration, permit or other requirement of, to or with any Governmental Authority.

"Governmental Authority" means any national, state, county or municipal government, any agency, board, bureau, commission, court, department or other instrumentality of any such government, or any arbitrator, in any case that has jurisdiction over either a Seller, Upland, Buyer or any of their respective properties or assets.

"Hazardous Material" means (a) any "hazardous substance," as defined by CERCLA, (b) any "hazardous waste" as defined by the Resource Conservation and Recovery Act, as amended, or (c) any substances, materials or wastes classified, characterized or otherwise regulated under any Environmental Law as hazardous, toxic, pollutant, contaminant, or words of similar meaning or effect, as well as, any petroleum product, by product or constituent thereof.

"Hydrocarbon Sales Agreement" means any sales agreement, purchase contract or marketing agreement that is currently in effect and under which Upland is a seller of Hydrocarbons (other than "spot" sales agreements entered into in the ordinary course of business with a term of three months or less, terminable without penalty on thirty (30) days' notice or less, and which provide for a price not less than the market value price that would be received pursuant to an arm's length contract for the same term with an unaffiliated third-party purchaser).

"Hydrocarbons" means oil, condensate, gas, casinghead gas and other liquid or gaseous hydrocarbons.

"Indemnified Party" has the meaning specified in Section 11.04(a).

"Indemnifying Party" has the meaning specified in Section 11.04(a).

"Knowledge", unless otherwise defined in this Agreement, means, (a) with respect to a party hereto that is an entity, the actual knowledge, without independent investigation, of any officer or manager of such entity in charge of a discrete business area or function having responsibility for the referenced matter, and (b) with respect to a party hereto that is an individual, the actual knowledge of such individual.

"Lessors" has the meaning specified in Section 7.02(d).

"Lien" means any lien, mortgage, security interest, pledge, deposit, production payment, restriction, burden, encumbrance, right of a vendor under any title retention or conditional sale agreement, or lease or other arrangement substantially equivalent thereto.

"Material Adverse Effect" means (a) when used with respect to a Seller or Upland, as the case may be, a result or consequence that would materially adversely affect the financial condition, results of operations or business of such Seller or Upland or the aggregate value of its assets, would materially impair the ability of such Seller or Upland to own, hold, develop and operate their assets, or would materially impair such Seller's or Upland's ability to perform its obligations hereunder or consummate the transactions contemplated hereby; and (b) when used with respect to Buyer, a result or consequence that would materially adversely affect the condition (financial or otherwise), results of operations or business of Buyer or the aggregate value of its assets, would materially impair the ability of Buyer to own, hold, develop and operate its assets, or would impair Buyer's ability to perform its respective obligations hereunder or consummate the transactions contemplated hereby.

"NRI" means Net Revenue Interest.

"Oil and Gas Interest(s)" means (a) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind and nature, direct or indirect, including working, royalty and overriding royalty interests, production payments, operating rights, net profits interests, other nonworking interests and nonoperating interests; (b) interests in and rights with respect to Hydrocarbons and other minerals or revenues therefrom and contracts in connection therewith and claims and rights thereto (including oil and gas leases, operating agreements, unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and

agreements and, in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations and concessions; (c) easements, rights-of-way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the operation of any of the foregoing; and (d) interests in equipment and machinery (including well equipment and machinery), oil and gas production, gathering, transmission, compression, treating, processing and storage facilities (including tanks, tank batteries, pipelines and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing. References in this Agreement to the "Oil and Gas Interests," "Oil and Gas Interests of Upland," and "Upland's Oil and Gas Interests" mean the collective Oil and Gas Interests of Upland held directly, indirectly or for the benefit of Upland, including the leases described on Exhibit A and the wells described on Exhibit B.

"Ownership Interest" means each Oil and Gas Interest as separately identified by line item on Schedule 1.01(a).

"Permits" has the meaning specified in Section 3.11.

"Permitted Encumbrances" means (a) Liens for Taxes, assessments or other governmental charges or levies if the same shall not at the particular time in question be due and delinquent or (if foreclosure, sale or other similar proceedings shall not have been commenced or, if commenced, shall have been stayed) are being contested in good faith by appropriate proceedings and if Upland shall have set aside on its books such reserves (segregated to the extent required by sound accounting practices) as may be required by or consistent with GAAP, whether reserves are set aside or not, which would not, individually or in the aggregate, result in an adverse effect on Upland; (b) Liens of carriers, warehousemen, mechanics, laborers, materialmen, landlords, vendors, workmen and operators arising by operation of law in the ordinary course of business or by a written agreement existing as of the date of this Agreement and necessary or incident to the exploration, development, operation and maintenance of the Oil and Gas Interests and related facilities and assets for sums not yet due or being contested in good faith by appropriate proceedings, if Upland shall have set aside on its books such reserves (segregated to the extent required by sound accounting practices) as may be required by or consistent with GAAP, whether reserves are set aside or not, which would not, individually or in the aggregate, result in an adverse effect on Upland; (c) Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance and other social security legislation (other than ERISA) which would not, individually or in the aggregate, result in an adverse effect on Upland; (d) Liens incurred in the ordinary course of business to secure the performance of bids, tenders, trade contracts, leases, statutory obligations, surety and appeal bonds, performance and repayment bonds and other obligations of a like nature; (e) Liens, easements, rights-of-way, restrictions, servitudes, permits, conditions, covenants, exceptions, reservations and other similar encumbrances incurred in the ordinary course of business or existing on property and not materially impairing the value of the assets of Upland or materially interfering with the ordinary conduct of the business of Upland or rights to any of their assets; (f) Liens arising pursuant to statute (or similar Liens created or arising by operation of law) to secure a party's obligations as a purchaser of oil and gas; (g) all rights to consent by, required notices to, filings with, or other actions by Governmental Authorities to the extent customarily obtained subsequent to closing; (h) farmout, carried working interest, joint operating, unitization, royalty, overriding royalty,

sales and similar agreements relating to the exploration or development of, or production from, the Oil and Gas Interests entered into in the ordinary course of business and not in violation of Section 5.0l(b), provided the effect thereof on the WI and NRI of Upland has been properly reflected in the Ownership Interests; (i) any defects, irregularities or deficiencies in title to easements, rights-of-way or other surface use agreements that do not adversely affect the value of any asset of Upland; (j) preferential rights to purchase and Third Party Consents that have been waived or obtained; (k) rights reserved to or vested in any municipality or governmental, tribal, statutory or public authority to control or regulate any of the Ownership Interests in any manner, and all applicable laws, rules and orders of governmental and tribal authority; and (l) all other liens, charges, encumbrances, contracts, agreements, instruments, obligations, defects and irregularities affecting the Ownership Interests (including, without limitation, liens of operators relating to obligations not yet due or pursuant to which Upland is not in default) that do not (or would not upon foreclosure or other enforcement) reduce the NRI set forth in Schedule 1.01(a), nor prevent the receipt of proceeds of production therefrom, nor increase the share of costs above the WI set forth in Schedule 1.01(a), nor are such as materially to interfere with or detract from the ownership, operation, value or use of the Ownership Interests; such defects include, without limitation:

(a)    as to producing Oil and Gas Interests, those which have not prevented the receipt of production proceeds by Upland or its predecessors in title without suspense by a production purchaser and as to which no challenge to title has been raised on the basis of such defect, so long as it can reasonably be concluded either that such challenge is unlikely or that such challenge would be unsuccessful by reason of statutes of limitation, waiver, estoppel or other defenses;

(b)    those defects customarily considered as advisory or waivable as a matter of prudent business judgment;

(c)    those in the nature of customary defects expected to be encountered in the area involved and customarily acceptable to Upland, Buyer or other prudent operators and interest owners in the area, including, without limitation, defects that have been cured by possession under applicable statutes of limitation, defects in the early chain of title such as failure to recite marital status in documents, omission of heirship or succession proceedings, lack of survey and failure to record releases of liens, production payments or mortgages that have expired of their own terms or which through the passage of time or statute are no longer enforceable or other defects that either as a practical matter have not resulted or are not likely to result in claims that will materially adversely affect Upland's title or are considered waivable under local bar association-approved title standards or customary title practices in the area; or

(d)    those included in an attorney's title opinion or that are otherwise evident from an examination of the records of Upland that have existed for seven (7) years as of the date of this Agreement and for which no claim has been asserted in writing to Upland or its predecessors in title during said seven (7) year period.

"Person" means any natural person, corporation, company, limited or general partnership, joint stock company, joint venture, association, limited liability company, trust, bank, trust company, land trust, business trust or other entity or organization, whether or not a Governmental Authority.

"Petro Pro" has the meaning specified in Section 11.02

"Phase I Environmental Audit" means an assessment of Upland's compliance with Environmental Laws relative to the Oil and Gas Interests and other assets of Upland consisting of examination of Upland's files and public documents, interviews of personnel and former personnel of Upland and of other appropriate Persons, visual inspection of the Oil and Gas Interests and other assets of Upland, and NORM and asbestos surveys. The foregoing definitions shall not include or authorize any soil borings or laboratory analysis of soil or groundwater samples on or from the Oil and Gas Interests and other assets of Upland.

"Post-Closing Defect" has the meaning specified in Section 6.01(e).

"Preliminary Purchase Price" has the meaning specified in Section 8.01(a).

"Purchase Price" means the amount shown in Section 2.01(b).

"Representative" means any director, officer, employee, agent, advisor (including legal, accounting and financial advisors), Affiliate or other representative of Upland, Sellers or Buyer, respectively.

"Roberts County Litigation" has the meaning specified in Section 11.02.

"Seller Indemnitees" has the meaning specified in Section 11.02(b)(i)(1).

"Seller's Royalties" has the meaning specified in Section 11.07.

"Sellers" means Bailey Peyton and George Bailey Peyton IV 2007 Grantor Retained Annuity Trust No. 1.

"Straddle Period" has the meaning specified in Section 5.08(d).

"Tax Returns" has the meaning specified in Section 3.16(a).

"Taxes" means taxes of any kind, levies or other like assessments, customs, duties, imposts, charges or fees, including income, gross receipts, ad valorem, value added, excise, real or personal property, asset, sales, use, federal royalty, license, payroll, transaction, capital, net worth and franchise taxes, estimated taxes, withholding, employment, social security, workers compensation, utility, severance, production, unemployment compensation, occupation, premium, windfall profits, transfer and gains taxes or other governmental taxes imposed or payable to the United States or any state, local or foreign governmental subdivision or agency thereof, and in each instance such term shall include any interest, penalties or additions to tax attributable to any such Tax, including penalties for the failure to file any Tax Return or report.

"Third Party Claim" has the meaning specified in Section 11.04(a).

"Third Party Consent" means the consent or approval of any Person other than a Seller, Buyer or any Governmental Authority.

"Title Arbitrator" has the meaning specified in Section 6.01(f).

512819 000002 HOUSTON 543524.5      -7-      CONFIDENTIAL      APACHE001141

"Title Defect" shall mean any encumbrance or defect in Upland's title to the Oil and Gas Interests (expressly excluding Permitted Encumbrances), that renders Upland's title to such Oil and Gas Interest less than Defensible Title.

"Transition Period" has the meaning specified in Section 12.17.

"Upland Balance Sheet" means the unaudited balance sheet of Upland as of June 30, 2007.

"Upland Common Stock" means the common stock, par value $1.00 per share, of Upland.

"WI" means Working Interest.

Section 1.02    References and Titles.    All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Article, Section, subsection or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to the Article, Section or subsection hereof in which such words occur. The word "or" is not exclusive, and the word "including" (in its various forms) means "including without limitation." Pronouns in masculine, feminine or neuter genders shall be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires.

## ARTICLE 2
## PURCHASE AND SALE

Section 2.01    Purchase and Sale of Upland Common Stock.

(a)    Basic Transaction.    Subject to the terms and conditions of this Agreement, Buyer agrees to purchase from each Seller, and each Seller agrees to sell, assign and deliver to Buyer, all of the Upland Common Stock owned by such Seller for the consideration specified below in this Article 2.

(b)    Purchase Price.    Buyer shall pay to Sellers an aggregate of $73,170,000 (the "Purchase Price") by wire transfer of immediately available United States funds to a designated account or accounts of Sellers at Closing.

Section 2.02    Adjustments to Purchase Price.    The Purchase Price shall be adjusted as follows:

(a)    increased or decreased as set forth in Section 5.07;

(b)    decreased for Title Defects and Environmental Defects as set forth in Article 6;

512819 000002 HOUSTON 543524.5          -8-      CONFIDENTIAL      APACHE001142

857

(c)    increased or decreased as set forth in Section 9.01 regarding gas imbalances for Oil and Gas Interests;

(d)    decreased for the amounts in "suspense accounts" maintained by Upland attributable to the Oil and Gas Interests to the extent such matters are not included in the adjustment made under (a) above;

(e)    decreased by the amount that any commercial debt obligations of Upland being assumed by Buyer exceeds $5,000,000;

(f)    increased (i) by the amount of actual drilling and completion expenses incurred and paid by Upland prior to the Effective Time relating to the Eubank #1-44 Well; and (ii) by the amount of actual capital expenditures made relating to Oil and Gas Interests between the Effective Time and the date hereof if authorized pursuant to Section 5.01 hereof other than those specified in (i) above (relating to the Eubank #1-44 Well);

(g)    increased or decreased for ad valorem, real and personal property, production, and income taxes as provided in Section 5.08(a) and (d) to the extent such matters are not included in the adjustment made under (a) above;

(h)    decreased by the amount of any receivable due from any Affiliate of Upland, including any receivable due from Panhandle Pipeline, L.P.;

(i)    decreased by amount necessary for the net working capital of Upland to be zero dollars ($0) as of June 30, 2007 (with net working capital computed as set forth in Section 5.07); and

(j)    increased or decreased by any other amounts as agreed to in writing between Sellers and Buyer.

Section 2.03    **The Closing.**    The Closing of the transactions contemplated by this Agreement shall take place at the offices of Upland in Canadian, Texas, commencing at 9:00 a.m. local time on November 1, 2007, or such other time or place as Buyer and Sellers may mutually determine.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF UPLAND AND SELLERS

Sellers and Upland hereby jointly and severally represent and warrant to Buyer as follows:

Section 3.01    **Organization.**    Upland (a) is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas, (b) has the requisite corporate power and authority to own, lease and operate its properties and to conduct its business as it is presently being conducted, and (c) is duly qualified to do business as a foreign corporation, and is in good standing, in each jurisdiction listed on the Disclosure Schedule, which are all the jurisdictions where the character of the properties owned or leased by it or the nature of its activities makes such qualification necessary.  No actions or proceedings to dissolve Upland are

512819 000002 HOUSTON 543524.5                -9-           CONFIDENTIAL      APACHE001143

pending. Sellers have delivered to Buyer accurate and complete copies of (i) the articles of incorporation and by-laws of Upland, (ii) the stock records of Upland, and (iii) the minutes of all meetings of Upland's board of directors, any committees of such board, and Upland's shareholders (and all consents in lieu of such meetings). Such records, minutes, and consents accurately reflect the stock ownership of Upland and all actions taken by Upland's board of directors, any committees of such board, and Upland's shareholders. Upland is not in violation of any provision of its articles of incorporation or bylaws.

Section 3.02 **Subsidiaries.** Upland has no subsidiaries. Upland does not own, directly or indirectly, any capital stock or other equity interest in any corporation, limited liability company, general or limited partnership, or other entity (other than joint venture, joint operating or ownership arrangements or tax partnerships entered into in the ordinary course of business).

Section 3.03 **Authority and Enforceability.** Upland has the requisite corporate power and authority to enter into and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of Upland, including approval by the board of directors of Upland, and no other corporate proceedings on the part of Upland are necessary to authorize the execution or delivery of this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by Upland and constitutes a valid and binding obligation of Upland enforceable against Upland in accordance with its terms, except to the extent that (a) the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer, or other similar laws now or hereafter in effect relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought. Each Seller has full legal right, power, and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by each Seller and constitutes, and each other agreement, instrument, or document executed or to be executed by a Seller in connection with the transactions contemplated hereby has been, or when executed will be, duly executed and delivered by such Seller and constitutes, or when executed and delivered will constitute, a valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with their terms, except to the extent that (a) the enforcement hereof may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer, or other similar laws now or hereafter in effect relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

Section 3.04 **No Violations.** The execution, delivery, and performance by Sellers and Upland of this Agreement does not, and the consummation of the transactions contemplated hereby and compliance by Sellers with the provisions hereof will not, conflict with, result in any violation of or default (with or without notice or lapse of time or both) under, give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a material benefit under, or result in the creation of any Lien on any of the properties or assets of Upland or a Seller under, any provision of (a) the certificate or articles of incorporation or by-laws of Upland or the

governing documents of George Bailey Peyton IV 2007 Grantor Retained Annuity Trust No. 1, (b) any loan or credit agreement, note, bond, mortgage, indenture, lease, permit, concession, franchise, license or other agreement or instrument applicable to a Seller or Upland, or (c) assuming the consents, approvals, authorizations or permits and filings or notifications referred to in Section 3.05 are duly and timely obtained or made, any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to a Seller or Upland or any of their respective properties or assets.

Section 3.05 **Consents and Approvals.** No Governmental Action from any Governmental Authority is required by or with respect to Upland or either Seller in connection with the execution and delivery of this Agreement by Upland or either Seller or the consummation by Upland or either Seller of the transactions contemplated hereby, except for the following: (a) any Governmental Action which the failure to obtain or make would not, individually or in the aggregate, have a Material Adverse Effect on Upland; (b) all Governmental Action by Governmental Authorities to the extent customarily obtained subsequent to Closing; and (c) such filings and approvals as may be required by any applicable state securities, "blue sky" or takeover laws, or Environmental Laws. No Third Party Consent is required by or with respect to Upland or either Seller in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby, except for such consent, approval or waiver as set forth in the Disclosure Schedule.

Section 3.06 **Capital Structure; Ownership of Upland Common Stock.**

(a) The authorized capital stock of Upland consists of 100,000 shares of Upland Common Stock, par value $1.00 per share.

(b) There are issued and outstanding 1,000 shares of Upland Common Stock. No shares of Upland Common Stock are held by Upland as treasury stock. There are and as of the Closing Date there will be no outstanding obligations of Upland to repurchase, redeem, or otherwise acquire any of the foregoing shares of Upland Common Stock.

(c) All outstanding shares of Upland Common Stock are owned by Sellers in the proportions set forth on the Disclosure Schedule. Except as set forth in (b) above, there are outstanding (i) no shares of capital stock or other voting securities of Upland, (ii) no securities of Upland or any other Person convertible into or exchangeable or exercisable for shares of capital stock or other voting securities of Upland, and (iii) no subscriptions, options, warrants, calls, rights (including preemptive rights), commitments, understandings or agreements to which a Seller is a party or by which it is bound obligating a Seller or Upland to issue, deliver, sell, purchase, redeem or acquire shares of capital stock or other voting securities of Upland (or securities convertible into or exchangeable or exercisable for shares of capital stock or other voting securities of Upland) or obligating a Seller or Upland to grant, extend or enter into any such subscription, option, warrant, call, right, commitment, understanding or agreement.

(d) All outstanding shares of Upland Common Stock have been validly issued and are fully paid and nonassessable, and no shares of Upland Common Stock have been issued in violation of preemptive or similar rights. The shares of Upland Common Stock owned by Sellers constitute all of the outstanding shares of capital stock of Upland.

(e)     There is no stockholder agreement, voting trust or other agreement or understanding to which a Seller is a party or by which it is bound relating to the voting or transfer of any shares of the capital stock of Upland.

(f)     Each Seller is (and at the Closing will be) the record and beneficial owner of, and upon consummation of the transactions contemplated hereby Buyer will acquire good, valid, and marketable title to, the number of shares of Upland Common Stock set forth opposite the name of such Seller on the Disclosure Schedule, free and clear of all Liens, other than (i) those that may arise by virtue of any actions taken by or on behalf of Buyer or its Affiliates, or (ii) restrictions on transfer that may be imposed by federal and state securities laws.

Section 3.07     <u>No Undisclosed Liabilities.</u>  There are no liabilities of Upland of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than (a) liabilities reflected in the Upland Balance Sheet, (b) liabilities incurred in the ordinary course of business subsequent to June 30, 2007, and (c) liabilities under this Agreement or expressly disclosed herein, including matters disclosed in the Disclosure Schedule and the exhibits attached hereto.

Section 3.08     <u>Brokers.</u>  No broker, finder, investment banker or other Person is or will be, in connection with the transactions contemplated by this Agreement, entitled to any brokerage, finder's or other fee or compensation based on any arrangement or agreement made by or on behalf of a Seller or Upland.

Section 3.09     <u>Upland Balance Sheet</u>  Upland has delivered to Buyer an accurate and complete copy of the Upland Balance Sheet.  The Upland Balance Sheet fairly presents in all material respects the financial condition of Upland as of the date thereof.

Section 3.10     <u>Absence of Certain Changes or Events.</u>  Except as otherwise set forth in the Disclosure Schedule or as contemplated by this Agreement, to the Knowledge of Sellers or Upland, since the Effective Time, Upland has not done any of the following:

(a)     Discharged or satisfied any Lien or paid any obligation or liability, absolute or contingent, other than current liabilities incurred and paid in the ordinary course of business and consistent with past practices;

(b)     Paid or declared any dividends or distributions, purchased, redeemed, acquired or retired stock or other securities from its stockholders or other security holders;

(c)     Except for Permitted Encumbrances, suffered or permitted any Lien to arise or be granted or created against or upon any of its assets;

(d)     Amended its certificate or articles of incorporation or by-laws;

(e)     Made any material investment in or contribution, payment, advance or loan to any Person, other than in the ordinary course of business and consistent with past practices;

(f)     Sold, transferred or leased any of its assets to, or entered into any other transactions with, any third party, other than in the ordinary course of business;

861

(g)     Made any material change in any of the accounting principles followed by Upland or the method of applying such principles;

(h)     Entered into any material transactions (other than this Agreement) except in the ordinary course of business and consistent with past practices;

(i)     Accelerated, terminated, modified, or cancelled any material agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) to which Upland is a party, or is bound;

(j)     Issued any note, bond, or other debt security or created, incurred, assumed, or guaranteed any indebtedness for borrowed money or capitalized lease obligations;

(k)     Delayed or postponed the payment of accounts payable and other liabilities outside the ordinary course of business;

(l)     Cancelled, compromised, waived, or released any right or claim (or series of related rights and claims);

(m)     Issued, sold, or otherwise disposed of any of its capital stock or granted any options, warrants, or other rights to purchase or obtain (including upon conversion, exchange, or exercise) any of its capital stock;

(n)     Except for the assignments of overriding royalty interest to Peyton Oil & Gas, Inc. set forth on the Disclosure Schedule, made any loan to, or entered into any other transaction with, any of its directors, officers, or employees outside the ordinary course of business;

(o)     Made or pledged to make any charitable or other capital contribution outside the ordinary course of business;

(p)     Made any change in Tax elections or in the manner in which Taxes are reported or made any payment of Taxes in excess of the liability accruals for Taxes reflected on the Upland Balance Sheet;

(q)     Entered into any Hydrocarbon Sales Agreement except as disclosed on the Disclosure Schedule; or

(r)     Entered into any swap, hedging or similar arrangements which remain open on the date of this Agreement except as disclosed on the Disclosure Schedule.

Section 3.11     Compliance with Laws, Material Agreements and Permits.  Upland is not in violation of, or in default in any respect under, and no event has occurred that (with notice or the lapse of time or both) would constitute a violation of or default under any applicable law, rule, regulation, order, writ, decree or judgment of any Governmental Authority (excluding Environmental Laws which are the subject of Section 3.25).  Upland has, or Sellers on behalf of Upland have, obtained and hold all permits, licenses, variances, exemptions, orders, franchises, approvals and authorizations of all Governmental Authorities necessary for the lawful conduct of its business or the lawful ownership, use and operation of its assets ("Permits").  Upland (or Sellers on behalf of Upland) is in compliance with the terms of such Permits.  No investigation

512819 000002 HOUSTON 543524.5                    -13-          CONFIDENTIAL          APACHE001147

or review by any Governmental Authority (excluding those under Environmental Laws which are the subject of Section 3.25) with respect to Upland is pending or, to the Knowledge of Upland or a Seller, threatened. Upland is not in breach of any material agreement to which it is a party. To the Knowledge of Upland or a Seller, no party to any material agreement is in material breach of the terms, provisions and conditions of such material agreement.

Section 3.12    Governmental Regulation.    Upland is not subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, the Investment Company Act of 1940 or any state public utilities laws.

Section 3.13    Litigation.    Except as otherwise set forth in the Disclosure Schedule and except for matters involving Environmental Laws or landowner or overriding royalties (which are discussed in Sections 3.25 and 3.26), (a) no litigation, arbitration, investigation or other proceeding is pending or, to the Knowledge of a Seller or Upland, threatened against Upland or its Affiliates or its assets; (b) Upland is not subject to any outstanding injunction, judgment, order, decree or ruling; and (c) neither a Seller nor Upland has Knowledge of any facts that are likely to give rise to any litigation, arbitration, investigation or other proceeding before any Governmental Authority.

Section 3.14    No Restrictions.    Except as otherwise set forth in the Disclosure Schedule, Upland is not a party to (a) any agreement, indenture or other instrument that contains restrictions with respect to the payment of dividends or other distributions with respect to its capital, (b) any agreement, contract or commitment relating to the making of any advance to, or investment in, any Person (other than advances in the ordinary course of business), or (c) any agreement, contract or commitment limiting in any respect its ability to compete with any Person or otherwise conduct business of any line or nature.

Section 3.15    Title to Non-Oil and Gas Assets.    Upland has good, marketable, and (in the case of real property) insurable title to all properties it owns or purports to own, other than the Ownership Interests, including (a) the properties reflected in its books and records and in the Upland Balance Sheet, other than those disposed of after the date of the Upland Balance Sheet in the ordinary course of business consistent with past practice, and (b) the properties referenced in Section 3.21 of the Disclosure Schedule, free and clear of all Liens other than Permitted Encumbrances. The Disclosure Schedule sets forth a list, by street address and deed reference, of all real property owned by Upland. Upland does not lease any real property.

Section 3.16    Taxes.

(a)    Except as otherwise set forth in the Disclosure Schedule, Upland has (i) duly and timely filed (after taking into account all applicable extensions of time for such filings) all federal and all state, local and foreign returns, declarations, reports, estimates, information returns and statements ("Tax Returns") required to be filed by it on or before the date hereof with respect to any Taxes, no extensions with respect to such Tax Returns are outstanding, and all such Tax Returns are true, complete and correct in all respects and were prepared and filed in accordance with applicable law; and (ii) timely paid, or accrued as a liability on the Upland Balance Sheet, all Taxes for which Upland is liable, whether or not shown to be due on the Tax Returns.

(b)     Except as otherwise set forth in the Disclosure Schedule, (i) no audits or other administrative or court proceedings are presently pending or, to the Knowledge of Sellers and Upland, threatened with regard to any federal, state or local income or franchise Taxes of Upland; (ii) there are no pending requests for rulings from any taxing authority, no outstanding subpoenas or requests for information by any taxing authority with respect to any Taxes, no proposed reassessments by any taxing authority of any property owned or leased, and no agreements in effect to extend the time to file any material Tax Return or the period of limitations for the assessment or collection of any material Taxes for which Upland would be liable; (iii) there has been no issue raised or adjustment proposed (and none is pending) by the Internal Revenue Service (the "IRS") or any other taxing authority in connection with any of the Tax Returns. Sellers have delivered to Buyer true, correct and complete copies of all federal income Tax Returns, audit and examination reports, and statements of deficiencies filed by, assessed against or agreed to by Upland for all periods and will deliver to Buyer any such documents received on or before the Closing Date immediately upon receipt.

(c)     Except as otherwise set forth in the Disclosure Schedule, (i) there are no Liens on any of the assets of Upland for unpaid Taxes, other than Liens for Taxes not yet due and payable, and (ii) Upland has no liability under Treasury Regulation § 1.1502-6 or any analogous state, local or foreign law by reason of having been a member of any consolidated, combined or unitary group.

(d)     Upland has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party.

(e)     There is no tax sharing agreement, tax allocation agreement, tax indemnity obligation or similar written or unwritten agreement, arrangement, understanding or practice with respect to Taxes (including any advance pricing agreement, closing agreement or other arrangement relating to Taxes) that will require any payment by Buyer at any time or by Upland after the Effective Time.

(f)     Upland is not a party to any joint venture, partnership, contract or other arrangement which is treated (or could be treated) as a partnership for U.S. federal income Tax purposes.

(g)     Upland is not an S corporation as defined in Code Section 1361.

(h)     Neither Seller is a "foreign person" within the meaning of Sections 1445 and 7701 of the Code.

(i)     With respect to any federal income Tax Return for which the statute of limitations for assessments remains open, Upland has not engaged in any reportable transaction as defined in United States Treasury Regulation Section 1.6011-4(b) and has adequately disclosed on its federal income Tax Returns any positions taken therein that would reasonably be expected to result in any "substantial understatement of federal income tax" within the meaning of Section 6662 of the Code.

Section 3.17 **Employee Benefit Plans.** There is no "employee benefit plan", as defined in Section 3(3) of ERISA, (i) which is subject to any provision of ERISA, (ii) which is, or is required to be, maintained, administered, or contributed to by Upland or any affiliate of Upland, and (iii) which covers any employee or former employee of Upland or any affiliate of Upland or under which Upland or any affiliate of Upland has any liability. For purposes of this Section only, an "affiliate" of any Person means any other Person which, together with such Person, would be treated as a single employer under Section 414 of the Code.

Section 3.18 **Payment Contracts and Benefits.** Except as otherwise set forth in the Disclosure Schedule, Upland is not subject to or obligated under any consulting, employment, severance, termination or similar arrangement, any employee benefit, incentive or deferred compensation plan with respect to any Person, or any bonus, profit sharing, pension, stock option, stock purchase or similar plan or other arrangement or other fringe benefit plan entered into or maintained for the benefit of employees or any other Person.

Section 3.19 **Accounts Receivable.** All of the accounts, notes and loans receivable have been recorded on the books of Upland, as reflected in the Upland Balance Sheet, are bona fide and represent accounts, notes and loans receivable validly due for goods sold or services rendered, and are reasonably expected to be collected in full within 90 days after the applicable invoice or note maturity date. Except for Permitted Encumbrances, all of such accounts, notes and loans receivable are free and clear of any and all Liens and other adverse claims and charges, and none of such accounts, notes or loans receivable is subject to any offsets or claims of offset; and none of the obligors on such accounts, notes or loans receivable has given written notice to Upland that it will or may refuse to pay the full amount or any portion thereof.

Section 3.20 **Insurance.** Upland maintains, and through the Closing Date will maintain, insurance with reputable insurers in such amounts and covering such risks as are generally in accordance with normal industry practice for companies engaged in businesses similar to those of Upland and owning properties in the same general area in which Upland conducts its business. The Disclosure Schedule contains a list and a brief description of all such insurance policies. None of such policies or binders was obtained through the use of false or misleading information or the failure to provide the insurer with all information requested in order to evaluate the liabilities and risks insured. All such policies and binders are in full force and effect. There is no material default with respect to any provision contained in any such policy or binder, nor has Upland failed to give any notice or present any claim under any such policy or binder in due and timely fashion. There are no billed but unpaid premiums past due under any such policy or binder. Except as otherwise set forth in the Disclosure Schedule, (a) there are no outstanding claims under any such policies or binders; (b) no notice of cancellation or non-renewal of any such policies or binders has been received; and (c) there are no performance bonds outstanding with respect to Upland other than such bonds routinely obtained in the oil and gas industry.

Section 3.21 **Office and Other Equipment.** The Disclosure Schedule contains a list of all furniture, equipment, machinery, materials, motor vehicles, tools, implements and other personal property owned or leased by Upland. At Closing, such personal property will continue to be owned or leased by Upland, subject to such substitutions or removals thereof that occur in the ordinary course of business.

**Section 3.22    Title to Oil and Gas Assets.**  Upland has Defensible Title to all Ownership Interests included in Upland's Oil and Gas Interests.  Adjustments to the Purchase Price for Title Defects shall be made pursuant to Article 6 and such Article is the sole remedy for all matters related to title to the Ownership Interests.

**Section 3.23    Oil and Gas Operations.**  Except as otherwise set forth in the Disclosure Schedule to the Knowledge of Sellers, all wells included in the Oil and Gas Interests of Upland have been drilled and (if completed) completed, operated and produced in accordance with generally accepted oil and gas field practices and in compliance in all material respects with applicable oil and gas leases and applicable laws, rules and regulations (excluding Environmental Laws).  There are no more than seven (7) unplugged wells on expired leasehold operated by Upland for which Upland is liable for plugging and abandonment, and reclamation.

**Section 3.24    Hydrocarbon Sales Agreements.**  The Disclosure Schedule contains a complete list of the Hydrocarbon Sales Agreements to which Upland is a party.  Except as otherwise set forth in the Disclosure Schedule, each Hydrocarbon Sales Agreement is valid, binding and in full force and effect, and no party is in material breach or default of any Hydrocarbon Sales Agreement, and no event has occurred that with notice or lapse of time (or both) would constitute a material breach or default or permit termination, modification or acceleration under any Hydrocarbon Sales Agreement.  There are no take-or-pay, nor any hedge derivative contracts in place.

**Section 3.25    Environmental Matters.**  Except as set forth in the Disclosure Schedule:

(a)    Upland has conducted its business and operated its assets, and is conducting its business and operating its assets, in compliance with all Environmental Laws;

(b)    Upland has not been notified by any Governmental Authority or other third party that any of the operations or assets of Upland is the subject of any investigation or inquiry by any Governmental Authority or other third party evaluating whether any material remedial action is needed to respond to a release or threatened release of any Hazardous Material or to the improper storage or disposal (including storage or disposal at offsite locations) of any Hazardous Material;

(c)    Upland has not filed any notice under any Environmental Law indicating that (i) Upland is responsible for the improper release into the environment, or the improper storage or disposal, of any Hazardous Material, or (ii) any Hazardous Material is improperly stored or disposed of upon any property of Upland, that in either case remains unresolved;

(d)    Upland has no material contingent liability in connection with (i) the release or threatened release into the environment at, beneath or on any property now or previously owned or leased by Upland, or (ii) the storage or disposal of any Hazardous Material; and

(e)    Upland has not received a claim, complaint, notice, inquiry or request for information involving any matter which remains unresolved as of the date of this Agreement with respect to any alleged violation of any Environmental Law or regarding potential liability under any Environmental Law relating to operations or conditions of any facilities or property

512819 000002 HOUSTON 543524.5                    -17-          CONFIDENTIAL        APACHE001151

(including off-site storage or disposal of any Hazardous Material from such facilities or property) currently or formerly owned, leased or operated by Upland.

Section 3.26    Royalties.  With respect to Upland's Oil and Gas Interests operated by Upland, all landowners' royalties and overriding royalties, with respect to production from the Ownership Interests, have been or will be, prior to the Closing, properly and correctly paid or provided for in all material respects.  With respect to Upland's Oil and Gas Interests not operated by Upland, to Upland's and each Seller's Knowledge, all landowners royalties and overriding royalties, with respect to production from the Ownership Interests, have been or will be, prior to the Closing, properly and correctly paid or provided for in all material respects.

Section 3.27    Securities Matters.  All securities which have been offered or sold by Upland have been registered pursuant to the Act and applicable state securities laws or were offered and sold pursuant to valid exemptions therefrom.

Section 3.28    Insider Interests.  Except as disclosed on the Disclosure Schedule, no shareholder, director, officer, or employee of Upland or any family member of any such shareholder, director, officer, or employee is presently, directly or indirectly, a party to any transaction with Upland.

Section 3.29    Financial Requirements.  Set forth on the Disclosure Schedule is a list of all bonds, deposits, financial assurance requirements, and insurance coverage required to be submitted to Governmental Authorities for the continued ownership and operation of the business and assets of Upland.

Section 3.30    Bank Accounts and Powers of Attorney.  Set forth on the Disclosure Schedule are (i) the name and address of each bank or other financial institution in which Upland has an account or a safe deposit box, the account and safe deposit box numbers thereof, and the names of all Persons authorized to draw thereon or to have access thereto, (ii) the names of all Persons authorized to borrow funds on behalf of Upland and the names of all entities from which they are authorized to borrow funds, and (iii) the names of all Persons, if any, holding powers of attorney from Upland.

Section 3.31    Representations and Warranties Exclusive.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE REPRESENTATIONS AND WARRANTIES MADE BY UPLAND AND SELLERS IN THIS AGREEMENT AND THE DISCLOSURE SCHEDULE ARE IN LIEU OF AND ARE EXCLUSIVE OF ALL OTHER REPRESENTATIONS AND WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UPLAND AND SELLERS HEREBY DISCLAIM ANY SUCH OTHER OR IMPLIED REPRESENTATIONS OR WARRANTIES, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BUYER OR ITS OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES OF ANY DOCUMENTATION OR OTHER INFORMATION BY UPLAND OR SELLERS OR ANY OTHER PERSON IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NO WARRANTY AND REPRESENTATION SHALL BE CONSIDERED TO COVER A SUBJECT THAT IS MORE SPECIFICALLY ADDRESSED BY ANOTHER WARRANTY AND REPRESENTATION.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Section 4.01    Organization.   Buyer (a) is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Colorado, (b) has the requisite power and authority to own, lease and operate its properties and to conduct its business as it is presently being conducted, and (c) is duly qualified to do business as a foreign limited liability company, and is in good standing, in each jurisdiction where the character of the properties owned or leased by it or the nature of its activities makes such qualification necessary.

Section 4.02    Authority and Enforceability.   Buyer has the requisite limited liability company power and authority to enter into and deliver this Agreement and to consummate the transactions contemplated hereby.   The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary limited liability company action on the part of Buyer, and no other limited liability company proceedings on the part of Buyer are necessary to authorize the execution or delivery of this Agreement or to consummate the transactions contemplated hereby.  This Agreement has been duly and validly executed and delivered by Buyer and constitutes a valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

Section 4.03    No Violations.   The execution and delivery of this Agreement does not, and the consummation of the transactions contemplated hereby and compliance by Buyer with the provisions hereof will not, conflict with, result in any violation of or default (with or without notice or lapse of time or both) under, give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a material benefit under, or result in the creation of any Lien on any of the properties or assets of Buyer under, any provision of (a) the certificate of formation or operating agreement of Buyer, (b) any loan or credit agreement, note, bond, mortgage, indenture, lease, permit, concession, franchise, license or other agreement or instrument applicable to Buyer, or (c) any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Buyer, or any of its properties or assets.

Section 4.04    Consents and Approvals.   No consent, approval, order or authorization of, registration, declaration or filing with, or permit from, any Governmental Authority is required by or with respect to Buyer or in connection with the execution and delivery of this Agreement by Buyer or the consummation by Buyer of the transactions contemplated hereby.  No Third Party Consent is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby.

Section 4.05    Governmental Regulation.   Neither Buyer nor any of its subsidiaries is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act, the Investment Company Act of 1940 or any state public utilities laws.

Section 4.06    Litigation.   There is no litigation, proceeding or investigation pending or, to the Knowledge of Buyer, threatened against or affecting Buyer (i) that questions the validity or enforceability of this Agreement or any other document, instrument or agreement to be executed and delivered by Buyer or in connection with the transactions contemplated hereby; (ii) that would reasonably be expected to have a Material Adverse Effect on Buyer, or (iii) that

868

APPENDIX B - Page 24

otherwise would reasonably be expected to interfere with Buyer's ability to perform its obligations hereunder.

Section 4.07    Funding.  Buyer has available adequate liquid funds in an aggregate type and amount sufficient to pay (a) all amounts required to be paid to Sellers upon consummation of the transaction contemplated hereunder, and (b) all expenses incurred by Buyer in connection with this Agreement and the transactions contemplated hereby.

Section 4.08    Brokers.  No broker, finder, investment banker or other Person is or will be, in connection with the transactions contemplated by this Agreement, entitled to any brokerage, finder's or other fee or compensation based on any arrangement or agreement made by or on behalf of Buyer.

Section 4.09    Held for Investment.  Buyer will be acquiring the Upland Common Stock pursuant to this Agreement for investment only and not with a view to the distribution thereof in violation of federal or state securities laws.  Buyer understands that the shares of Upland Common Stock it is acquiring have not been registered under the Act, or under any state securities or blue sky laws and must be held indefinitely unless they are subsequently registered under the Act and such state laws or an exemption from such registration is available.

Section 4.10    Buyer's Investigation; Sophisticated Buyer.  Prior to the Closing, Buyer shall have directly and through its Representatives, at Buyer's sole expense, in cooperation with Sellers, made such investigation of Upland as Buyer deemed necessary or advisable, and Buyer acknowledges that it is and shall be relying solely on its own investigation and the representations and warranties contained in this Agreement and the Disclosure Schedule in deciding to proceed with the purchase of the Upland Common Stock.  Further, Buyer expressly represents that it (i) is a sophisticated purchaser owned by or employing individuals having substantial experience in the conduct of oil and gas business, (ii) its agents shall, prior to the Closing Date, have had the opportunity to have exercised due diligence in its examination of the affairs of the business of Upland, and (iii) has not relied on any representation or warranty by Sellers, Upland, or Upland's agents, officers, stockholders, or employees, in entering into this Agreement, except as may be expressly stated or provided herein and the Disclosure Schedule.

Section 4.11    Absence of Certain Changes and Events.  Other than as a result of (a) events or conditions which are of a general or industry-wide nature, or (b) events or conditions pertaining to Buyer which have been disclosed in writing by Buyer to Sellers since June 1, 2007, there has not been any material adverse change in the financial condition, properties or businesses of Buyer and its subsidiaries taken as a whole.

Section 4.12    Compliance with Law.  The business of Buyer and its subsidiaries is not being conducted in violation of any applicable law, ordinance, regulation, decree or order of any governmental entity, except for violations which either individually or in the aggregate do not and are not expected to have a Material Adverse Effect on the financial condition, properties or businesses of Buyer and its subsidiaries taken as a whole.

Section 4.13    No Undisclosed Liabilities.  There are no liabilities of Buyer of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, that

512819 000002 HOUSTON 543524.5          -20-     CONFIDENTIAL     APACHE001154

are reasonably likely to have a Material Adverse Effect on Buyer's ability to consummate the transactions set forth in this Agreement.

## ARTICLE 5
## COVENANTS

Section 5.01    Conduct of Business by Upland and Sellers Pending Closing. Sellers covenant and agree with Buyer that, from the date of this Agreement until the Closing Date, Upland will, and Sellers will cause Upland to, conduct its business only in the ordinary and usual course consistent with past practices. Notwithstanding the preceding sentence, Sellers covenant and agree with Buyer that, except as specifically contemplated in this Agreement or as disclosed in the Disclosure Schedule, from the date of this Agreement until the Closing Date, without the prior written consent of Buyer, Sellers will cause Upland to comply with the following:

(a)    Upland will not (i) amend its certificate or articles of incorporation or by-laws; (ii) split, combine or reclassify any of its outstanding capital stock; (iii) issue, sell or agree to issue or sell any securities, including its capital stock, any rights, options or warrants to acquire its capital stock, or securities convertible into or exchangeable or exercisable for its capital stock; (iv) purchase, cancel, retire, redeem or otherwise acquire any of its outstanding capital stock or other securities; (v) merge or consolidate with, or transfer all or substantially all of its assets to, another corporation or other business entity; (vi) liquidate, wind-up or dissolve (or suffer any liquidation or dissolution); or (vii) enter into any contract, agreement, commitment or arrangement with respect to any of the foregoing.

(b)    Upland will not (i) acquire any corporation, partnership or other business entity or any interest therein (other than interests in joint ventures, joint operation or ownership arrangements acquired in the ordinary course of business); (ii) elect to participate in the drilling, workover, completion, recompletion, plugging and abandonment of any well or sell, lease or sublease, transfer or otherwise dispose of or mortgage, pledge or otherwise encumber any Oil and Gas Interest of Upland with an Allocated Value in excess of $50,000, in the aggregate, or any other assets that have a value at the time of such sale, lease, sublease, transfer or disposition in excess of $50,000, in the aggregate (except that this clause shall not apply to the sale of Hydrocarbons in the ordinary course of business); (iii) farm-out any Oil and Gas Interest of Upland or interest therein; (iv) make any material loans, advances or capital contributions to, or investments in, any Person; (v) enter into any material agreement or any other agreement not terminable by Upland upon notice of thirty (30) days or less and without penalty or other obligation (including Hydrocarbon Sales Agreements entered into in the ordinary course of business); or (vi) enter into any contract, agreement, commitment or arrangement with respect to any of the foregoing. Sellers shall cause Upland to use reasonable efforts to consult with Buyer's designated Representative as to any matter covered by this Section 5.01(b).

(c)    Upland will not (i) incur any indebtedness for borrowed money; (ii) incur any other obligation or liability (other than liabilities incurred in the ordinary course of business and consistent with past practices); (iii) assume, endorse (other than endorsements of negotiable instruments in the ordinary course of business), guarantee or otherwise become liable or responsible (whether directly, contingently or otherwise) for the liabilities or obligations of any Person; or (iv) enter into any contract, agreement, commitment or arrangement with respect to any of the foregoing.

512819 000002 HOUSTON 543524.5                    -21-                CONFIDENTIAL      APACHE001155

(d)     Upland will use its reasonable best efforts to operate, maintain and otherwise deal with its Oil and Gas Interests in accordance with good and prudent oil and gas field practices.

(e)     Upland shall not resign, transfer or otherwise voluntarily relinquish any right it has as of the date of this Agreement, as operator of any Oil and Gas Interest.

(f)     Upland will not (i) enter into, or otherwise become liable or obligated under or pursuant to, (1) any employee benefit, pension or other plan (whether or not subject to ERISA), (2) any other stock option, stock purchase, incentive or deferred compensation plans or arrangements or other fringe benefit plan, or (3) any consulting, employment, severance, termination or similar agreement with any Person, or amend or extend any such plan, arrangement or agreement; (ii) grant, or otherwise become liable for or obligated to pay, any severance or termination payments, bonuses or increases in compensation or benefits to, or forgive any indebtedness of, any employee or consultant; or (iii) enter into any contract, agreement, commitment or arrangement to do any of the foregoing.

(g)     Upland will keep and maintain accurate books and records in the same manner as such books and records are kept and maintained currently.

(h)     Upland will not create, incur, assume or permit to exist any Lien on any of its assets, except for Permitted Encumbrances incurred or created in the ordinary course of business.

(i)     Upland will (1) pay all Taxes, assessments and other governmental charges imposed upon any of its assets or with respect to its franchises, business, income or assets that have become due and payable before any penalty or interest accrues thereon; (2) pay all claims (including claims for labor, services, materials and supplies) that have become due and payable and which by law have or may become a Lien upon any of its assets prior to the time when any penalty or fine shall be incurred with respect thereto or any such Lien shall be imposed thereon; and (3) comply in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, obtain or take all Governmental Actions necessary in the operation of its businesses, and comply with and enforce the provisions of all material agreements, including paying when due all rentals, royalties, expenses and other liabilities relating to their businesses or assets; provided, that Upland may contest the imposition of any such Taxes, assessments and other governmental charges, any such claim, or the requirements of any applicable law, rule, regulation or order or any material agreement if done so in good faith by appropriate proceedings and if adequate reserves for such contested amounts are already reflected on the Upland Balance Sheet or are established with Buyer's consent.

(j)     Upland will maintain in full force and effect the policies or binders of insurance described in Section 3.20.

(k)     Sellers and Upland will keep Buyer informed of and shall consult with Buyer concerning all material operations, or proposals for operations, affecting the Oil and Gas Interests and other assets of Upland; provided, however, that all operations pertaining to casing, fracturing and completion designs for the Eubank #1-44 Well shall be governed by that certain Agreement for the Completion of Eubank 44 – Well #1 entered into by and between Upland and Buyer on the 21st day of August, 2007.

**Section 5.02    Access to Assets, Personnel and Information.**

(a)    From the date of this Agreement until the Closing Date, Upland and Sellers shall afford to Buyer and Buyer Representatives, at Buyer's sole risk and expense, reasonable full access to any of the assets, books and records, contracts, representatives, agents and facilities of Upland, including all data necessary for Buyer to fully audit Upland's financials and balance sheet.  During such period, Upland or Sellers will make available Buyer Representatives adequate office space and facilities as available at the office of Upland in Canadian, Texas. Sellers shall and shall cause Upland's Representatives to, use their reasonable best efforts to provide Buyer's Representatives with requested files, existing reports and other existing information.

(b)    Buyer and Buyer Representatives shall have the right to conduct a Phase I Environmental Audit, make a physical assessment of the assets of Upland and, in connection therewith, shall have the right to enter and inspect such assets and all buildings and improvements thereon, and generally conduct such tests, examinations, investigations and studies, as Buyer deems necessary, desirable or appropriate for the preparation of engineering or other reports relating to such assets, their condition and the presence of Hazardous Materials. Sellers and Upland shall be provided at least twenty-four (24) hours prior notice of such activities, and Sellers and Upland Representatives shall have the right to witness all such tests and investigations.  Buyer shall (and shall cause Buyer Representatives to) keep any data or information acquired by any such examinations and the results of any analyses of such data and information strictly confidential and will not (and will cause Buyer Representatives not to) disclose any of such data, information or results to any Person unless otherwise required by law or regulation and then only after written notice to Sellers and Upland of the determination of the need for disclosure.  Immediately upon its receipt thereof, Buyer shall provide Sellers with an actual, correct and complete copy of all data, reports, analyses, estimates and advice Buyer acquires in connection with any examination of the Oil and Gas Interests, which information Sellers shall keep confidential, and which information Sellers shall return to Buyer at such time as Sellers have no further potential obligations to Buyer under Section 11.02 with respect to the warranty and representation in Section 3.25. Buyer hereby releases Upland and Sellers from any loss, liability or claim arising out of, and shall indemnify, defend and hold Upland and Sellers and their Representatives harmless from and against, any and all losses, liabilities and claims to the extent arising out of or as a result of the activities of Buyer and Buyer Representatives on the assets of Upland in connection with conducting such environmental and physical assessment, except to the extent of and limited by the gross negligence or willful misconduct of Upland or Sellers or any representative thereof.

(c)    Buyer will maintain as confidential and will not (and will cause Buyer Representatives not to), use any information obtained pursuant to this Section 5.02 for any purpose unrelated to the consummation of the transactions contemplated by this Agreement.

(d)    Notwithstanding anything in this Section 5.02 to the contrary, (i) neither Upland nor Sellers shall be obligated under the terms of this Section 5.02 to disclose to Buyer or Buyer Representatives, or grant Buyer or Buyer Representatives access to, information that is within their possession or control but subject to a valid and binding confidentiality agreement with a third party without first obtaining the consent of such third party, and Sellers, to the extent

512819 000002 HOUSTON 543524.5                    -23-            CONFIDENTIAL        APACHE001157

reasonably requested by Buyer, will use reasonable commercial efforts to obtain any such consent.

Section 5.03 **Additional Arrangements.** Subject to the terms and conditions herein provided, Sellers, Upland, and Buyer shall take, or cause to be taken, all action and shall do, or cause to be done, all things necessary, appropriate or desirable under any applicable laws and regulations or under applicable governing agreements to consummate and make effective the transactions contemplated by this Agreement, including using its reasonable efforts to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings. Sellers, Upland, and Buyer shall take, or cause to be taken, all action or shall do, or cause to be done, all things necessary, appropriate or desirable to cause the covenants and conditions applicable to the transactions contemplated hereby to be performed or satisfied as soon as practicable. In addition, if any Governmental Authority shall have issued any order, decree, ruling or injunction, or taken any other action that would have the effect of restraining, enjoining or otherwise prohibiting or preventing the consummation of the transactions contemplated hereby, each of Sellers, Upland, and Buyer shall use its reasonable efforts to have such order, decree, ruling or injunction or other action declared ineffective as soon as practicable.

Section 5.04 **Public Announcements.** Prior to the Closing and for thirty (30) days thereafter, Sellers, Upland, and Buyer will consult with each other before issuing any press release or otherwise making any public statements with respect to the transactions contemplated by this Agreement and shall use diligence, restraint and good faith in attempting to accommodate the reasonable requests of the other party to limit or complete information in such press release; provided, however, the foregoing shall not prevent either party, after complying with the foregoing, from making a public disclosure it believes in good faith upon advice of counsel is required by applicable law.

Section 5.05 **Payment of Expenses.** Buyer and Sellers shall each pay its or their (as applicable) respective fees and expenses incident to preparing for, entering into and carrying out this Agreement and the consummation of the transactions contemplated hereby. Without limiting the foregoing, Upland shall not bear any of the Sellers' fees and expenses referenced in the immediately preceding sentence.

Section 5.06 **Operations.** Except as otherwise provided for in the Transition Agreement, Buyer shall, or shall cause Upland to, subject to the applicable terms of existing operating agreements, take over operations as of 7:00 a.m. local time at the wellsites on the day after the Closing Date, with respect to Upland-operated wells included in the Oil and Gas Interests. Upon taking over operations, Buyer will, or will cause Upland to, post all necessary state, federal and local bonds and shall assist Sellers in having Sellers' existing bonds released, or in the alternative, having the wells so operated by Buyer or Upland released from Sellers' existing bond. Sellers shall use their reasonable best efforts (without the expenditure of funds or prosecution of litigation) to assist Buyer in retaining operatorship or succeeding to operatorship of the Oil and Gas Interests.

Section 5.07 **Adjustments to the Financial Statements.**

(a) On or before five (5) days prior to Closing, Sellers shall prepare and submit to Buyer for Buyer's review and approval, an audited balance sheet of Upland (the "Effective Date

Balance Sheet") prepared in accordance with GAAP as of June 30, 2007. The Purchase Price shall be adjusted as appropriate at Closing to reflect the positive or negative change in the Effective Date Balance Sheet, but only as to the difference that the "current assets" (for purposes of this paragraph only, this amount shall be referred to as the "Assets") as reflected on the Effective Date Balance Sheet exceeds the "current liabilities" (for purposes of this paragraph only, this amount shall be referred to as the "Liabilities"). If the amount of Assets exceeds the Liabilities as shown on the Effective Date Balance Sheet, the Purchase Price shall be adjusted upward by that amount. If the amount of Liabilities exceeds the Assets as shown on the Effective Date Balance Sheet, the Purchase Price shall be reduced by that amount.

(b)     If the parties fail to agree on the Effective Date Balance Sheet and the appropriate adjustments to the Purchase Price to be made as a result thereof, the disputed items shall be resolved by binding arbitration submitting the same to the accounting firm of Ernst and Young, LLP (Denver, Colorado office) (the "Accounting Arbitrator"). The Accounting Arbitrator shall resolve disputes regarding any such adjustments within thirty (30) days of submittal by the parties of the relevant materials for review taking into account, among other things, the likelihood the disputed item will cause Buyer to not receive value bargained for under this Agreement, the length of time that the item has been treated by Upland or its predecessors in the manner Sellers have asserted on the Effective Date Balance Sheet, and the industry custom and practice of treatment for the disputed item. The decision of the Accounting Arbitrator shall be final and binding on the parties and shall not be subject to appeal to a court that may have jurisdiction over disputes between the parties. The fees and expenses of the Accounting Arbitrator shall be borne equally by Sellers and Buyer. Any amounts owed by either party as a result of the Accounting Arbitrator that were not paid at Closing as an adjustment to the Purchase Price pursuant to Section 2.02 shall be paid to the other party within five (5) days of the decision of the Accounting Arbitrator.

(c)     Subsequent to agreement as to the Effective Date Balance Sheet, Sellers may receive payments for pre-Effective Time amounts owed to Upland for the sale of Hydrocarbons which were not reflected as a "receivable" on the Effective Date Balance Sheet. Sellers shall promptly remit to Buyer that portion of such amounts that are payable to a third party (such as royalty owners, other working interest owners, or taxing authorities).

(d)     Subsequent to agreement as to the Effective Date Balance Sheet, Sellers may receive an invoice for payment of money by Upland attributable to goods and services provided to Upland prior to the Effective Time which were not reflected as a "payable" on the Effective Date Balance Sheet. Sellers shall forward such invoice to Buyer for payment and shall remit to Buyer that portion of the invoice attributable to Upland. Buyer shall be responsible for collecting that portion of the invoice payable by a third party (such as other working interest owners).

(e)     Subsequent to agreement as to the Effective Date Balance Sheet, Buyer may receive payments for pre-Effective Time amounts owed to Upland for the sale of Hydrocarbons which were not reflected as a "receivable" on the Effective Date Balance Sheet. Buyer shall remit to Sellers the monies received less that portion of such amounts that are payable to a third party (such as royalty owners, other working interest owners, or taxing authorities).

(f)     Subsequent to agreement as to the Effective Date Balance Sheet, Buyer may receive an invoice for payment of money attributable to goods and services provided to Upland

prior to the Effective Time which were not reflected as a "payable" on the Effective Date Balance Sheet. Buyer shall pay such invoice and Sellers shall promptly pay to Buyer, after receipt of an invoice from Buyer, that portion of the invoice attributable to Upland. Buyer shall be responsible for collecting that portion of the invoice payable by a third party (such as other working interest owners).

(g)     Upland shall be entitled to use or distribute cash received attributable to the Oil and Gas Interests of Upland provided the distribution does not adversely affect Upland's ability to conduct its business in its usual and customary manner. In the event Closing does not occur on or before November 1, 2007, the Purchase Price shall be decreased at Closing for the cash so used by Upland subsequent to November 1, 2007. Further, the Purchase Price shall be decreased at Closing for the amount that has been distributed to Sellers from Upland between July 1, 2007 and the Closing Date in the form of a dividend or other distribution that is not used in the business of Upland, but rather for the benefit of Sellers.

Section 5.08    Tax Matters.

(a)     Payment and Apportionment of Real Property Taxes and Personal Property Taxes. With respect to real property taxes and personal property taxes:

(i)     Real and Personal Property Taxes. All ad valorem taxes, real property taxes and personal property taxes that are based on or measured by production for the year in which the Effective Time occurs shall be apportioned as of the Effective Time between Sellers and Buyer. As to all such ad valorem, real and personal property taxes, Sellers shall be responsible for all taxes based on or measured by production occurring prior to the Effective Time. Buyer shall file all required reports and returns incident to such taxes and shall be responsible for all such taxes based on or measured by production occurring on and after the Effective Time. For all such real and personal property taxes, other than taxes based on or measured by oil and gas production, Sellers shall be liable for the portion of such taxes based upon the number of days in the year occurring prior to the Effective Time, and Buyer shall be liable for the portion of such taxes based upon the number of days in the year occurring on and after the Effective Time. Buyer shall file all required reports and returns incident to these taxes and shall remit to the appropriate taxing authorities all taxes for the year in which the Effective Time occurs that are not paid by Sellers as of the Closing Date. Sellers shall pay to Buyer, at the time of Buyer's remittance, Sellers' share of such taxes to the extent such amounts were not credited to Buyer in calculating adjustments in the Purchase Price in Section 2.02 or accrued on the Upland Balance Sheet.

(ii)     Liability and Right to Purchase Claims. Sellers shall retain liability for all adjustments, examinations or claims relating to taxes that are paid by Sellers and that are allocated to Sellers pursuant to this Section 5.08. Buyer shall retain liability for all adjustments, examinations or claims relating to taxes that are paid by Buyer and that are allocated to Buyer pursuant to this Section 5.08. Sellers shall administer and defend any examination, claim or adjustments arising in connection with taxes to be paid by Buyer but which are allocated to Sellers pursuant to this Section 5.08.

(iii)    Taxes Relating to Production.    All excise, production, severance, gross receipts, conservation, oil and gas severance and other similar taxes relating to production of Hydrocarbons attributable to the Oil and Gas Interests prior to the Effective Time shall be allocated to Sellers, and all such taxes relating to production on or after the Effective Time shall be allocated to Buyer. Buyer shall file any reports or returns not filed as of the Closing, and shall remit to the proper taxing authorities any such taxes allocated to Sellers, but not paid as of the Closing. Sellers shall pay Sellers' share of such taxes at the time Buyer remits such taxes to the extent such amounts were not credited to Buyer in the Purchase Price as adjusted pursuant to Section 2.02 or accrued on the Upland Balance Sheet.

(b)    Sales Taxes.    The Purchase Price does not include any sales taxes or other transfer taxes imposed in connection with the sale of the Upland Common Stock. Buyer shall pay any sales tax or other transfer tax, as well as any applicable conveyance, transfer and recording fee, and real estate transfer stamps or taxes imposed on or related to the transfer of the Upland Common Stock pursuant to this Agreement. Buyer shall defend and indemnify Sellers against and hold Sellers harmless from any loss, liability or claim, including penalties and interest, resulting from such matters. The parties shall cooperate with each other and with their respective Affiliates in obtaining any exemptions from any sales or other transfer taxes that may be due as a result of the transactions contemplated in this Agreement.

(c)    Tax Proceedings.    In the event Buyer receives notice of any examination, claim, adjustment or other proceeding relating to the liability for taxes for any period Sellers are or may be liable under Section (a)(ii) above. Buyer shall notify Sellers in writing within thirty (30) days of receiving notice thereof. As to any such taxes for which Sellers are or may be liable under Section (a)(ii) above Sellers shall, at their expense, control or settle the contest of such examination, claim adjustment or other proceeding, and shall indemnify Buyer against all losses, damages, costs, expenses, liabilities, claims, demands, penalties, fines, assessments, settlements, and any related expenses in connection therewith. In the event of an adjustment, or other proceeding relating to the liability for taxes for any period Buyer is or may be liable under Section (a)(ii) above. Sellers shall notify Buyer in writing within thirty (30) days of receiving notice thereof. As to any such taxes for which Buyer is or may be liable under Section (a)(ii) Buyer shall, at Buyer's expense, control or settle the contest of such examination, claim, adjustment, or other proceeding, and shall indemnify Sellers against all losses, damages, costs, expenses, liabilities, claims, demands, penalties, fines, assessments, settlements, and any related expenses in connection therewith. The parties shall cooperate with each other and with their respective affiliates in the negotiations and settlement of any proceeding described in this Section 5.08. Each party shall provide, or cause to be provided, to the other party necessary authorizations, including powers of attorney, to control any proceeding which such party is entitled to control.

(d)    Income Taxes.    Buyer shall cause Upland to pay all federal income and state income and franchise Taxes due for any taxable year or taxable period commencing before and ending after the Closing Date (the "Straddle Period"). Upon notice from Buyer, Sellers shall pay to Upland prior to the date for which any payment for such taxes is due, an amount equal to the excess, if any, of (i) the amount of such taxes that would have been due if the Straddle Period had ended on the Closing Date (using an interim-closing-of-the-books method, except that

exemptions, allowances, and deductions that are otherwise calculated on an annual basis (such as deductions for depreciation and depletion) shall be apportioned on a per diem basis and the deduction for real and personal property taxes and production taxes shall be allocated the same as the liability for such taxes is allocated in Sections 5.08(a)(i) and (iii) less (ii) the sum of such taxes for the Straddle Period (A) that have been accrued as a liability on the Upland Balance Sheet or credited to Buyer in calculating adjustments in the Purchase Price in Section 2.02 or (B) paid prior to the Closing Date by Upland or by Sellers or an affiliate thereof with respect to Upland. For purposes of this Section 5.08(d), the term "Straddle Period" includes the Texas franchise tax privilege period for the calendar year after the Effective Time to the extent that the tax for such period is computed based on Upland's revenues and deduction for the calendar year that includes the Effective Time.

(e)     Adjustment.  Any adjustments made pursuant to this Article shall be considered adjustments to the Purchase Price.

**Section 5.09     Upland Name Change.**  Within ten (10) days after Closing Buyer shall file the appropriate documents with the Secretary of State of Texas, and promptly thereafter Buyer shall file the appropriate documents in all other states where Upland is registered as a foreign corporation to cause the name of Upland to be changed so that "Upland" is removed from the corporate name of Upland.  Buyer shall not otherwise use the name "Upland" or any similar name for any purpose.

**Section 5.10     Signs.**  Within sixty (60) days of Closing, Buyer shall cause the name of Upland or any reference to Upland, to be removed from any signs located on or about any of the Oil and Gas Interests.

**Section 5.11     Preferential Right to Purchase.**

(a)     In the event Sellers or any of their respective Affiliates (which, with respect to Bailey Peyton shall include Peyton Oil & Gas), either directly or indirectly, acquires any oil and gas leasehold interests in the lands in which Upland owns a leasehold interest as of the Effective Date or Closing Date, or within a one mile radius surrounding such lands, for a period of two (2) years from the Closing Date, Sellers shall notify Buyer immediately after any such acquisition, giving complete information as to the interests acquired, along with copies of the instrument or instruments by which the interest was acquired, and the consideration to be given or paid.  Buyer shall have thirty (30) days following receipt of such notice to notify Sellers of Buyer's desire to acquire (or to cause its Affiliates to acquire) all or any part of any such interest by paying Sellers (or their Affiliate, as applicable) for such Seller's (or their Affiliate's) cost to acquire such interest or part thereof.  Thereupon, Sellers (or their Affiliate, as applicable) shall immediately assign such interest to Buyer, with special warranty of title, in an instrument in form and substance approved by Buyer and Sellers in writing, which approval shall not be unreasonably withheld.

(b)     In the event Sellers or any of their respective Affiliates (which, with respect to Bailey Peyton shall include Peyton Oil & Gas), either directly or indirectly, currently owns or acquires any oil and gas mineral interests or rights in the lands in which Upland owns a leasehold interest as of the Effective Date or the Closing Date or within a one mile radius surrounding such lands, that, with respect to any such interest currently owned by Sellers or their Affiliates, are not currently subject to an oil and gas lease granted to a third party, for a period of two (2) years from

the Closing Date, Sellers shall notify Buyer immediately after any such acquisition, and shall offer Buyer the right to lease such oil and gas mineral interests or rights on the same terms as are contained in the form of lease attached hereto as Exhibit C (except containing a $185 an acre bonus to the lessor).

## ARTICLE 6
## TITLE AND ENVIRONMENTAL MATTERS

Section 6.01    Title Defect Adjustments.

(a)    Each Ownership Interest of Upland set forth on Schedule 1.01(a) shall constitute a separate asset for purposes of this Article 6 and a Title Defect that pertains to more than one Ownership Interest shall be considered a separate Title Defect as to each Ownership Interest.

(b)    Buyer shall give Sellers written notice of Title Defects on or before October 18, 2007. Such notice shall be in writing and shall include: (i) a description of the Title Defect, (ii) the Allocated Value of the Ownership Interest affected by the Title Defect, (iii) the amount by which Buyer believes the Allocated Value of such Ownership Interest has been reduced because of such Title Defect and the reasoning therefor, and (iv) supporting documentation, including title opinions, title claims, or other data that evidences the Title Defect. Buyer shall be deemed to have waived all Title Defects of which Sellers have not been given timely notice by Buyer and all Title Defects for which a remedy is not provided under this Article 6.

(c)    If an Ownership Interest is affected by a Title Defect, the Purchase Price shall be reduced by the net reduction in value of the pertinent property caused by the Title Defect (the "Defect Amount") based on the criteria listed in Section 6.01(d) as well as the likelihood that the Title Defect will cause a title failure (considering such matters as the length of time the Title Defect has existed without being subject to an adverse claim, the producing status of the property, the nature of the Title Defect, whether the potential claimant has executed a division order and/or received proceeds without asserting the title claim, and all of the other factors considered in connection with determining whether a matter is a Permitted Encumbrance) and also taking into account the method for attributing the Allocated Value for the relevant property, the legal and practical effect of the Title Defect or other breach, the probability of adverse impact of the Title Defect or breach of title warranty on the use and enjoyment of the property interest affected, and the predicted duration of the Title Defect or breach of title warranty over the life of the property involved. The amount of any reduction shall not exceed the Allocated Value of the Oil and Gas Interest of Upland in question. A Purchase Price adjustment will not be made for any Title Defect that, when aggregating such Title Defect with all other Defect Amounts affecting one Lease/Unit as shown on Schedule 1.01(a), has Defect Amounts of less than $5,000. A Purchase Price adjustment will not be made if, prior to October 25, 2007, at Sellers' election: (i) the Title Defect has been cured (consistent with the standards contained herein), or (ii) for Title Defects for which there is a mere risk of title failure, Sellers agree to indemnify Buyer against all losses, costs, expenses and liabilities with respect to such Title Defect up to Allocated Value thereof.

(d)    Without limiting Sellers' right to dispute the existence of a Title Defect and subject to the factors listed in Section 6.01(c) that may cause the Defect Amount of a Title Defect

512819 000002 HOUSTON 543524.5                      -29-        CONFIDENTIAL        APACHE001163

878

to be less than the maximum potential economic effect of the Title Defect, the Defect Amount shall take into account the following:

(i) If the Title Defect relates to failure of title to the entirety of Upland's title to an Ownership Interest, the maximum amount of the Defect Amount shall be the amount set forth as the value for that Ownership Interest in Schedule 1.01(a).

(ii) If the Title Defect results from a Lien, security interest, pledge or collateral assignment upon one or more Ownership Interest (or a portion thereof) which is liquidated in amount, then the maximum amount of the Defect Amount shall be the amount necessary to remove such lien, security interest, pledge or collateral assignment from Upland's title to such one or more Ownership Interests (or portion thereof).

(iii) If the Title Defect results from Upland having a lesser NRI in an Ownership Interest than the NRI specified therefor in Schedule 1.01(a), the maximum amount of the Defect Amount shall be equal to the product obtained by multiplying the value for that NRI in Schedule 1.01(a), by a fraction, the numerator of which is the reduced NRI and the denominator of which is the NRI specified for such Ownership Interest in Schedule 1.01(a).

(iv) If the Title Defect results from Upland having a greater WI in an Ownership Interest than the WI specified therefor in Schedule 1.01(a), the maximum amount of the Defect Amount shall be equal to the present value (discounted at 10% compounded annually) of the increase in Buyer's Projected Costs with respect to such Ownership Interest for the period from and after the Effective Time which is attributable to such increase in the WI.

(v) If the Title Defect results from any matter not described in paragraph (i), (ii), (iii), or (iv) above, then the maximum amount of the Defect Amount shall be a portion of the value set forth for that Ownership Interest in Schedule 1.01(a), said portion to be equal to the differences between the value of Upland's title to such Ownership Interest without such Title Defect and with such Title Defect (assuming the value without such Title Defect to be the value set forth in Schedule 1.01(a)).

(vi) If a Title Defect is not effective or does not affect Upland's title to an Ownership Interest throughout the entire productive life of such Ownership Interest, such fact shall be taken into account in determining the Defect Amount.

(vii) If a Title Defect affects only a portion of an Ownership Interest (as contrasted with an undivided interest in the entirety of such Ownership Interest) and a portion of the Purchase Price has not been allocated specifically to such portion of an Ownership Interest in Schedule 1.01(a), then for purposes of computing the Defect Amount, the Purchase Price allocated to such Ownership Interest shall be further allocated among the portions of such Ownership Interest in a fair and reasonable manner taking into account the values set forth in Schedule 1.01(a).

(viii) A Title Defect shall not result from a clerical, typographical or mathematical error in the computation of Upland's WI or NRI as set forth in

Schedule 1.01(a) and correction thereof would not be applied to the aggregate value of all Title Defects. Should such error be found, Buyer shall be entitled to a reduction in the Purchase Price based on the Allocated Value set forth on Schedule 1.01(a).

(e)     Notwithstanding anything herein to the contrary, if Sellers are unable to cure a Title Defect on or prior to Closing, Sellers shall have the option, by notice in writing to Buyer on or before Closing, to attempt to cure such Title Defect (a "Post-Closing Defect") within the ninety (90) day period commencing on the Closing Date (the "Cure Period"). In such event, the transactions contemplated hereby will close as provided herein and the Purchase Price shall be reduced by the applicable Title Defect Amount in respect of such Post-Closing Defect as provided in this Section 6.01. If, during or upon the expiration of the Cure Period, Sellers and Buyer mutually agree that a Post-Closing Defect has been cured, then within two (2) business days after such determination, Buyer shall tender to Sellers an amount equal to the Title Defect Amount (and, for the avoidance of doubt, without interest) in respect thereof. If, during or upon the expiration of the Cure Period, Sellers and Buyer are unable to agree whether there has been a satisfactory cure of a Post-Closing Defect, then such disagreement shall be resolved by the method provided in Section 6.01(f).

(f)     To the extent Sellers and Buyer can reach agreement prior to Closing under Section 6.01(c) as to any particular Title Defect, the Purchase Price shall be adjusted under Section 2.02 for such agreed-upon amounts. As to all remaining Title Defects, Sellers and Buyer shall attempt in good faith to reach agreement under (c) above by October 25, 2007, and as to Title Defects for which the parties can reach agreement, any monies that are owed shall be paid by the owing party to the other party at Closing through adjustments of the Purchase Price. If the Sellers and Buyer are unable to agree on the extent of the adjustment to the Purchase Price relative to any Title Defect by October 25, 2007, the dispute shall be submitted to binding arbitration before a mutually agreeable arbitrator with at least ten (10) years experience in oil and gas title matters (the "Title Arbitrator"). The Title Arbitrator shall resolve the dispute within thirty (30) days of submittal of the relevant documentation by the parties. The decision of the Title Arbitrator is final and is not subject to appeal by the parties to any court that may have jurisdiction. If the decision of the Title Arbitrator requires payment of funds, the party required to pay such amounts shall pay the other party within five (5) days of the arbitrator's decision. Fees and expenses of the Title Arbitrator shall be borne equally by the parties.

(g)     If there is any inaccuracy in Schedule 1.01(a) that results in an increase in the value of an Oil and Gas Interest, the amount of increased value (a "Credit Adjustment"), determined in a similar manner as a reduction for a Title Defect is determined, shall only be a credit against any reductions to the Purchase Price for Title Defects. Credit Adjustments, if any, only shall reduce Sellers' obligation to make any payments to Buyer or to suffer reduction of the Purchase Price under Articles 3, 6 or 11 of this Agreement, and shall not serve to increase the Purchase Price other than offsetting such reductions. Buyer shall promptly notify Sellers of any inaccuracies it discovers in Schedule 1.01(a) that might lead to a Credit Adjustment.

**Section 6.02     Environmental Defect Adjustments.**

(a)     Each Ownership Interest set forth on Schedule 1.01(a), each other Oil and Gas Interest, and each other asset of Upland, shall constitute a separate asset for purposes of this Article 6 and an Environmental Defect that pertains to more than one Ownership Interest, Oil and

512819 000002 HOUSTON 543524.5                    -31-          CONFIDENTIAL     APACHE001165

Gas Interest, or other asset of Upland shall be considered a separate Environmental Defect as to each Ownership Interest, Oil and Gas Interest, or other asset.

(b)     Buyer shall give Sellers written notice of Environmental Defects on or before October 18, 2007. Such notice shall be in writing and shall include: (i) a description of the Environmental Defect; (ii) if applicable, the Allocated Value of the Ownership Interest affected by the Environmental Defect; (iii) Buyer's good faith estimate of the costs associated with correcting the circumstance or condition to the extent required by the standards set forth in Section 11.02(b)(iii); and (iv) supporting documentation, including all data, reports and analysis of which Buyer is aware concerning the problem. Sellers' inclusion in the Disclosure Schedule of a condition that constitutes an Environmental Defect will not preclude Buyer from raising such condition as an Environmental Defect. Buyer shall be deemed to have waived all breaches of Upland's and Sellers' warranty and representation pursuant to Section 3.25 with respect to any circumstance or condition of which Buyer has Knowledge as of October 18, 2007, and for which Buyer has not provided a valid notice pursuant to this Section 6.02(b).

(c)     If an Ownership Interest, Oil and Gas Interest, or other asset is affected by an Environmental Defect, the Purchase Price shall be reduced by amount of the Environmental Defect; provided, however (A) no reduction shall be made with respect to an Ownership Interest, Oil and Gas Interest, or other asset subject to an Environmental Defect if on or before Closing, Sellers elect any of the options set forth in Sections 11.02(b)(i)(2) or 11.02(b)(ii), and (B) all of the provisions of Section 11.02(b)(i)(1) shall apply with respect to any property as to which a reduction in the Purchase Price is made.

Section 6.03     **Casualty Loss.** If subsequent to the date of this Agreement and, prior to the Closing, all or any material portion of an Ownership Interest, Oil and Gas Interest, or other asset of Upland is destroyed by fire or other casualty, is taken in condemnation or under the right of eminent domain or proceedings for such purposes are pending or threatened, the obligations of Buyer shall remain in effect and the Purchase Price shall not be adjusted. Sellers shall, at the Closing, pay to Buyer all sums paid to Sellers by third parties by reason of the destruction or taking of such Ownership Interest, Oil and Gas Interest, or other asset, and shall assign, transfer and set over unto Buyer all of the right, title and interest of Sellers in and to any unpaid awards or other payment from third parties arising out of the destruction, taking or pending or threatened taking. Sellers shall not voluntarily compromise, settle or adjust any material amount payable by reason of any material destruction, taking or pending or threatened taking without first obtaining the written consent of Buyer.

### ARTICLE 7
### CONDITIONS

Section 7.01     **Conditions to Each Party's Obligation to Effect the Transaction.** The respective obligations of each party to effect the transaction contemplated by this Agreement shall be subject to the satisfaction, at or prior to the Closing Date, of the following condition:

(a)     No Injunctions or Restraints. No temporary restraining order, preliminary or permanent injunction or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transaction contemplated hereunder shall be in effect; provided, however, that prior to invoking this condition, each party shall have

complied fully with its obligations under Section 5.03 and, in addition, shall use all reasonable efforts to have any such decree, ruling, injunction or order vacated, except as otherwise contemplated by this Agreement.

Section 7.02    Conditions to Obligations of Buyer.    The obligation of Buyer to effect the transaction contemplated by this Agreement is subject to the satisfaction of the following conditions, any or all of which may be waived in whole or in part by Buyer:

(a)    Representations, Warranties and Covenants.    Each of the representations and warranties of Upland and Sellers set forth in Article 3 shall be true and correct as of the date made and shall be true and correct in all material respects as of the Closing Date as though made on and as of that time (unless by its express terms or reasonable interpretation the representation and warranty is made as of a time specific), and Sellers shall have performed their covenants hereunder in all material respects to the extent such were to be performed prior to Closing and Buyer shall have received a certificate signed by Sellers to both such effects;

(b)    Consents.    Sellers shall obtain the Bank Consent (which may be conditioned on the consummation of the Closing and the delivery of certificates and other documents to be provided by Sellers to the Bank), and all Third Party Consents.

(c)    Panhandle Pipeline LP.    Panhandle Pipeline, LP and Buyer shall have closed on that certain Purchase and Sale Agreement for the purchase of the Farmers and Ranchers Pipeline; such transfer to be free and clear of all encumbrances, liens and debts.

(d)    Sellers shall have caused Sellers, Peyton Oil & Gas, and Bailey Peyton ("Lessors") to grant new oil and gas leases to Upland on the form attached hereto as Exhibit C carrying a four year primary term and delivering a 75% NRI to Upland, and covering all of such Lessors' non-producing mineral interests in Crosby, Hansford, Hemphill, Lipscomb, Ochiltree, Randall, Roberts and Wheeler Counties, Texas, and in Beckham, Ellis, Rogers Mills and Texas Counties, Oklahoma as set forth on Schedule 7.02(d).

(e)    Upland shall have delivered the Effective Date Balance Sheet in accordance with Section 5.07.

(f)    Upland shall have filed all tax returns listed on Section 3.16 of the Disclosure Schedule.

(g)    All documents required to be delivered at Closing shall be in a form in compliance with the obligations hereunder in all material respects.

Section 7.03    Conditions to Obligation of Sellers.    The obligation of Sellers to effect the transaction contemplated by this Agreement is subject to the satisfaction of the following conditions, any or all of which may be waived in whole or in part by Sellers:

(a)    Representations, Warranties and Covenants.    The representations and warranties of Buyer set forth in Article 4 shall be true and correct in all material respects as of the Closing Date as though made on and as of that time (unless by its express terms or by reasonable implication the representation and warranty is made as of a specific time) and Buyer shall have

CONFIDENTIAL        APACHE001167

performed in all material respects all covenants and agreements required to be performed by them under this Agreement at or prior to the Closing Date, and Sellers shall have received a certificate signed by the President or a Vice President of Buyer to both such effects.

(b)     All documents required to be delivered at Closing shall be in a form in compliance with the obligations hereunder in all material respects.

## ARTICLE 8
## CLOSING

**Section 8.01    Closing Obligations.** At the Closing the following events shall occur, each being a condition precedent to the others and each being deemed to have occurred simultaneously with the others:

(a)     Sellers and Buyer shall execute and deliver a settlement statement, prepared in accordance with this Agreement and that shall set forth the Preliminary Purchase Price and each adjustment and the calculation of such adjustments used to determine such amount. Sellers shall provide Buyer with the Preliminary Settlement Statement seven (7) days prior to Closing for Buyer's review and approval. The term "Preliminary Purchase Price" shall mean the Purchase Price, adjusted as provided in Section 2.02, using for such adjustments the best information then available.

(b)     Buyer shall deliver to Sellers the Preliminary Purchase Price by direct bank or wire transfer in immediately available United States funds to the account or accounts designated by Sellers.

(c)     Sellers and Buyer shall execute, acknowledge and deliver transfer orders or letters in lieu thereof directing purchasers of production to make payment to Buyer, if necessary, of proceeds attributable to production from the Oil and Gas Interests.

(d)     Sellers shall deliver to Buyer the stock certificates for all of the Upland Common Stock properly executed for assignment to Buyer.

(e)     Sellers shall deliver to Buyer resignations of the members of the board of directors and all officers of Upland.

(f)     Sellers and Buyer shall execute the Officers' Certificates required in Section 7.02(a) and Section 7.03(a) respectively.

(g)     Sellers shall deliver to Buyer schedules as prepared by Sellers relating to wells, oil and gas leases, oil and gas equipment, and non-oil and gas assets related to the Ownership Interests of Upland.

(h)     Sellers shall deliver the agreement of Peyton Oil and Gas, Inc. pursuant to Section 11.07.

## ARTICLE 9
## POST-CLOSING GAS IMBALANCE

**Section 9.01**   **Gas Balancing.**

(a)   **General.**   Schedule 9.01 sets forth the gas imbalance as to the Oil and Gas Interests as of the various dates set forth on the Schedule. At Closing, the Purchase Price shall be adjusted by such amount based on a value of $4.00 per MCF. The parties will use their best efforts to update (to the Effective Time) the volume amounts listed on Schedule 9.01 within sixty (60) days from the Closing Date. If the gas imbalance of an Oil and Gas Interest indicated on Schedule 9.01 changes or additional Oil and Gas Interests are added as a result of this update, the parties will make the appropriate payments to one another within ninety (90) days after Closing based on a value of $4.00 per MCF to reflect the updated imbalance volume and the resulting balancing value for the Oil and Gas Interest. If Sellers and a third party operator disagree as to the amount of any imbalance, Buyer and Sellers shall mutually agree to an amount. After ninety (90) days after the Closing, there shall be no further adjustment made as to gas imbalance on any of the Ownership Interests.

## ARTICLE 10
## TERMINATION

**Section 10.01**   **Termination Rights.**   This Agreement may be terminated and the transaction contemplated hereunder may be abandoned at any time prior to the Closing Date:

(a)   By mutual written consent of Buyer and Sellers;

(b)   By either Sellers or Buyer if (i) the transaction contemplated hereunder has not been consummated by November 1, 2007 provided, however, that the right to terminate this Agreement pursuant to this clause (b) shall not be available to any party whose breach of any representation or warranty or failure to perform any covenant or agreement under this Agreement has been the cause of or resulted in the failure of the transaction contemplated hereunder to occur on or before such date; or (ii) any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transaction and such order, decree, ruling or other action shall have become final and nonappealable (provided, however, that the right to terminate this Agreement pursuant to this clause (b) shall not be available to any party until such party has used all reasonable efforts to remove such injunction, order or decree);

(c)   By Buyer if Sellers or Upland have failed to comply in any material respect with any of their respective covenants or agreements contained in this Agreement (provided, however, that Buyer shall have given Sellers at least forty-eight (48) hours prior notice of such failure to comply and Sellers have failed to comply within such forty-eight (48) hours);

(d)   By Sellers if Buyer has failed to comply in any material respect with any of its covenants or agreements contained in this Agreement (provided, however, that Sellers shall have given Buyer at least forty-eight (48) hours prior notice of such failure to comply and Buyer has failed to comply within such forty-eight (48) hours); or

(e)     By either Sellers or Buyer, if the aggregate amount of the actual and unresolved adjustments to the Purchase Price pursuant to Article 6 exceeds $6,000,000.

(f)     In the event of the termination of this Agreement by Sellers in accordance with Sections (a), (b), (d) or (e) above, Sellers shall have no liability hereunder of any nature whatsoever to Buyer, including any liability for damages. If Buyer terminates this Agreement in accordance with Sections (a), (b), (c) or (e) above, it shall have no liability hereunder of any nature whatsoever to Sellers including any liability for damages.

Section 10.02   **Effect of Termination.** If this Agreement is terminated by either Sellers or Buyer pursuant to the provisions of Section 10.01 above, there shall be no further obligation on the part of any party hereto or its respective Affiliates, directors, officers, or stockholders except the obligations embodied in Section 10.01(f) and the obligations pursuant to the provisions of Section 5.02(b) (but only to the extent of the confidentiality and indemnification provisions contained therein), and Article 11, Sections 5.05, 12.02, 12.04, 12.05, 12.11, 12.12, 12.13, 12.14, and the Confidentiality Agreement (which shall continue pursuant to their terms); provided, however, that a termination of this Agreement shall not relieve any party hereto from any liability for damages incurred as a result of a breach by such party of its representations, warranties, covenants, agreements or other obligations hereunder occurring prior to such termination.

**ARTICLE 11**
**INDEMNIFICATION AND ASSUMPTION**

Section 11.01   **Survival of Representations and Warranties.**

(a)     Sellers' and Upland's Representations and Warranties. The representations and warranties of the Sellers and Upland contained in the Sections listed below shall survive Closing (even if the Buyer knew or had reason to know of any misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect for the respective periods shown below:

| Agreement Section | Survival Period |
|---|---|
| 3.22 | Closing Date |
| 3.01 through 3.15, 3.18 through 3.21, 3.23 through 3.25, and 3.28 through 3.30 | one year |
| 3.16 | three months after the expiration of the applicable statute of limitations for the assessment of Taxes |
| 3.26 | two years |
| 3.17 and 3.27 | unlimited |

(b)     Buyer's Representations and Warranties. The representations and warranties of the Buyer shall survive Closing (even if the Sellers knew or had reason to know of any

512819 000002 HOUSTON 543524.5                    -36-    CONFIDENTIAL    APACHE001170

misrepresentation or breach of warranty at the time of Closing) and continue in full force and effect for a period of one (1) year.

Section 11.02  **Indemnification By Sellers.**  If the Closing occurs, Sellers shall jointly and severally indemnify, defend and hold harmless Buyer and Upland and their respective Affiliates, directors, managers, officers, shareholders, employees, agents and representatives ("Buyer Indemnitees") from (i) any Adverse Consequence resulting from the breach by Upland or either Seller of any warranty and representation contained in Article 3 hereof except Section 3.22, and (ii) the breach by a Seller or Upland of any of a Seller's or Upland's covenants hereunder; and (iii) any Adverse Consequence arising from or in connection with all pending or threatened claims or causes of action asserted against Upland in the litigation styled Petro Pro, Ltd., L&R Energy Corporation, Nancy Wilson Briscoe, Judith Brock Seitz, and Carolyn Rogers (collectively, "Petro Pro") v. Upland Resources, Inc., KCS Resources, Inc., Great Lakes Energy Partners, L.L.C., and Steve Zemkoski, Cause No. 1893, in the 31st District Court in and for Roberts County, Texas (the "Roberts County Litigation"), including any appeal of the Roberts County Litigation, and any and all other claims or causes of action of Petro Pro or anyone else against Upland, Buyer, or Sellers arising out of or related in any way to any of the events made the basis of the Roberts County Litigation; and (iv) any Adverse Consequence arising from or in connection with all pending or threatened claims or causes of action asserted against Upland in the litigation styled Amarillo Production Company v. Upland Resources, Inc. Cause No. 12, 021, in the 31st District Court in and for Wheeler County, Texas (the "Byrd Well Litigation"), including any appeal of the Byrd Well Litigation; and (v) any Adverse Consequences resulting from the litigation disclosed on Section 3.13 of the Disclosure Schedule other than the Roberts County Litigation or Byrd Well Litigation.  Sellers' obligations under this Section 11.02 are subject to the following:

(a)  Sellers' obligation under this Article 11 for breaches of warranties and representations is strictly conditioned (with time being the essence hereof) on Buyer or Upland providing written notice to Sellers of a claim for indemnification under this Section 11.02 prior to the end of the applicable survival period referred to in Section 11.01 above, and in the case of the warranty and representation set forth in Section 3.26, is conditioned additionally upon Buyer's receipt of written notice of a Third-Party Claim based on the same facts on which the asserted breach is based having been asserted in writing against Buyer or on or before the end of the survival period applicable to such warranty and representation.  As a condition to being effective, such notice must contain (i) sufficient details concerning the claim of breach so that Sellers can determine the full extent and nature of the breach and (ii) reasonable evidence supporting Buyer's claim of breach as well as any and all information, documentation or evidence Buyer may have, including such information that may be contrary to the claim of breach.

(b)  Claims for breach of Sellers' environmental representations and warranties contained in Section 3.25 shall be subject to the following:

(i)  Sellers may elect to do any of the following (singly or in any combination) to satisfy any indemnification obligation with respect to claims for breach of Section 3.25:

(1)  Sellers may tender to Buyer Sellers' reasonable estimate of costs for any cleanup, removal, recovery, response, restoration, corrective action or

remedial action that is required in order to cure Sellers' breach ("Cleanup"), with Buyer being obligated to perform such Cleanup diligently and in a workmanlike manner in accordance with the standards set forth in Section 11.02(b)(iii), and with Buyer, after such tender is made, being obligated to thereafter indemnify, defend and hold harmless Sellers and their respective Affiliates, directors, officers, shareholders, employees, agents and representatives ("Seller Indemnitees") for any further Adverse Consequences associated with environmental matters on the relevant property. If Buyer disputes Sellers' reasonable estimate of costs, and the parties cannot reach agreement, the matter, including the existence and value of the breach, shall be submitted to arbitration. The arbitrator shall be an environmental consulting firm with extensive experience with regard to oil and gas producing properties located in the same general area as those submitted for arbitration. Prior to Closing, the parties shall attempt to agree on the name of one (1) acceptable environmental consulting firm available to act as arbitrator in the event of a dispute. If the parties cannot agree on the mutually acceptable arbitrator, the arbitrator shall be selected in accordance with the commercial rules of the American Arbitration Association.

> (2)     Sellers may perform the Cleanup at their own cost prior to Closing.

(ii)     Sellers, in lieu of any of the remedies required by Section 11.02(b)(i) above and provided that the delay of Cleanup or similar action on a property will not materially adversely affect the liability associated with the property, may elect to defend, indemnify and hold harmless Buyer Indemnitees from any Adverse Consequences arising in connection with the specific item with respect to which a breach of the warranty and representation exists without limitation in time.

(iii)     Sellers shall not be deemed to have breached the warranty and representation in Section 3.25 if the condition or circumstance giving rise to the allegation of breach meets or exceeds any one of the following standards:

> (1)     compliance with Environmental Laws as they are being enforced by the applicable Governmental Authority as of the date hereof.

> (2)     compliance with Environmental Laws as generally evident on Buyer's properties of a similar nature (and Buyer shall give Sellers reasonable access on forty-eight (48) hours notice to examine such properties for purposes of determining this standard).

> (3)     compliance with Environmental Laws as generally evident on properties of similar nature of the "Majors" in the relevant jurisdiction.

The value of any Adverse Consequences associated with any alleged breach shall also take into account the probability that the applicable Governmental Authority will become aware of any noncompliance (unless such noncompliance is required to be reported) and actually require compliance.

(c)     Notwithstanding the above provisions of this Section 11.02, Sellers shall indemnify, defend and hold harmless the Buyer Indemnities from any Adverse Consequences resulting from the matters set forth on the Disclosure Schedule that are indicated to be retained by Sellers.

(d)     In the event that a petition for review or other request for appellant review of the Roberts County Litigation is not filed with the Texas Supreme Court or any federal court of appeals (including the U.S. Supreme Court), Sellers' obligation under Section 11.02(iii) for Adverse Consequences arising from the Roberts County Litigation shall be limited to (i) $500,000 plus (ii) actual attorneys' fees and expenses incurred by Buyer or Upland after the Effective Time. In the event that a petition for review or other request for appellant review of the Roberts County Litigation is filed with the Texas Supreme Court or any federal court of appeals (including the U.S. Supreme Court), Sellers' obligation under Section 11.02(iii) for Adverse Consequences arising from the Roberts County Litigation shall not be limited. Sellers' obligation under Section 11.02(iv) for Adverse Consequences arising from the Byrd Well Litigation shall be limited to $5,400,000. Furthermore, Sellers' obligation under Section 11.02(v) for Adverse Consequences arising from the litigation disclosed on Section 3.13 of the Disclosure Schedule other than the Roberts County Litigation and Byrd Well Litigation shall not be limited.

**Section 11.03   Indemnification by Buyer and Upland.**  Except (a) with respect to the matters for which Sellers have provided an express indemnification as set forth in Section 11.02, (b) Purchase Price adjustments covered by Section 2.02 and Section 5.07 and Article 9 to the extent such adjustments are provided for after Closing, (c) Title Defect adjustments covered by Article 6, and (d) tax obligations covered by Sections 3.16 and 5.08, from and after the Closing, Buyer and Upland shall, to the fullest extent permitted by law, indemnify, defend and hold harmless Seller Indemnitees against all Adverse Consequences associated with (i) the breach by Buyer of any warranty, representation or covenant contained in this Agreement; and (ii) the business of Upland or operations conducted by Sellers on behalf of Upland prior to, and after the Effective Time.

**Section 11.04   Matters Involving Third Parties.**

(a)     If any third party shall notify an indemnified party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against Sellers, Buyer or Upland (the "Indemnifying Party") under this Article 11, the Indemnified Party shall promptly notify each Indemnifying Party thereof in writing; provided, however, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent that) the Indemnifying Party thereby is prejudiced.

(b)     Any Indemnifying Party will have the right to assume the defense of the Third Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party at any time within fifteen (15) days after the Indemnified Party has given notice of the Third Party Claim; provided, however, that the Indemnifying Party must conduct the defense of the Third Party Claim actively and diligently thereafter in order to preserve its rights in this regard; and provided further that the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim.

(c)     So long as the Indemnifying Party has assumed and is conducting the defense of the Third Party Claim in accordance with Section 11.04(b) above, (i) the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages by one or more of the Indemnifying Parties and does not impose an injunction or other equitable relief upon the Indemnified Party and (ii) the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably).

(d)     In the event none of the Indemnifying Parties assumes and conducts the defense of the Third Party Claim in accordance with Section 11.04(b) above, however, (i) the Indemnified Party may defend against, and consent to the entry of any judgment or enter into any settlement with respect to, the Third Party Claim in any manner he or it reasonably may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith) and (ii) the Indemnifying Parties will remain responsible for any Adverse Consequences the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third Party Claim to the fullest extent provided in this Section 11.04.

Section 11.05     **Indemnification Despite Negligence.** **It is the express intention of the parties hereto that each party to be indemnified pursuant to this Article 11 shall be indemnified and held harmless from and against all Adverse Consequences as to which indemnity is provided for under this Article 11, notwithstanding that any such Adverse Consequences arise out of or result from the ordinary, strict, sole, or contributory negligence of such party and regardless of whether any other party (including the other parties to this Agreement) is or is not also negligent. The parties hereto acknowledge that the foregoing complies with the express negligence rule and is conspicuous.**

Section 11.06     **Determination of Adverse Consequences.**     The parties shall make appropriate adjustments for insurance coverage and take into account the time cost of money (using the Applicable Rate as the discount rate) in determining Adverse Consequences for purposes of this Article 11. All indemnification payments under this Article 11 shall be deemed adjustments to the Purchase Price.

Section 11.07     **Offset.**     Peyton Oil & Gas, Inc., an Affiliate of Sellers, owns certain overriding royalty interests and landowners' royalty interests payable to Peyton Oil and Gas out of production from the Ownership Interests (the "Seller's Royalties"). The Buyer's right to enforce Section 11.02 of this Agreement shall include, but shall not be limited to, the right of offset against the Seller's Royalties. At Closing, Sellers shall deliver a guaranty agreement in the form attached hereto as Exhibit D evidencing Peyton Oil & Gas, Inc.'s agreement to such right of offset.

Section 11.08     **Application of Article 11.**     This Article 11 provides the sole and exclusive remedy for breaches of representations, warranties and covenants under this Agreement except:

**APPENDIX B - Page 45**

(a)     Accounting adjustments to the Purchase Price for normal operating revenues and expenses, as well as capital expenditures in the ordinary course of business, are handled by Sections 2.02 and 5.07.

(b)     Indemnities with respect to tax matters including, but not limited to Sections 3.16 and 5.08

(c)     All adjustments, indemnities, and provisions with respect to Title Defects are handled exclusively by Article 6.

## ARTICLE 12
## MISCELLANEOUS

Section 12.01   Amendment.   This Agreement may not be amended except by a written instrument signed on behalf of each of the parties hereto.

Section 12.02   Notices.   Any notice or other communication required or permitted hereunder shall be in writing and either delivered personally, by facsimile transmission or by registered or certified mail (postage prepaid and return receipt requested) and shall be deemed given when received (or, if mailed, five (5) business days after the date of mailing) at the following addresses or facsimile transmission numbers (or at such other address or facsimile transmission number for a party as shall be specified by like notice):

If to Sellers:

Bailey Peyton
105 North Fifth St
Canadian, Texas  79014

With a copy to:

Jeffrey G. Shrader, Esq.
Sprouse Shrader Smith P.C.
P.O. Box 15008
701 S. Taylor, Suite 500
Amarillo, Texas  79106

If to Buyer:

Cordillera Energy Partners III, LLC
George Solich
8450 E. Crescent Parkway, Suite 400
Greenwood Village, Colorado  80111
Phone:  (303) 785-1550
Fax:  (303) 290-9997

Section 12.03   Counterparts.   This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become

512819 000002 HOUSTON 543524.5          -41-          CONFIDENTIAL          APACHE001175

effective when two (2) or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

Section 12.04  **Entire Agreement; No Third Party Beneficiaries.**  This Agreement (together with the Confidentiality Agreement and the documents and instruments delivered by the parties in connection with this Agreement) (a) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof; and (b) is solely for the benefit of the parties hereto and their respective successors, legal representatives and assigns and does not confer on any other Person any rights or remedies hereunder.

Section 12.05  **Applicable Law.**  This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of Texas regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 12.06  **No Remedy in Certain Circumstances.**  Each party agrees that, should any court or other competent authority hold any provision of this Agreement or part hereof to be null, void or unenforceable, or order any party to take any action inconsistent herewith or not to take an action consistent herewith or required hereby, the validity, legality and enforceability of the remaining provisions and obligations contained or set forth herein shall not in any way be affected or impaired thereby, unless the foregoing inconsistent action or the failure to take an action constitutes a material breach of this Agreement or makes this Agreement impossible to perform, in which case this Agreement shall terminate pursuant to Article 10.  Except as otherwise contemplated by this Agreement, to the extent that a party hereto took an action inconsistent herewith or failed to take action consistent herewith or required hereby pursuant to an order or judgment of a court or other competent Governmental Authority, such party shall not incur any liability or obligation unless such party breached its obligations under Section 5.03 or did not in good faith seek to resist or object to the imposition or entering of such order or judgment.

Section 12.07  **Assignment.**  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by Sellers, Upland, or Buyer (whether by operation of law or otherwise) without the prior written consent of each other party.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

Section 12.08  **Waivers.**  At any time prior to the Closing Date, the parties hereto may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive performance of any of the covenants or agreements, or satisfaction of any of the conditions, contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such party.  Except as provided in this Agreement, no action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representations, warranties, covenants or agreements

contained in this Agreement. The waiver by any party hereto of a breach of any provision hereof shall not operate or be construed as a waiver of any prior or subsequent breach of the same or any other provisions hereof.

Section 12.09 **Confidentiality Agreement.** The Confidentiality Agreement shall remain in full force and effect following the execution of this Agreement and shall terminate at Closing. Any and all information received by Buyer under this Agreement shall be governed by the applicable terms and provisions of the Confidentiality Agreement.

Section 12.10 **Incorporation.** Exhibits and Schedules referred to herein are attached to and by this reference incorporated herein for all purposes.

Section 12.11 **Waiver of Jury Trial.** EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

Section 12.12 **Jurisdiction and Venue.** The parties hereby irrevocably and unconditionally consent to submit to the non-exclusive venue and jurisdiction of the courts of the State of Texas and of the United States of America located in Texas for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and Buyer, Upland, and Sellers agree not to commence any action, suit or proceeding relating thereto except in such courts), and further agree that service of process, summons, notice or document by U.S. registered mail shall be effective service of process for any action, suit or proceeding brought against a party hereto in any such court.

Section 12.13 **Damage Waiver.** NO PARTY SHALL BE LIABLE FOR OR BE REQUIRED TO PAY FOR OR INDEMNIFY AN INDEMNIFIED PARTY FOR SPECIAL, PUNITIVE, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR INDIRECT DAMAGES SUFFERED BY THE INDEMNIFIED PARTY IN CONNECTION WITH OR IN ANY MATTER RELATING TO THIS AGREEMENT PROVIDED THIS LIMITATION SHALL NOT LIMIT ANY OBLIGATIONS OTHERWISE PROVIDED FOR HEREUNDER TO INDEMNIFY A PARTY FOR THE FOREGOING TYPE OF DAMAGES THAT MUST BE PAID TO A THIRD PARTY.

Section 12.14 **Legal Fees.** The prevailing party in any legal proceeding brought under or to enforce this Agreement shall be additionally entitled to recover court costs and reasonable attorneys' fees from the non-prevailing party.

Section 12.15 **Injunctive Relief, Specific Performance.** The parties hereto acknowledge and agree that irreparable damage would occur in the event any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement, and shall be entitled to enforce specifically the provisions of this Agreement, subject to the provisions of Section 12.12, in any court of the United States or any state thereof having jurisdiction, in addition to any other remedy to which the parties may be entitled under this Agreement or at law or in equity.

Section 12.16 **Further Assurances.** After the Closing, each of the parties will execute, acknowledge, and deliver to the other such further instruments, and take such other actions as may be reasonably requested in order to more effectively assure to said party all of the respective properties, rights, titles, interests, estates, and privileges intended to be assigned, delivered, or inuring to the benefit of such party and consummation of the transactions contemplated hereby.

Section 12.17 **Transition.** The parties recognize that matters involving the transition of the business of Upland to Buyer have not been addressed in the forgoing provisions of this Agreement. Therefore, the parties agree that as a general principle, they will cooperate with each other to accomplish an orderly transfer of the business that satisfies the reasonable needs of each party to conduct its business and satisfy its obligations corporately and under this Agreement, and allows each party to enjoy the benefits it has secured under this Agreement, with the expenses for such transition generally being borne by the party or parties benefiting from the expense. This obligation shall continue for the period of time necessary to accomplish the orderly transition, but shall not continue after December 31, 2007 (the "Transition Period"). The transition shall anticipate the following obligations and conditions:

(a) Transition Agreement. At Closing, the parties shall execute and deliver the Transition Agreement attached hereto as Exhibit E. As to transition matters, any conflict between this Agreement and the Transition Agreement, the terms of the Transition Agreement shall control.

(b) Personnel. Promptly after the announcement of this transaction to the employees of Upland, Upland shall request from each employee his/her consent to release to Buyer the employee's resume and current salary information. Upland shall not release such information to Buyer for any employee that does not consent to such release. For those consenting employees, Buyer may interview such employees upon 24 hours notice to Sellers. Should Buyer wish to make an offer to that employee, Buyer shall consult with Sellers prior to making such an offer, in order that Buyer and Sellers may reasonably agree as to the most convenient date for which the employee would no longer be an employee of Upland and would be hired by Buyer.

(c) File Access. After Closing, Buyer shall provide Sellers reasonable access during normal business hours to files and records that Sellers reasonably needs in order to comply with its obligations under this Agreement and to respond to audits and/or litigation or arbitration proceedings. Buyer agrees to maintain the records of Upland for a period of three years after Closing, except that Buyer agrees to maintain Upland's Tax records for so long as the period of limitations for the assessment of any Taxes related to such records has been extended. If Buyer elects to destroy any such records, or any portion thereof, it shall notify Sellers prior to such destruction and provide Sellers with an opportunity to take possession of the same.

(d) Field Operations. At Closing, Buyer shall take over supervision of the field operations for the Ownership Interests. If Buyer is unable to take over such supervision, Buyer may request that Sellers continue to supervise such activities.

(e) Marketing. Between the date of this Agreement and Closing, Buyer and Sellers shall coordinate the nominations of natural gas and shall further reasonably cooperate with one another as deemed necessary by Buyer regarding the marketing, gas control and contract

administration activities necessary in order to sell Hydrocarbons from the Oil and Gas Interests after Closing.

(f)     Land and Accounting Functions.  Buyer may request that Sellers after Closing continue providing land and lease administration activities, such as lease administration and division orders, and maintain all land, lease and other records, and provide associated services, pay rentals, shut-in payments and other lease payments. Buyer may request that Sellers after Closing continue providing accounting functions such as royalty and other lease payments, payment of accounts payable, collection of accounts receivable, computation and payment of severance and other taxes based on production, gas balancing, and general ledger and financial reporting activities.

(g)     Employee Contacts.  Sellers and Buyer shall designate certain employees to contact for the coordination of activities required in order to have an orderly transition of the business of Upland to Buyer.

[Remainder of Page Intentionally Left Blank]

894

APPENDIX B - Page 50

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized Representatives, on the date first written above.

SELLERS:

_____
BAILEY PEYTON

GEORGE BAILEY PEYTON IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1

By: _____
Name: BAILEY PEYTON
Title: Trustee

UPLAND:

UPLAND RESOURCES, INC.

By: _____
Name: Bailey Peyton
Title: President

BUYER:

CORDILLERA ENERGY PARTNERS III, LLC

By: _____
Name: George H. Solich
Title: President

SIGNATURE PAGE TO STOCK PURCHASE AND SALE AGREEMENT

CONFIDENTIAL     APACHE001180

895

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized Representatives, on the date first written above.

SELLERS:

_____

BAILEY PEYTON

GEORGE BAILEY PEYTON IV 2007 GRANTOR RETAINED ANNUITY TRUST NO. 1

By:     _____
Name:  _____
Title:   Trustee

UPLAND:

UPLAND RESOURCES, INC.

By:     _____
Name: Bailey Peyton
Title:   President

BUYER:

CORDILLERA ENERGY PARTNERS III, LLC

By:     _____
Name: George H. Solich
Title:   President

SIGNATURE PAGE TO STOCK PURCHASE AND SALE AGREEMENT

CONFIDENTIAL     APACHE001181

896

# EXHIBIT A

## CAUSE NO. 12,021

| | | |
|---|---|---|
| AMARILLO PRODUCTION COMPANY, | § | IN THE 31st DISTRICT COURT |
| A Texas Corporation | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | IN AND FOR |
| | § | |
| UPLAND RESOURCES, INC., | § | |
| A Texas Corporation | § | |
| | § | |
| Defendant | § | WHEELER COUNTY, TEXAS |

### COMPROMISE SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS

This COMPROMISE AND SETTLEMENT AGREEMENT AND RELEASE OF ALL CLAIMS ("Agreement") is entered into by and between Amarillo Production Company, Paul A. Clark and Ronald Nickum (hereinafter referred to as "Plaintiff") and Defendant Upland Resources, Inc. (referred to as "Defendant") each of whom stipulates and agrees to the following:

### I. RECITALS

A. WHEREAS the Plaintiff filed suit against Defendant in Cause No. 12,021, pending in the 31st District Court in and for Wheeler County, Texas ("Litigation");

B. WHEREAS all provisions of this Agreement are contractual in nature, and not mere recitals;

C. WHEREAS the Parties understand that this Agreement constitutes the final agreement contemplated in the Settlement Agreement and Rule 11 Agreement executed on October 23, 2007;

D. WHEREAS this Agreement, and the execution thereof, does not, and is not intended to be, an admission of fault or wrongdoing by any party, and all Parties expressly disclaim any liability to any other party; and

E. WHEREAS the Parties desire to reach a full and final settlement and resolution, have agreed to compromise and settle the Litigation, including any and all claims relating to any right or damage of any kind or character whatsoever by the Plaintiff against Defendant, whether now known or unknown, whether asserted in the above-styled and captioned lawsuit or not. This includes claims which the Plaintiff's affiliates, owners, subsidiaries or any other party in privity with the Plaintiff has or may have against Defendant and its respective subsidiaries, affiliates, officers, directors, insurers, agents, servants, employees, representatives and attorneys, whether

DEPOSITION EXHIBIT
#16

420

CONFIDENTIAL APACHE001046

**APPENDIX C - Page 1**

herein named or not, for any damages, of any kind or character whatsoever, arising out of or related to the acts and omissions alluded to in the Plaintiff's pleadings in the Litigation.

F.    WHEREAS the Parties understand that this Agreement contains the entire agreement of the Parties and the Parties warrant and represent that no promise or agreement not herein expressed has been made by any other party herein and that this Agreement is not executed in reliance upon any statement or representation made by any party not expressly contained herein.

## II.    SETTLEMENT AND RELEASE

NOW, THEREFORE, in consideration of the mutual agreements, covenants, representations, stipulations, releases and terms contained in this Agreement, the sufficiency of consideration is hereby mutually acknowledged, the Parties to this Agreement agree as follows:

1.    **Release of Defendant.**    In return for the consideration outlined below, the Plaintiff hereby **releases, acquits and forever discharges** Defendant and its respective subsidiaries, affiliates, officers, directors, insurers, agents, servants, employees, representatives and attorneys, whether herein named or not, of and from any and all actions, claims, obligations, demands or lawsuits whatsoever, which the Plaintiff now has or hereinafter may have on account of or in any manner arising out of or relating to the damages, matters and allegations set forth, alleged or alluded to or which might have been set forth, alleged or alluded to by the Plaintiff in its pleadings filed in the Litigation and to which reference is made, including the consequences of such damages, including any attorneys' fees, costs or interest, directly or indirectly, by reason of any damages sustained by the Plaintiff, it being the express intent of the Plaintiff to release Defendant.

2.    **No Admission of Liability.** This Agreement is a compromise and settlement. It is specifically understood and agreed by the Parties that the execution of this Agreement is not an admission of liability on the part of any person or entity, liability being expressly denied. By entering into this Agreement, the Parties do not admit any legal or factual position or allegation that is or may be asserted in any pending or future action or matter, or any liability, fault or wrongdoing of any nature or kind whatsoever.

3.    **Dismissal With Prejudice.** As consideration, it is agreed and understood that the attorneys for the Parties will execute on behalf of the Parties the Agreed Motion to Dismiss with Prejudice and an Agreed Order of Dismissal with Prejudice of the Litigation, as styled above and as attached to this Agreement as Exhibit A. The attorneys will execute the Motion and Order contemporaneously with the execution of this Agreement. The Litigation shall be dismissed with prejudice as to all causes of action alleged or which could have been alleged therein by the Plaintiff and its respective affiliates, officers, directors, agents, insurers, servants, employees, representatives and attorneys, whether herein named or not, by entry of an appropriate order.

APPENDIX C - Page 2

4. **Settlement Payment.** Within ten days of Plaintiff's compliance with the Plaintiff's obligations contained herein, Defendant shall pay to Amarillo Production Company **THREE HUNDRED TWENTY THOUSAND DOLLARS ($320,000.00)** paid to the order of "Amarillo Production Company." This payment will be proportionately reduced if Plaintiff is unable to deliver the Top Leases, as hereinafter defined, covering an undivided 100% of the mineral interest. Plaintiff is responsible for any and all bonus payments due or to become due to Lessors under the Top Leases.

5. **Attorneys' Fees, Expenses & Costs of Court.** The Parties agree that they shall each bear their own attorneys' fees, expenses and costs of court, and that this Agreement includes and releases any right to claim or recover such attorneys' fees, expenses and costs of court.

### III. SPECIAL TERMS

6. **Prior Lease.** Subject to the provisions of paragraph 7 herein, the Defendant agrees that it will release the prior Leases that are the subject of the Litigation. The release is attached to this Agreement as Exhibit B.

7. **Top Leases.** The Plaintiff agrees that it will assign to Cordillera Energy Partners III, LLC or Defendant's designee the Top Leases, attached to this Agreement as Exhibit C. The Top Leases will be the form that was provided to Defendant at the meeting on October 23, 2007. The Top Leases will be assigned free and clear of all liens and encumbrances of any kind, provided that the Plaintiff will retain a five percent ORRI and the Plaintiff will assign a two percent ORRI to Peyton Oil & Gas or its designee. The reservation and assignment is attached to this Agreement as Exhibit D. It is agreed that no Top Lease applies to the mineral interest of Jim Tom Higgins, and that the Oil, Gas and Mineral Lease dated August 28, 1986, and recorded at Volume 353, Page 732, Deed Records of Wheeler County, Texas, will remain in full force and effect as to his undivided interest in the East Half of Section 42, Block A-3, H&GN Survey, Wheeler County, Texas, owned and leased by him, but only as to his interest, and the lease, insofar as it covers that interest, is reserved in all of its terms, covenants and conditions to Upland Resources, Inc. and is not and will not be released herein.

8. **Pooling.** The Plaintiff has caused all Lessors to execute a stipulation of a pooling agreement that recognizes that the current production holds the Top Leases as to 640 acres to a depth of 50 feet below the base of the lowest producing horizon. In the event Lessors or any of them do not ratify or stipulate as referenced, Defendant may terminate this Agreement. The stipulation is attached to this Agreement as Exhibit E.

9. **Smith Lease.** The Plaintiff agrees that they will not, directly or indirectly, take or attempt to take any leases with the mineral owners of the Smith Lease covering Section 41, Block A-3, H&GN Survey, Wheeler County, Texas.

10. **Proportionate Reduction of ORRI.** Plaintiff agrees to assign to Defendant a two percent ORRI in the Top Leases in question. The Parties understand that ORRI owners under the prior lease will lose their interests. However, Plaintiff agrees that they will share on a proportionate basis any reduction in retained override if such owners make a claim and the prior ORRI owners recover any interest. The Parties understand that Defendant has a two percent ORRI and the Plaintiff will have a three percent ORRI, and that any reduction shall be shared on that basis. It is agreed, however, that Plaintiff and Defendant may jointly or separately defend any action brought by third parties for recovery of overrides under the prior lease or leases, and may jointly or separately settle or try any such cases. If either Defendant or Plaintiff separately settles or tries any such action, its override shall be reduced by the amount of override recovered, if any, by any such third party without proportionate reduction. Only if the Plaintiff and Defendant both settle or try such an action and lose will their override will be proportionately reduced.

## IV. CONFIDENTIALITY AGREEMENT

11. **Confidentiality Provision.** In consideration of the mutual covenants, the sufficiency of which is hereby acknowledged, the Parties agree that the terms of this Agreement, including the fact that the Plaintiff received payment from Defendant, shall be kept forever confidential and shall not be revealed by either Party or any of their attorneys to any person, party or individual, other than their attorneys and co-counsel, and, if necessary, accountants. The Parties agree that, should revelation of the terms of this Agreement become necessary for compliance with court order, it will give the other Party notice of such requirement as soon as practicable. It is expressly agreed by the Parties that this confidentiality covenant constitutes a material component of this Agreement. It is agreed, however, that either party may furnish information concerning this settlement to their tax or financial professional in connection with their internal tax and financial affairs.

## V. ADDITIONAL TERMS

12. **Authorship of Agreement.** This Agreement was drafted jointly by the Parties and their respective legal counsel, and is not to be construed or interpreted against any of the Parties on the grounds of sole or primary authorship.

13. **Authority and Non-Assignment.** As part of the consideration of this Agreement, the Parties expressly represent and warrant to each other that they are legally competent and authorized to execute this Agreement. Each of the Parties represents and warrants to the other that it has not sold, assigned, granted, or transferred to any other person or entity any claim, counterclaim, demand, action,

APPENDIX C - Page 4

or cause of action encompassed by this Agreement and that it is the real party in interest.

14. **Modification or Alteration of Agreement**. This Agreement may not be modified, altered, revised, supplemented, or changed in any way, unless said change be evidenced by a single writing that is executed by all Parties to this Agreement or their heirs, successors, or assigns.

15. **Headings.** The headings used in this Agreement are inserted solely for convenience and shall not be used to interpret the meaning of this document.

16. **Counterparts.** This instrument may be executed in multiple original counterparts, each of which shall be deemed an original for all purposes. No single counterpart of this Agreement need be executed by all of the Parties, so long as each of the Parties shall have executed at least one counterpart. Facsimile signatures shall be valid.

17. **Governing Law, Venue and Jurisdiction.** The rights and liabilities of the Parties under this Agreement shall be governed as to validity, interpretation, enforcement, effect and damages by the laws of the State of Texas, without regard to any rules, statutes, or case law regarding conflicts of law. Potter County, Texas shall be the appropriate and exclusive venue for any suit arising out of this Agreement.

19. **Entire Agreement.** This Agreement contains the entire agreement and all understandings between the Parties relating to the resolution of the Litigation, and supersedes any and all prior agreements, arrangements, or understandings of whatever nature between the Parties.

20. **References.** References herein to the singular or plural shall be deemed to include the other unless the circumstances eliminate such inclusion.

21. **Effective Date of Agreement.** With the exception of the Confidentiality Provision referenced in Section IV above, this Agreement is effective the first day that the Agreement bears the signature of all Parties and their representatives.

22. **Binding Agreement. All of the terms of this Agreement shall be binding upon the Parties' heirs, successors, and assigns. This agreement is intended to be fully binding and is not revocable. Any party who unsuccessfully seeks to void, invalidate, or set aside this Agreement shall be liable for attorneys' fees and court costs incurred by opposing Parties in connection therewith.**

EXECUTED this 31st day of October, 2007.

Amarillo Production Company

By: _____

Paul A. Clark, Individually and as President
of Amarillo Production Company

_____

Ronald Nickum, Individually and as Counsel
For Amarillo Production Company

Upland Resources, Inc.

By: _____

Bailey Peyton, President

As to form:

_____

Jeffrey Shrader
Christopher L. Jensen
Attorneys for Upland Resources, Inc.

451620.1
8902.2

CONFIDENTIAL APACHE001051

APPENDIX C - Page 6